<pre>
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,           )
                                         )
 5            Plaintiff,                  )
                                         )
 6        v.                              )
                                         )  Criminal Action No.
 7   KINGSLEY R. CHIN,                    )  1:21-cr-10256-IT
     ADITYA HUMAD, and                    )
 8   SPINEFRONTIER, INC.,                 )
                                         )
 9            Defendants.                 )
                                         )
10   _____

11

12       BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

13

14                        MOTION HEARING

15

16                   Thursday, March 28, 2024
                          10:05 a.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 9
     One Courthouse Way
22   Boston, Massachusetts

23
     Robert W. Paschal, RMR, CRR
24   Official Court Reporter
     rwp.reporter@gmail.com
25
</pre>

1                    **A P P E A R A N C E S**

2

3    On behalf of the Government:

4        UNITED STATES ATTORNEY'S OFFICE
         BY:  ABRAHAM R. GEORGE
5            PATRICK M. CALLAHAN
             CHRISTOPHER R. LOONEY
6        One Courthouse Way
         Suite 9200
7        Boston, MA  02210
         (617) 748-3152
8        abraham.george@usdoj.gov
         patrick.callahan@usdoj.gov
9        christopher.looney@usdoj.gov

10

11   On behalf of the Defendant Kingsley R. Chin and
     SpineFrontier, Inc.:

12       POLLACK SOLOMON DUFFY LLP
         BY:  BARRY S. POLLACK
13           JOSHUA L. SOLOMON
         31 St. James Avenue
14       Suite 940
         Boston, MA  02116
15       (617) 439-9800
         bpollack@psdfirm.com
16       jsolomon@psdfirm.com

17

18   On behalf of the Defendant Aditya Humad:

19       FICK & MARX LLP
         BY:  WILLIAM W. FICK
20           DANIEL N. MARX
         24 Federal Street
21       4th Floor
         Boston, MA  02110
22       (857) 321-8360
         wfick@fickmarx.com
23       dmarx@fickmarx.com

24

25

**P R O C E E D I N G S**

1

2          (In open court at 10:05 a.m.)

3          THE DEPUTY CLERK:  United States District Court is

4    now in session, the Honorable Judge Indira Talwani presiding.

5          This is Case Number 21-cr-10256, United States v.

6    Kingsley R. Chin, Aditya Humad, and SpineFrontier, Inc.  Will

7    counsel please identify themselves for the record.

8          MR. GEORGE:  Good morning, Your Honor.  Abraham

9    George for the United States.

10          THE COURT:  Good morning.

11          MR. CALLAHAN:  Good morning, Your Honor.  Patrick

12    Callahan, also for the United States.

13          THE COURT:  Good morning.

14          MR. LOONEY:  Good morning, Your Honor.  Chris

15    Looney, also for the United States.

16          THE COURT:  Good morning.

17          MR. POLLACK:  Good morning, Your Honor.  Barry

18    Pollack on behalf of Dr. Kingsley Chin and SpineFrontier,

19    Inc.

20          THE COURT:  Good morning.

21          MR. SOLOMON:  Good morning, Your Honor.  Joshua

22    Solomon, also on behalf of Dr. Chin and SpineFrontier.

23          THE COURT:  Good morning.

24          MR. FICK:  Good morning, Your Honor.  William Fick

25    for Mr. Humad, who is here with us.

1            THE COURT:  Good morning.

2            MR. MARX:  Good morning, Your Honor.  Daniel Marx

3    for Mr. Humad.

4            THE COURT:  Good morning.

5            Okay.  I have these three motions, and I have

6    another hearing at 11:00, so we're going to try and get

7    through whatever we can, and I may be going back and

8    re-reading some of these things as we work our way through.

9            I'd like to start with the motion to dismiss

10    Count 8.

11            MR. SOLOMON:  That would be me, Your Honor.

12            Does Your Honor -- it's been a while since I've

13    been live here.  Does Your Honor have a preference for the

14    lectern or here?

15            THE COURT:  Whatever anyone wants to do is --

16            MR. SOLOMON:  Thank you.

17            THE COURT:  -- fine.

18            MR. SOLOMON:  Well, thank you, Your Honor.

19            Again, Joshua Solomon on behalf of SpineFrontier

20    and Dr. Chin.  This motion is also brought on behalf of

21    Mr. Humad as well.

22            The primary issue that this motion to dismiss the

23    money laundering count raises is whether the money laundering

24    charge adequately separates the alleged money laundering

25    scheme and the conduct behind that scheme from the alleged

1    underlying kickback charges.

2         And the problem with the indictment as charged is

3    particularly well illustrated by paragraph 44 of the

4    indictment, which is really the substantive paragraph for

5    this count.  And it alleges that money was transferred from

6    SpineFrontier to IME for the purpose of paying bribes and

7    that that money that was transferred was the proceeds of

8    those bribes.  And it's that structure of the charge that

9    gives rise to the so-called merger problem that our motion

10    has raised.

11         The government's opposition to the motion contains

12    quite a bit of argument about general principles; in,

13    particular, principles regarding double jeopardy.  But it

14    largely allides over the way the prosecution in this case --

15    somewhat unusually in sort of an odd framing of the count --

16    chose to actually charge the money laundering count.

17         And it's important to keep in mind in that regard

18    as I go through this -- and I'll say more about this in a

19    minute -- that this is not a promotional money laundering

20    charge.  This is a concealment-only money laundering charge.

21         THE COURT:  I think I'd like to start with that

22    point and pose a question here to the government.  They do

23    make that distinction, and then you respond and argue that

24    much of their legal argument falls out since it's not a

25    promotional count.

1              Is there any dispute that the only -- the only

2    aspect of money laundering we're talking about here is

3    concealment?

4              MR. LOONEY:  No.  We're talking about concealment

5    money laundering.  That's clear.

6              THE COURT:  Okay.  So then my question turns to you

7    on the concealment aspect, which is -- or, well, with your

8    whole argument, which is do I need to make my way -- should I

9    be starting with the constitutional arguments that you're

10   raising, or should I be starting with your argument that the

11   concealment allegations are insufficient?

12             MR. SOLOMON:  I -- well, I think there are two, in

13   a sense, alternative arguments.  Either could be a ground on

14   its own for dismissal, and I'm happy to start wherever

15   Your Honor would prefer.

16             THE COURT:  So let's start with the concealment --

17             MR. SOLOMON:  Sure.

18             THE COURT:  -- how you view the concealment

19   allegation as insufficient.

20             MR. SOLOMON:  Yes.  This is -- as I mentioned in

21   the beginning, this is sort of an odd indictment in a couple

22   ways.  One is what I mentioned, that they -- they allege that

23   the -- that the money was transferred for the purpose of

24   paying bribes, which would normally be the way you would

25   frame a promotional money laundering, because you say you're

1          taking the proceeds from one crime and trying to promote
2          another.  But that's not -- while they plead it that way,
3          they don't claim promotional money laundering.
4                    But the other aspect is that there simply was no
5          concealment.  And there are matters of public record,
6          literally hundreds of disclosures in SpineFrontier's own
7          name, things the Court can take judicial notice of because
8          they're on a public government website from public sources.
9                    We've included the material with the motion to
10         dismiss Counts 1 through 7, which Mr. Pollack is going to get
11         into in more detail.  But SpineFrontier actually disclosed in
12         its own name and not in IME's name ever that -- and the
13         government doesn't contest this.  They didn't contest it in
14         our meet-and-confers.  They don't contest it in their
15         opposition.  The disclosures were made.
16                    So put most simply, there was not any concealment,
17         yet this is --
18                    THE COURT:  Well, the disclosure that they're
19         taking about here is not -- the concealment they're talking
20         about here isn't concealing that SpineFrontier sometimes paid
21         doctors.  Their charge is that SpineFrontier paid IME to pay
22         doctors, and that wasn't disclosed.
23                    MR. SOLOMON:  Well, no, I believe what their charge
24         is, is that SpineFrontier used IME to conceal the fact that
25         SpineFrontier was the one making the payments.  That's what

1    the indictment --

2            THE COURT:  But the money -- yes.  As to the

3    payment -- they're not saying as to every single payment

4    SpineFrontier ever made, but as to the payments made by IME,

5    that was SpineFrontier using IME, concealing payments to IME

6    that were going to go to the doctors.

7            MR. SOLOMON:  And those payments, the ones that

8    went through IME, were fully disclosed as originating with

9    SpineFrontier.  And I don't think they contest that.

10            THE COURT:  Is that true?

11            MR. LOONEY:  They weren't disclosed -- there were

12    Sunshine Act disclosures made about those.

13            THE COURT:  Wait, wait, wait.  There were Sunshine

14    Act disclosures made about payments that SpineFrontier paid

15    to IME?

16            MR. LOONEY:  Paid to doctors --

17            THE COURT:  No, I'm not --

18            MR. LOONEY:  -- through IME.

19            THE COURT:  Oh.

20            MR. LOONEY:  Yeah.  But IME is this dummy, shell

21    organization, whose sole purpose was so that --

22            THE COURT:  Now I'm really confused.  So I had

23    understood the papers to say that some of the time

24    SpineFrontier was disclosing under the Sunshine Act payments

25    it was making to surgeons; and some of the time, IME was

1    disclosing payments made to surgeons, but at no time was

2    SpineFrontier disclosing that it was the one that was the

3    entity behind the IME payments.  Or at least it wasn't

4    disclosing its relationship.

5              But are you saying that SpineFrontier was making

6    disclosures of the payments that IME was paying to doctors?

7              MR. LOONEY:  Yes.  And so the money went from

8    SpineFrontier to IME to doctors.  Those were disclosed as

9    payments from SpineFrontier to doctors.

10             IME was this dummy organization put in place, and

11   what we expect the evidence will show is that SpineFrontier

12   and its representatives told the doctors IME is there to

13   protect you from disclosures.

14             THE COURT:  Right.  And the letters say that; IME

15   is there to protect you, the doctor, from the notion that

16   you're getting paid by the manufacturer of this device.  They

17   told that to the doctors, and so I'm not here challenging

18   your AKS charges.

19             The question is:  What's the concealment that makes

20   up the money laundering charge?

21             MR. LOONEY:  It --

22             THE COURT:  And I thought your argument was they

23   were concealing -- the money laundering was, in your view,

24   taking -- being secret about money coming from SpineFrontier

25   to IME, and you're saying that's not the concealment.  So

1    tell me what the concealment is, because I'm not following

2    it.

3              MR. LOONEY:  The concealment conspiracy is that

4    they told -- held out to doctors that they would -- that --

5              THE COURT:  That they would get away with -- they

6    wouldn't get in trouble for what's happening.

7              MR. LOONEY:  Yes.

8              THE COURT:  But that's not money laundering.

9              MR. LOONEY:  Well, that will conceal the nature,

10    the source, the ownership that these are SpineFrontier funds

11    because we're making them appear to be IME funds that are

12    going to the doctors.

13             THE COURT:  So, as you all know, I don't come to

14    this job with an extensive background in criminal law, so I'm

15    just making my way through this.  But my understanding of

16    what we're talking about with money laundering is that

17    someone has unlawful proceeds.

18             MR. LOONEY:  Yes.

19             THE COURT:  And because they have unlawful

20    proceeds, their -- but they want to use their unlawful

21    proceeds, and so they do various things to hide the use of

22    their unlawful proceeds so that those unlawful proceeds

23    aren't being tracked to the unlawful activity.  That's what

24    I -- that's my very simplistic understanding of money

25    laundering.

1           I don't get how this falls under that.  And maybe

2   my simplistic understanding of money laundering is wrong, so

3   feel free to push that, but --

4           MR. LOONEY:  I think there are two issues that are

5   two factual or sufficiency issues at play.  One is whether

6   the funds are proceeds, which is the merger issue; and then

7   one is whether there is an act of concealment.  Is that --

8           THE COURT:  My question is:  Don't you have to have

9   an act of concealment of unlawful gains?

10          MR. LOONEY:  Yes.  Absolutely.

11          THE COURT:  So it's both sides of it.  It's not --

12  so that's my question.  What's the concealment of unlawful

13  gains?  I hear where they're saying, "Hey, Doc, we're going

14  to tell the outside world we're separate entities, and that

15  will protect you."  That seems to me pretty bad evidence for

16  them as to what kind of an arrangement they were setting up.

17  I get why that is relevant and of issue in the AKS.

18          I just don't understand how that means that they're

19  conceal- -- and I don't really quite get how you're going to

20  show that the money that's going -- I mean --

21          MR. LOONEY:  So IME is set up.  It is -- it was

22  held out as an independent entity, that it was a third party,

23  that this is all arm's length, when, in fact, it was just a

24  dummy corporation with no function other than SpineFrontier

25  could put money in there, and then that company could

1    transfer the money to the doctors.

2            THE COURT:  Right.  Clearly understand why --

3            MR. LOONEY:  And doctors could then say, "We're

4    receiving money -- the source of this money, the ownership is

5    IME.  We're not receiving money from SpineFrontier."  So the

6    doctors were able to say -- it was -- concealed the fact that

7    they were receiving money --

8            THE COURT:  Right.

9            MR. LOONEY:  -- from IME.

10           THE COURT:  Concealed the fact that they were part

11   of a conspiracy here to get -- I understand that part of your

12   theory.

13           MR. LOONEY:  Concealed the source and the ownership

14   of the funds.

15           THE COURT:  But not the -- concealing that the

16   funds are illegal.

17           MR. LOONEY:  I don't think it has to conceal that

18   the funds are illegally gained.  The transaction has to

19   involve --

20           THE COURT:  Well, does the transaction have to

21   involve illegal funds?

22           MR. LOONEY:  It definitely has to involve illegal

23   funds.

24           THE COURT:  Okay.  And here are you saying the

25   problem here is that once this circle starts, therefore,

1   every transaction after the circle starts must have funds

2   that are unlawfully gained?

3           MR. LOONEY:  I think that's something -- we will

4   have to show that the funds transferred to IME were proceeds,

5   and that's a factual question about what we'll have to show.

6           But I think -- so I think it falls squarely within

7   the cases, and I want to walk through them.  I don't know if

8   it's my turn now, but -- so you can have multiple phases

9   of --

10          THE COURT:  You can sit down.

11          MR. LOONEY:  -- of an illegal arrangement.  So --

12          THE COURT:  But, remember, on those cases -- I will

13  go back and read all of those cases -- are any of them

14  concealment cases?  Are all of them concealment cases?

15          MR. LOONEY:  Very few are concealment cases on

16  either side --

17          THE COURT:  Okay.

18          MR. LOONEY:  -- because there is -- there is almost

19  never a double jeopardy merger problem with concealment

20  because it has an additional element.

21          THE COURT:  I'm not worried right now about the

22  double jeopardy.  I'm worried whether you've alleged the

23  elements.

24          MR. LOONEY:  The money laundering.

25          THE COURT:  That's my problem.

1        MR. LOONEY:  Yeah.  I think we've probably alleged
2   it because we've said they've taken proceeds from their
3   scheme.  When they are realized proceeds -- that is from, you
4   know, paying a bribe to a surgeon, the surgeon used
5   SpineFrontier products, the hospital buys new products,
6   SpineFrontier gets revenue -- that money at that point is
7   unlawful proceeds.
8        They used those proceeds to pay further bribes.
9   And that fits very comfortably within the proceeds definition
10  used by a lot of the cases they rely on, like
11  *United States v. Cloud*.  It's a mortgage scheme.
12       There, there was multiple substantive counts, and
13  the Court said these are not proceeds because you're paying
14  the expenses of the original underlying offense.  But then
15  they went on to say, for the conspiracy, the -- we're going
16  to firm the counts because there's a lot of evidence that a
17  person committed mortgage fraud, realized proceeds, kept the
18  money in the account, and then used that to purchase the next
19  set of properties, to engage in the next set of offenses.
20       And so that proceeds element, it's a factual
21  question of what the evidence will show.  Will we be able to
22  show that -- you know, if they used clean, untainted money
23  for each subsequent round, then you could convict on the AKS
24  without convicting on the money laundering charges.  We'll
25  have to show that they're taking the proceeds from the

1    kickbacks --

2           THE COURT:  Okay.  So that's the proceeds part.

3    And now the concealment part, they're not concealing it from

4    the doctors.  They're telling the doctors, "We've creating

5    this" -- by your allegations here, they're telling the

6    doctors that "We've created this thing so you can get away

7    without an AKS violation here," or Stark law violation or

8    whatever it was going to be, or your Sunshine obligations.

9    But you can get away with those things, but they're telling

10   them there's no concealment.

11          MR. LOONEY:  No, I think the whole purpose of --

12   that's why IME existed.  I mean --

13          THE COURT:  Well, it consisted so you could commit

14   these AKS violations, but it wasn't -- it doesn't -- IME

15   isn't created so that you could hide the illegal proceeding.

16          MR. LOONEY:  But the -- but it concealed the

17   nature, you know --

18          THE COURT:  And that's the question.  Is concealing

19   the nature of another crime what the money laundering statute

20   is getting at, or is concealing that the proceeds are

21   unlawfully obtained what the money laundering is getting at?

22          MR. LOONEY:  I think -- and -- that it is -- the

23   defendant has to know that they are proceeds of unlawful

24   activity, and which we've alleged; and then the purpose has

25   to be conceal the ownership, a source of those funds.

1          THE COURT:  Okay.

2          MR. LOONEY:  So it doesn't have to necessarily

3    conceal an act of concealing the crime; it has to be an act

4    of concealing the --

5          THE COURT:  The unlawful nature of --

6          MR. LOONEY:  -- the ownership of the funds.

7          THE COURT:  The ownership or the unlawful nature?

8          MR. LOONEY:  I believe it's ownership of the funds.

9          THE COURT:  Okay.  So any time somebody is using a

10   shell corporation, you have a money laundering issue then?

11   You're concealing who's the seller.

12         MR. LOONEY:  As long as the person knows that the

13   fund -- that they're doing transactions in unlawful funds and

14   then they move it through a bunch of things, you know, so the

15   government couldn't seize it.

16         THE COURT:  Okay.

17         MR. LOONEY:  They may not be disclosing the

18   underlying illegality.  They're disguising where the funds

19   are and who owns it.

20         THE COURT:  Okay.  I'll go back and read the cases,

21   which I have not yet had a chance to do, and make sure I'm

22   not heading in the wrong direction on this.  But let me just

23   ask you just a couple of questions in just terms of sort of

24   where I make the decision here and when I make the decision.

25         It is true that generally there's an allegation of

1    fact there; I leave that to trial.  But to the extent this

2    seems to me more of a legal issue, what you can count in the

3    bucket and what you can't, isn't it the case that if I find

4    on that legal question for the defendant now, that gives you

5    an opportunity to challenge it on the appeal, whereas if I

6    find after trial then -- or after you've presented your case,

7    then you're kind of stuck on it, so that in terms of -- to

8    the extent that this is kind of a little different than any

9    of the cases out there, and I'm thinking the law supports the

10   defendant, doesn't -- isn't the government in, actually, a

11   cleaner position if I go ahead with that now rather than

12   after you put on your evidence, which seems will be likely to

13   be consistent with -- I mean, I don't --

14          MR. LOONEY:  So I -- I think this is a factual

15   issue.

16          THE COURT:  Uh-huh.

17          MR. LOONEY:  I think the two factual issues are:

18   Is it proceeds?  Was there an act of concealment?

19          THE COURT:  Okay.  And I will go back and look at

20   the case and say, okay, this is purely a factual issue.  But

21   if I think it's actually kind of a legal issue --

22          MR. LOONEY:  It might be -- I think if it's purely

23   a legal issue, I think we prevail, and I think we will

24   prevail on here and should prevail on appeal and --

25          THE COURT:  Okay.  And if it's a purely legal issue

1    and I think they prevail, am I correct that if I do this --

2    if I find for them now, you can, while we're still proceeding

3    and moving things along to trial, you can take this issue up?

4         MR. LOONEY:  Yes, but I would -- I wouldn't -- I'm

5    not advocating that.  That is true that it might make the

6    appeal quicker and a pretrial appeal rather than afterwards

7    and those aspects might be easier in some ways; but I would

8    urge you not to take that course, because I think, both in

9    the law and on the facts, we're squarely on firm ground here.

10        THE COURT:  So I hear --

11        MR. LOONEY:  And I --

12        THE COURT:  I absolutely hear you think you're

13   right on the arguments.  I get that.  I'm really asking you a

14   procedural question.  If I disagree with you as to your being

15   right on the issue --

16        MR. LOONEY:  Yeah.

17        THE COURT:  -- and I think that this is a question

18   of law and I find that the defendant has the better argument,

19   am I correct that that -- my making that finding now would

20   give you an opportunity to test the legal question, whereas

21   if I wait until after you've presented your evidence on it

22   and make that legal ruling, you lose your opportunity to test

23   that legal view?

24        MR. LOONEY:  We would if you made that legal ruling

25   before there was a jury verdict, I think.  So it kind of

1    depends how it plays out.

2    THE COURT:  And if I make it after the jury verdict

3    then -- and I'm right -- I forced the cost --

4    MR. LOONEY:  Of the trial.

5    THE COURT:  -- trial.

6    Okay.  I will go back and read the cases.  We need

7    to talk about the other motions, but that's somewhere --

8    that's where I'm leaning right now, but I will go back and

9    read the cases and make sure I'm not off.

10    Okay.  On Counts 1 through 7, I have a few just

11    sort of housekeeping matters.  There's a footnote from the

12    defendant that the indictment cites a section about

13    soliciting or receiving remuneration, but that they don't

14    think that's what the allegations are about.  Is there any

15    response to that?

16    MR. GEORGE:  Good morning, Your Honor.

17    It's strictly a typo error.

18    THE COURT:  Okay.  And then on the alleged *Brady*

19    act violations and what the government does and doesn't have

20    a duty to do, do we still have a live dispute, or is this

21    just background?

22    MR. POLLACK:  Yes, Your Honor.  The -- it's a live

23    dispute.  The government has obtained selectively some

24    materials from CMS, produced those, but not generally.  And

25    if I can frame what it is, if I heard Your Honor correctly

1    when you started questioning, there was at least some

2    confusion about whether SpineFrontier made some disclosures

3    or all disclosures.

4         I want that to be clear, because CMS is in

5    possession of this, of information nobody else is.  Every

6    payment at issue in this case, whether it involved IME or

7    not, the money originated with SpineFrontier, and

8    SpineFrontier was disclosed as the payor.  And IME was never

9    used for its name as the payor.

10         THE COURT:  Okay.  So --

11         MR. POLLACK:  CMS --

12         THE COURT:  -- let me stop you for a minute.  Why

13   doesn't SpineFrontier also have those records?

14         MR. POLLACK:  Some of them date back to 2013,

15   Your Honor, and I'm going to be frank; from the access I have

16   had, for months I expected to receive in discovery some

17   disclosures being made by IME because that's what the charges

18   said, was that IME was used to evade the reporting

19   requirements -- never got that.

20         We've never been able to ensure we have the full

21   universe.  Plus, CMS holds itself out as triggering certain

22   internal reports of its own approvals and consistency.  And

23   what we expect exists at CMS, and while the government has

24   obtained what it's wanted from CMS, it hasn't obtained what

25   is listed as -- referred to as error reports.

1          We have a list that we've put.  It's four or five

2     topics of reports it's -- CMS maintains that would show that,

3     according to the government, CMS, the alleged victim in this

4     matter, because that's what it's referred to in the related

5     civil case, it self-called these all fine or approved

6     disclosures by SpineFrontier, never hidden that SpineFrontier

7     is a source of the money, as it's alleged, never evading

8     SpineFrontier's reporting -- so we want those reports from

9     CMS.

10          THE COURT:  Let's stick right to the narrow thing.

11          MR. POLLACK:  Yes.

12          THE COURT:  I -- the longer you all deal with me,

13     the more you'll learn I don't like adjectives and just try to

14     get to the facts.

15          Is there a dispute as to whether all of these

16     payments were disclosed?

17          MR. GEORGE:  Your Honor, there's no dispute that

18     SpineFrontier made Sunshine Act disclosures and that, I

19     believe, every payment that's at issue here was disclosed by

20     SpineFrontier.  The dispute is did SpineFrontier disclose to

21     the doctors that IME was not a real company?  That's it.

22          THE COURT:  I understand that.  I understand

23     there's a different -- that you're charging something

24     different than what the defendant is focused on.  I'm just

25     trying to figure out if there's a dispute here.

1          MR. GEORGE:  There is no dispute here, Your Honor.

2    And if I may just add one thing, in the investigation, the

3    government subpoenaed and requested all of this information

4    from SpineFrontier, and it was not produced to us.  And we

5    have now agreed, notwithstanding our legal position that

6    we're not required to do so, to go to CMS and request the

7    information they've asked for.

8          We did produce to them information that was in our

9    position, the litigation team's possession, custody, and

10   control.  They have that now.  And we will be producing more

11   information from CMS.  So on this, I do not believe there is

12   a live dispute.

13         THE COURT:  Okay.  So what I'm going to do on this

14   issue is, if you need to bring a motion to compel, you bring

15   a motion to compel.  But this isn't a basis for dismissal of

16   Counts 1 through 7.

17         So -- and I would say I do appreciate being

18   corrected that -- I was under the impression that there

19   was -- IME payments that went through IME were not being

20   disclosed, and I understand -- I now understand that neither

21   side -- there's no factual dispute about that.

22         But that said, the notion that there can be, as a

23   matter of law, no violation here because the disclosures were

24   made to -- by SpineFrontier, I think you're going too far.

25   You can't get that last part.

1          MR. POLLACK:  I agree with Your Honor on that

2    point.  That's not our grounds for dismissal.  Our grounds

3    for dismissal is that the same way that -- and I realized

4    this even last night and this morning as I was reading

5    through the government's opposition and how it was framed

6    here at one point is that, oh, no, SpineFrontier made some of

7    the disclosures.

8          The grand jury was never told that IME never made a

9    disclosure.  It was never told that SpineFrontier made all

10   the disclosures.  In fact, it was led to believe the contrary

11   by the indictment itself.  The same confusion that we as

12   defense counsel had when first reading the indictment and

13   expecting to see IME -- IME's name used in a disclosure for

14   SpineFrontier payment and the same reaction Your Honor had

15   initially to that, there would be absolutely no reason to

16   think that a -- let me go to the test.  This is not a *Twombly*

17   motion.  We're not saying it's different than the argument

18   that was made about money laundering.

19          This isn't about the sufficiency of the allegation.

20   It's about whether the grand jury was free from substantial

21   influence of misleading testimony.  And it was, Your Honor,

22   because what was presented to the grand jury was that IME was

23   used.  Its name was used for disclosures.  And we know this

24   because, one -- and I have six reasons why, that that was

25   what the grand jury walked away with and why the government's

1    reasons in rebuttal do not actually rebut this.

2         So one of the biggest problems is their reliance at

3    the grand jury on agent summary testimony.  It's been a long

4    time since I've presented a case to a grand jury, but I think

5    I appeared a hundred times; and never once did I -- or when I

6    observed one of my colleagues -- did I ever use an agent to

7    testify there was probable cause that each and every

8    paragraph in the crimes -- they were just essentially saying,

9    Your Honor, standing by paragraph 37, which says IME was

10   operated by the defendants to evade Sunshine reporting

11   requirements.

12        I think we all read that indictment, and it's clear

13   the Sunshine Act is at the center of it and that there was --

14        THE COURT:  To evade the surgeons.

15        MR. POLLACK:  The surgeons' names are used.

16        THE COURT:  To evade their Sunshine Act, their

17   obligations to disclose.  Isn't that --

18        MR. POLLACK:  No.

19        THE COURT:  -- what the allegation is?

20        MR. POLLACK:  The manufacturers have a duty to

21   disclose and identify the doctor.  And they did.  This is

22   what's amazing, Your Honor.  It's -- over -- Mr. Solomon's

23   right.  There's something like 733 in the public record on

24   the website.  There's over a thousand.  This is why this is

25   unlike any other case I've seen.

1          In a failure-to-report type of a case or a

2     concealed reporting case, where the allegation presented to

3     the grand jury is that Mr. Humad, Dr. Chin, and SpineFrontier

4     operated IME to evade sunshine reporting acts, every single

5     payment at issue identified SpineFrontier as the payor and

6     the doctor who received it.  It's -- every one of them.

7          THE COURT:  So --

8          MR. POLLACK:  So there's --

9          THE COURT:  Hold on a minute.

10         I think the one problem with where you're going on

11    this is that the indictment says that they were referencing

12    the payments through IME as a way to avoid Sunshine Act

13    disclosure requirements, but they're not charged with

14    Sunshine Act disclosure requirement failures.  They're

15    charged with paying bribes.

16         MR. POLLACK:  Well, they actually --

17         THE COURT:  And the way -- and so the bribe, if the

18    bribe is I'm giving you money to do this, that's one flavor

19    of the bribe.  If the bribe is I'm giving you money, and

20    don't worry; you don't have to worry about this being a

21    bribe, we're all fine -- wink, wink; nod, nod -- that still

22    is a kickback violation, not a Sunshine Act violation.

23         They've just sweetened the bribe.  They've

24    sweetened the bribe by saying, "Hey, not only are we bribing

25    you, but no one will find out."

1          MR. POLLACK:  So, actually, I look at it a little

2     differently, Your Honor, than sweetening the bribe, is that

3     the government sweetened the evidence because it knew it had

4     to show specific intent and willfulness.  This is a case --

5     nobody is disputing that the contracts between SpineFrontier

6     and these doctors was improper if it was followed, if the

7     doctors actually did the work required of them, right?

8          THE COURT:  If they did the work required.

9          MR. POLLACK:  If they did the work, a

10    hundred percent, Your Honor, if they did -- substantially

11    performed is probably the test; but, yes, if they did the

12    work.

13          And -- but the government knew to indict it needed

14    to show a specific intent from the outset.  They're

15    essentially turning a failure to perform down the road into a

16    specific intent from the beginning.  I mean, that's what they

17    need to show --

18          THE COURT:  If you -- if you -- they are using --

19    they want to draw an inference from the failure to perform

20    down the road, combined with reassurances that you can bill

21    for the same time that you're in surgery; and, wink, we're

22    putting this payment through here so you don't have to worry

23    about the Sunshine Act.  They're saying all of that was to

24    cause the doctors to do it.

25          They're not simply saying, hey, at the end of the

1    day, it turned out the doctors didn't do the jobs that

2    SpineFrontier was anticipating they would.  They're going to

3    have to make that proof, and whether they can do that or not

4    is not in front of me.

5        The question is they're trying to make the proof,

6    and the fact that they set up this IME and they told the

7    doctors, "Hey, doctors, this IME is going to help you avoid

8    any problems here."

9        MR. POLLACK:  I agree with just about all of that

10   in the way I analyzed this as well, we analyzed this as well,

11   Your Honor.  What is different, though, is that I think

12   everyone has to agree there are two very different cases.

13   One where -- one where IME's name was actually used in place

14   of SpineFrontier's name would present a different case.

15       THE COURT:  It would be --

16       MR. POLLACK:  And Your Honor thought that's what

17   this case was from reviewing the papers.

18       THE COURT:  And having now clarified what that

19   difference is, it will certainly be something I will go back

20   and read the indictment now with that in mind.  And, you

21   know, I don't know how much I jump to a conclusion here or

22   not.

23       MR. POLLACK:  But here's what I want Your Honor to

24   think about when you do that:  The grand jury didn't have the

25   benefit of us pointing out the mistake to you, and it's not

1    just a mistake, Your Honor.  It very much changes the nature

2    of the case.  Your Honor took it as the government alleging

3    in that indictment, and the summary testimony by

4    Agent Lambert told the grand jury that there was probable

5    cause to believe they evaded it.

6              And all -- their response is, "No, we told the

7    grand jury through two witnesses that some disclosures were

8    made by SpineFrontier," which Your Honor thought from the

9    beginning of this hearing and we thought, you know, some were

10   made by SpineFrontier and some were made by IME.

11             This grand jury was never informed -- and it was

12   informed actually to the contrary -- it was never informed

13   that IME's name was never used in a disclosure.  So when it

14   viewed this case and tried to decide are we looking at a

15   breach of contract or are we looking at a specific intent

16   offense from the beginning, this grand jury had that same

17   misimpression, Your Honor, that IME's name was used.

18             And nothing that the government has cited is to the

19   contrary.  When they cite to testimony by ████████ and

20   Amanda Dalton --

21             MR. GEORGE:  Your Honor -- Your Honor, this is

22   grand jury testimony.  There's no 6(c).  They should not be

23   naming witnesses in a public open courtroom that testified

24   before the grand jury.  We've talked about this in our

25   filing.  They need to stop.

1          MR. POLLACK:  Real easy.  Ms. Dalton --

2          THE COURT:  So hold on a minute.

3          I think when counsel raises a complaint about using

4     someone's name, the answer isn't to say, "Real easy, let me

5     say the name again."  Please sit down.

6          MR. POLLACK:  Your Honor, she's not a grand jury

7     witness.  She wasn't a grand jury witness.  That --

8          THE COURT:  Okay.  Here's the question.  And

9     just -- I'm sorry.  We have a limited amount of time.

10         Here is the question that I do have for the

11    government.  I maybe read these papers too fast, but I was

12    under the impression after I read these papers that IME was

13    making its disclosures, and SpineFrontier was making its

14    disclosures.

15         Was the grand jury presented evidence as to what

16    IME was doing as to its disclosures or not disclosures?

17         MR. GEORGE:  The grand -- IME never made any

18    disclosures.  The grand jury was never told that it did, and

19    the government has never presented any information that IME

20    ever made any disclosures.  Mr. Pollack --

21         THE COURT:  Okay.  But was -- what was the

22    government -- what was the grand jury told -- give me the sum

23    and substance about what the grand jury was told about

24    disclosures.

25         MR. GEORGE:  Yes, Your Honor.  I can and it's in

1    our papers.  And with respect to the grand jury information

2    that I'm going to talk about, I'm just going to use initials,

3    if that's okay with Your Honor.

4              THE COURT:  That's fine.

5              MR. GEORGE:  The government presented a number of

6    witnesses before the grand jury, including witness S.C.  Her

7    testimony was that she looked at open payments when she was a

8    current employee of SpineFrontier, saw that there was a

9    doctor that she worked with, and that he made, in her mind, a

10   lot of money per SpineFrontier's disclosure in the Sunshine

11   Act.

12             And the point for purposes of this motion is that

13   the government -- me, Your Honor -- presented through this

14   witness documents to the grand jury that showed

15   SpineFrontier's Sunshine Act disclosures.  Another witness

16   testified in CID, and that witness also said that

17   SpineFrontier made Sunshine Act disclosures.

18             So, Your Honor, rather than the government

19   misleading the grand jury, with all due respect --

20             THE COURT:  Okay.  I really don't want to spend a

21   lot of time with everybody making allegations of who's

22   misleading whom.  I'm just trying to get to the facts here.

23   So hold on a minute.

24             MR. GEORGE:  Okay.

25             THE COURT:  I understand in the government's

1    argument that the case isn't about, at the end of the day,

2    Sunshine Act violations.

3              MR. GEORGE:  Correct, Your Honor.

4              THE COURT:  The case is about bribes.  I understand

5    that.

6              MR. GEORGE:  Absolutely, correct, Your Honor.

7              THE COURT:  I'm just trying to figure out -- and I

8    walked in here on this one being prepared to rule for the

9    government on 1 through 7, but I want to make sure, given

10   that I had a misimpression here, trying to figure out if the

11   grand jury would similarly have had a misimpression here as

12   to anything about the Sunshine Act.

13             MR. GEORGE:  No, Your Honor.  It's not possible.

14   And if I could just point you to the indictment, what the

15   indictment says is that as one of eleven subparagraphs of the

16   manner and means just of the conspiracy count, nothing to do

17   with Counts 2 through 7, one subparagraph says one thing that

18   they -- the defendants did is, quote, "holding out IME as a

19   separate and independent entity from SpineFrontier in part

20   and to evade Sunshine Act disclosures," not that they

21   violated the Sunshine Act, not that they failed to make

22   Sunshine Act disclosures, only -- and there's ample evidence

23   of this -- that they held out IME -- and Your Honor mentioned

24   this already -- to doctors as a means to evade Sunshine Act

25   disclosures.

1          And even if we were wrong, despite the literal

2     language, this is one subparagraph of the manner and means of

3     one count.

4               MR. POLLACK:  Your Honor?

5               THE COURT:  Yes.

6               MR. POLLACK:  May I make one point?  I'll say

7     "Dr. C."  And there's a lot of stuff that's in the public

8     record before today, too, and a lot of stuff in the civil

9     case and other cases.  I will say the witness A.D. was not

10    actually a grand jury witness.  She testified pursuant to a

11    CID.  We understand that the government made her -- at best

12    we understand the government would have made her CID

13    testimony, not grand jury testimony, available to a grand

14    jury.

15          So I have two main points I just would like to get

16    to.  One is when the government said it disclosed through

17    exhibits the existence of SpineFrontier making payments,

18    that's with regard to two doctors.  I'm not sure whether I

19    should be using their initials here or their names, but it's

20    Dr. C. and Dr. L., but I'm just -- that two doctors.

21          An exhibit was used from I think it's -- from a --

22    for a certain period of time as to them showing that

23    SpineFrontier made some disclosures of its own payments.

24    That's two as to a lengthy list, not that none was made by

25    IME.

1    And I don't think someone can read paragraphs 37(c)

2    and 37(d) and not have the reaction that Your Honor had or

3    that we had that the government's theory was that IME was

4    used to evade the reporting requirements, and that is just a

5    different nature of the case.

6    And the test isn't *Twombly*, Your Honor.  It's not a

7    *Twombly*-type test of how did it plead?  Are there different

8    grounds?  It's whether the Court can say it's comfortable

9    that the jury was free from substantial influence on the way

10   the case was presented.  And it was presented to suggest --

11   that's the way it reads.  That's the way the probable cause

12   testimony improperly by ███████████████ came across.

13   It was used.

14   They used -- I can't think of his first name.  His

15   last name begins with an A.  They were emails and two emails

16   and one draft letter involving that person.  It's a

17   salesperson.  It's a salesperson suggesting in 2013 and early

18   2014 what's become a central portion of today's discussion

19   that -- to two doctors, a Dr. R. and a Dr. L., that IME could

20   function some way to change what the reporting act reports

21   are.

22   And they never were done that way.  One salesperson

23   makes those comments.  ███████████  testifies --

24   THE COURT:  But I will go back and read these

25   papers again and double-check that I -- where this goes with

1    this different understanding in my mind.  But the bigger part

2    of this, which I think is part of why I didn't make this

3    nuance, is that I do think you're overstating their reliance

4    on the Sunshine Act piece of it.  I think that's a -- it is a

5    part of what they were reassuring the doctors about.

6              MR. POLLACK:  Your Honor, not when it comes to

7    specific intent, Your Honor.  All they had was one

8    salesperson writing a draft that ███████████ -- I'm sorry --

9              THE COURT:  So -- but the finding here at the end

10   of the day for the grand jury is not whether it's beyond a

11   reasonable doubt on specific intent.  The question is whether

12   it was probable cause, right?

13             MR. POLLACK:  And whether or not the finding of

14   probable cause as to specific intent was substantially --

15   could have been substantially influenced by this

16   misimpression created from them.

17             THE COURT:  Okay.  I will go back and review your

18   briefing again on -- with that in mind.  We don't have that

19   much time, and I also want to deal with the attorney-client

20   issue.

21             MR. POLLACK:  The only to make sure -- it's in our

22   reply brief, is with regard to the fact that, because the

23   grand jury investigation lasted, I think, more than three

24   years or about three years, there were definitely multiple

25   grand juries.

1          So when Your Honor reviews these issues to

2     determine whether the government may have given a

3     misimpression or created confusion to the grand jury about

4     the nature of this case and whether IME was actually used for

5     its name to hide SpineFrontier making payments, when, in

6     fact, SpineFrontier made all the disclosures, Your Honor,

7     there were two -- there had to be, by timing, even if there

8     was extension, at least two grand juries.  We've asked for

9     that information.  The government has invoked Rule 6(c) that

10    they can't tell us that.

11         In our reply brief -- and I think it's pages 2 and

12    3 or 3 and 4 -- we list about four or five cases that have

13    found that the government cannot take a shortcut with a

14    second grand jury.  It would have been the second or third

15    grand jury that would have indicted here.

16         So when you think about all the information that

17    would avoid the confusion possibly -- and I don't think what

18    the government has identified does it.  An exhibit that shows

19    two doctors were disclosed --

20         THE COURT:  You need to stop here.  We have other

21    things we need to get to.  I'll go back and read your reply

22    brief carefully.

23         MR. POLLACK:  Thank you, Your Honor.

24         THE COURT:  I want to turn to the last motion -- or

25    maybe it was the first motion, I don't know -- on the waiver

1    of attorney-client privilege or not.  And it seems to be a

2    little bit of sort of a chicken/egg question here of who's

3    saying what about the doctor's letters.

4              So if I have an attorney -- if I have -- somebody

5    sends an attorney letter out into the world for whatever

6    their reason they're doing, at the moment they're sending

7    that attorney letter out into the world, we don't have a

8    waiver of the attorney-client privilege, correct?

9              MR. GEORGE:  As stated, I agree, Your Honor.

10             THE COURT:  Okay.

11             MR. GEORGE:  But I don't think that's the

12   circumstance here.

13             THE COURT:  I know.  I'm just moving very

14   quickly -- very slowly here.

15             So right now -- so they send this letter out, and

16   they send the letter out, in the government's view, as part

17   of their scheme to engage in this bribery scheme.  If the

18   defendants -- and it's your obligation to show specific

19   intent.

20             If the defendants -- if this case were to go to

21   trial and you were to prove your case and put -- try to prove

22   your case, including putting this letter in, the concern for

23   the government is there we have -- we now have an attorney

24   saying this is okay.

25             But when you're doing that, does that have them

1    relying at that stage yet on advice of counsel?

2        MR. GEORGE:  So that's a separate question from

3    waiver, right, Your Honor?  You're talking about whether it's

4    being used as a sword and a shield with fairness.

5        THE COURT:  Okay.  So then back me up a bit.

6        MR. GEORGE:  Yeah.

7        THE COURT:  There's no waiver when you simply use a

8    letter in connection with something.  So you're saying

9    there's something more that's creating a waiver here.  Tell

10   me what you say the waiver is at this stage in the

11   litigation.

12       MR. GEORGE:  Yes, Your Honor.  So at this stage, on

13   the waiver point alone, what the letter says is that, for

14   IME -- and this is Exhibit A to our motion, if you want to --

15   and I have it here if --

16       THE COURT:  I have it.

17       MR. GEORGE:  -- that we have acted as counsel only

18   for IME and, quote, "This letter is intended only for IME and

19   is limited to the attached agreement.  This letter must not

20   be copied or shared with and may not be relied upon by any

21   other person without prior written consent from this law

22   firm."

23       So this is not just -- for instance, they make the

24   analogy to a pleading.  We agree that if a lawyer takes a

25   position in a pleading, that's not a waiver.  If a lawyer

1  takes a conclusory position in a letter, that's not a waiver.

2       But there were underlying communications here, and

3  this letter was intended to be confidential; and when they

4  shared it with the world, despite the language in the letter,

5  they waived the privilege.

6       THE COURT:  Why do you say the letter was intended

7  to be confidential?

8       MR. GEORGE:  Because it says it's for IME only,

9  Your Honor, and it says --

10      THE COURT:  You're making an assumption there.

11      MR. GEORGE:  I'm --

12      THE COURT:  You're leaping to the conclusion that

13  because a lawyer writes -- I mean, I will tell you every

14  single email I've ever received from a lawyer has on the

15  bottom of it "This is confidential and may not be used."

16      MR. GEORGE:  I think that's more in the area of

17  boilerplate.  This is in the literal language of the letter.

18      THE COURT:  So let's assume that the attorney put

19  it in for some various different purposes.  Right now what I

20  have is a letter in -- a statement in a letter that you're

21  saying I must accept for the truth that they were, in fact,

22  of the view that this letter shouldn't be shared, rather than

23  that, as part of this missive that they were creating, they

24  wanted to make it look like a really authentic

25  attorney-client document.

1          MR. GEORGE:  Well, Your Honor, I think you get to

2     an interesting burden question here.  The burden to show the

3     privilege on the letter is theirs.

4          THE COURT:  No.

5          MR. GEORGE:  To show that it's privileged if they

6     wanted to show that it's privileged, which apparently they

7     don't, the burden would be theirs.  We're faced with the

8     burden to show that they waived it.

9          THE COURT:  So the first step is, if you have a

10     letter from an attorney and you hand it out, however you're

11     handing it out, does that mean you have waived the underlying

12     communication?  And I would suggest it's only when you've

13     waived it, when you're using that letter in a way that would

14     then cause the waiver.

15          I mean, you're saying any time an attorney's letter

16     is handed out, all the conversations behind that attorney's

17     letter are waived?

18          MR. GEORGE:  No, I think it depends on the nature

19     of the letter.  And this letter said it was intended to be

20     privileged, and they shared it.  And it's not a pleading.

21     It's not just a conclusory statement.  There's -- they say,

22     "Here's the analysis as to why you're not violating the

23     kickback statute.  And we intended this to be for you only."

24     That sounds like a waiver.

25          Of course, I don't disagree that there are many,

1     many, situations, maybe even the vast majority of the

2     situations, where a lawyer writes a letter and mere

3     disclosure of the letter does not effect a waiver.  I don't

4     think that's the situation.  They are analyzing to their

5     client why they're not violating the anti-kickback statute.

6           THE COURT:  But that happens -- I mean, lawyers

7     write letters all the time to their clients for their clients

8     to then use.  And the question is then at what point are the

9     things underlying it -- and I would suggest that the moment

10    they want to say, "This negates our burden," they've

11    absolutely waived the privilege.

12          But you're saying that the mere fact that the

13    letter comes out, I get there and I differentiate out from

14    every other lawyer letter that's floating around on the

15    grounds that the lawyer marked it as confidential; and,

16    therefore, it has worse ramifications than when the lawyer

17    just wrote to them and didn't mark it as --

18          MR. GEORGE:  Well, Your Honor, we can talk about

19    the second part, but we did cite a case to you that deals

20    with this situation.  It's *Electro Scientific Industries,*

21    *Inc. v. General Scanning, Inc.*, 175 F.R.D 539, and the issue

22    was a patent opinion letter.

23          And the Court said this, quote, "I hasten to

24    emphasize, moreover, that the fact that a party takes a

25    position in a pleading that is consistent with advice that

1    party received in confidence from attorneys is irrelevant to

2    its waiver analysis."  And that's your point, I believe,

3    Your Honor.

4            "A waiver analysis focuses on the disclosure of the

5    content of specific communications between counsel and

6    client, and a pleading would not effect a waiver unless the

7    pleading disclosed specific lawyer-client communications,

8    even if the substance of the pleading tracked what a lawyer

9    had confidentially advised the client," end quote.

10           And I think, if you "substitute opinion letter" for

11   "pleading" in this quote, that is the situation we have here.

12   This is an analysis from these lawyers to their client.  It

13   says they're acting on behalf of their client only --

14           THE COURT:  But --

15           MR. GEORGE:  -- and this is why you will not be

16   violating the kickback statute.

17           THE COURT:  The distinction that I'm making that

18   you're not wrestling with --

19           MR. GEORGE:  I'm trying at least, Your Honor.

20           THE COURT:  I appreciate that.  But the distinction

21   that I'm making is it's when the person is using it in the

22   proceeding that you're engaged in that you now say you're

23   using it; you've waived it.  It's not the dissemination to

24   the world writ large that waives the privilege as to that

25   letter, but to get behind it.

1          MR. GEORGE:  I agree with that, Your Honor.  I'm

2    sorry if I misunderstood.  I think that's clearly the case

3    from the First Circuit's case on this *In re XYZ Corp.*  And

4    the defendant's claim that this is only an extrajudicial

5    disclosure, which I believe is the point Your Honor is

6    making.  But it's not.  They say in their own opposition that

7    they've -- they've mentioned that they're going to be relying

8    on negating willfulness, and so --

9          THE COURT:  I agree with you it's coming up.

10          MR. GEORGE:  It's --

11          THE COURT:  It's only a question of exactly when

12    the timing is here.

13          MR. GEORGE:  But, Your Honor, I submit they already

14    have, because in meet-and-confers with us post indictment,

15    they are telling us they intend to put forward evidence

16    negating good faith.  They have already done that.  They say

17    it on page 4 of their opposition to this motion.  They're

18    already doing it, and it's clear they will continue to do it.

19          THE COURT:  So this is how I propose resolving this

20    issue.  First of all, have you -- what have you done to seek

21    this information other than we are now in this confrontation?

22          MR. GEORGE:  As Your Honor probably knows, the

23    Department of Justice guidelines prohibit us from subpoenaing

24    attorney information without going to the DAG's office, or I

25    forget what the exact approval is.  But we have not issued a

1    subpoena for this information because it's against department

2    policy.

3              But if there's been a waiver and the Court orders

4    that, then that's a different situation.

5              THE COURT:  So the way I would like to proceed is

6    have you -- and if you need to get permission, so be it; you

7    go and try and get the permission -- but assuming you can get

8    permission, that you make the demand for the information,

9    which will be responded by specific objections and a

10   privilege log.

11             And what I am trying to do there is tee up so we

12   have exactly what is at issue so that the moment they put it

13   at issue -- which I agree with you; I anticipate that they

14   are going to -- but at the moment when they do put it at

15   issue, we have the documents here ready to go.  That would

16   seem to me the framework.

17             And I understand that there's a -- you know, the

18   urgency of how you prepare for trial and so forth.  But it

19   does seem to me that is just -- at this juncture, they're

20   sort of able to -- I don't think you can say that the mere

21   fact that that letter was out there and being used for these

22   purposes out there waives it.

23             And I don't think the -- I agree with you that it

24   certainly looks from their papers like this is where they're

25   going to go with it or they may go with it.  But at this

1    point, I don't think we've completely crossed that line.

2              MR. GEORGE:  Your Honor, I mean, I understand you.

3    I submit they have crossed this line, but I understand your

4    position.  And if that's the way you want to go, it would be

5    helpful, as a matter of department policy, to get an order

6    from the Court that says we should issue a subpoena for this

7    information, and they're obligated to respond.

8              THE COURT:  I will -- that's what I will -- that's

9    the way I would intend to do it.  I -- again, on all of this,

10   I'll go back and go through it carefully.  But what I would

11   intend to do is to say the waiver has not yet happened, but

12   there's a high likelihood it will happen.  So let's get it

13   teed up.  You can make your -- issue your subpoena.

14             They can -- I mean, you could also -- they can

15   challenge it as overbroad.  It can be challenged for other

16   reasons.  But I'm focusing on the privilege, that it will

17   need to be responded with a privilege log, and then we will

18   be teed up to resolve the issue in the event that this comes

19   forward.

20             MR. GEORGE:  Thank you, Your Honor.

21             THE COURT:  Any objections from the defendants in

22   proceeding that way?

23             MR. MARX:  No, Your Honor.  And I certainly don't

24   want to steal defeat from the jaws of victory.  But that

25   being said, I do think at some point it would be useful well

1    in advance of trial to further flesh out the question

2    Your Honor started with, which is what happens if the

3    government in its case in chief presents, for example, this

4    letter as part of its case?

5         Does that somehow force the defendants into making

6    an advice of counsel defense and triggering the further

7    obligations?  And I think our position is -- and we're happy

8    to brief this, and I know you have an eleven o'clock to deal

9    with later -- our position would be, no, it doesn't.  They've

10   charged this as a criminal case.  The burden is on them.  And

11   it's -- the defendants have a constitutional right to take

12   the defense as it comes at trial.

13        THE COURT:  It seems to me that if the government

14   puts that letter in, they'd be entitled to a hearsay

15   instruction that it is not being offered for the truth of any

16   of the statements, and the jury may not consider whether any

17   of the statements in there are true; but it's being offered

18   as part of the course of what was happening, and the jury may

19   consider this letter was sent.

20        And then that will put the burden back on you to

21   decide how you want to respond to that, whether you want to

22   make an argument that they got that letter because that's

23   what they thought.

24        And the moment anything crosses in that way, which

25   including in cross-examination -- I mean, it's not that you

1    would have to affirmatively put something on, but as soon as

2    you put that issue in that they somehow thought this was

3    correct rather than they thought this was corrupt and --

4             I mean, if the government puts it in, they're going

5    to be putting it in to say, as part of their scheme, they

6    created this letter and I will tell the -- I mean, frankly, I

7    will probably tell the jury that they shouldn't consider

8    anything about whether this is a real law firm, whether

9    there's a real opinion here, anything other than what it says

10   on its face, because they can't take it for the truth of it.

11   They take it for the letter -- this is a copy of the document

12   that was forwarded.

13             Right?  Why would that be wrong?

14             MR. MARX:  Well, I don't want to get too close into

15   how to particularly instruct the jury about this exhibit, but

16   I certainly could be concerned if the instruction suggested

17   to the jury this was anything other than a real law firm and

18   a legitimate opinion letter --

19             THE COURT:  I can't --

20             MR. MARX:  -- because it is.

21             THE COURT:  I know, but you can put that in.

22             MR. MARX:  Well --

23             THE COURT:  You can -- but I don't think -- I think

24   the government -- I think the government is entitled to say

25   here's an email that went from this person to this person and

1    we're going to authenticate that this is the email, and this

2    is the attachment; and that this is a hearsay document, and

3    it cannot -- no part of it can be accepted for the truth of

4    the matter.

5           You don't get to have them verify that this is a

6    real law firm or me verify that it's a real law firm.

7           MR. MARX:  Right.  And this is what I think is --

8    probably would benefit from further discussion at a later

9    hearing.  But I think there's a line between the jury hearing

10   the fact, whether it's through cross-examination or a defense

11   presentation, that this is a real law firm and a real letter

12   and not the veneer of legitimacy that was, you know, created

13   by some fraud, but it's a real letter.

14          There's a difference between that and an advice of

15   counsel defense at trial which --

16          THE COURT:  Why?  What's the difference?

17          MR. MARX:  Because under First Circuit cases law

18   cited in our briefs, the jury is allowed to infer -- again,

19   keeping in mind it's their burden to prove willfulness beyond

20   a reasonable doubt.  The jury is entitled to infer, by the

21   presence of innocent parties, especially lawyers, that no one

22   would engage in this kind of brazen fraud with lawyers

23   looking at the contracts and writing these kinds of letters

24   unless --

25          THE COURT:  But you're asking to have that innocent

1    party without having any information about -- what you're

2    trying to do is try to make sure this letter comes in without

3    any information as to what information defendants told the

4    lawyers.

5           MR. MARX:  Yes, because there's two separate

6    things.  There's the fact that there was a lawyer in the

7    room, and then there's advice that a defendant may have

8    relied on from the lawyer.  Those are separate facts that --

9           THE COURT:  Yeah, but you want to get the fact --

10   you want to have -- so you're saying -- and I'll go back and

11   read that case.  But you're saying that they can infer from

12   the fact that a lawyer was in the room that this is a

13   legitimate legal opinion without having to get into the

14   question --

15          MR. MARX:  No, Your Honor.  No, Your Honor.  That's

16   not what I'm saying.  So I don't want to suggest that I'm

17   going that far, because I'm not.  It's just that the fact

18   that there is an innocent attorney involved -- it could be

19   anyone -- the fact that it is on an attorney, the jury can

20   infer what they want.  But the fact there's anyone involved

21   belies the allegation of conspiracy and tends to rebut the

22   allegations of specific intent, as it would in any drug case,

23   Your Honor.

24          That's why there's, you know, a mountain of

25   First Circuit cases saying conspirators do not invite

1    innocent bystanders into the room when they engage in their

2    illegal activity.  This is a person in the room while this

3    alleged activity is going on, separate and apart from

4    whatever advice that person may have given, that that fact I

5    think is one the jury is allowed to draw an inference from.

6          THE COURT:  I don't see how you can put that person

7    in as an innocent person in the room on the record as I have

8    it without anything more.

9          I mean, you're going to say that you get -- that

10   they don't get to -- I'll go look at those cases, but I do

11   not see how you can have it both ways.  I see that they may

12   be stuck having to put that letter in front of the jury

13   and -- if they want to use it.  And no matter how much I

14   instruct the jury, the jury will then go and -- there's the

15   risk that the jury will read it and say, well, that beats

16   reasonable doubt.

17         But to me, the moment you're making that pitch and

18   you are giving that letter legitimacy beyond it being a

19   hearsay document, I don't see how you can do that.  I will go

20   back and read those cases.  But the idea that it's the same

21   thing to have a letter from a counsel that we don't know what

22   they're told, we don't know on what basis they did this,

23   whether they're, in fact, innocent, whether they're part of

24   the conspiracy or not part of the conspiracy, we have no idea

25   about that at this point.

1          Okay.  I'm getting a note that maybe the next

2     hearing is --

3          We've got a problem here with the next hearing?

4          THE DEPUTY CLERK:  Yes, Your Honor.

5          (The Court and deputy clerk confer.)

6          THE COURT:  I think, despite my telling you I have

7     an eleven o'clock hearing, I think I'm also sort of where I

8     need to be in going through this, and I am going to go back

9     and parse through this all a little bit more.

10          But that's -- where I'm intending to go with this

11     at this point is denying the motion as to 1 through 7,

12     granting the motion as to 8, and on the attorney-client

13     privilege, laying out my thinking that there's not quite a

14     waiver yet, but small things will make there be a waiver.

15          MR. POLLACK:  Your Honor, on that last point, I

16     just want to make sure we had a chance, we -- you asked if

17     anyone objected.  We don't object to that path for the

18     attorney-client privilege so long as it makes clear that

19     there's not yet a waiver.  And I think you said --

20          THE COURT:  Right.  That's what I'm --

21          MR. POLLACK:  I wouldn't want to be accused of not

22     objecting --

23          THE COURT:  No.

24          MR. POLLACK:  -- if it's any different.

25          And there is one unique issue to my client,

1      SpineFrontier, on that privilege issue, which is they're

2      in-house counsel.

3              So I think this is a matter of motions in limine,

4      if we get that far.  I'm hoping Your Honor will go back and

5      read the arguments for Counts 1 through 7 and revisit that.

6      But if we get that far, I think these are motions in limine

7      because the entity was charged too, and it has in-house

8      counsel and in-house counsel who worked on disclosures, and

9      it worked on the contracts.

10             So it's -- I think it's a more complicated issue,

11     and I think Your Honor trying to have the government see what

12     it can do to build a record makes sense, because this is not

13     one that should probably be decided without a record for it.

14             THE COURT:  Right.  I mean, I think the way I

15     envision -- the way I'm picturing this going is that there is

16     going to be a likelihood at some point, if this case is going

17     to trial, that we're going to have tee up what it means that

18     somebody signed this.

19             And I think if we have set up so that it's very

20     clean to figure out what everybody's arguments are of -- you

21     know, there may be a waiver, but the waiver may have limits

22     to its scope of how far afield we're going.  Obviously,

23     in-house counsel presents further complications on this.  But

24     we'll tee it up this way.

25             MR. GEORGE:  Your Honor, one last thing?

```
 1                    THE COURT:  Sure.
 2                    MR. GEORGE:  Would you be open to hearing from the
 3      government further on Count 8 on the point of concealment in
 4      a brief filing to just make clear the concealment is about
 5      the nature and ownership of IME?  That's what --
 6                    THE COURT:  I understand that's your argument.
 7                    MR. GEORGE:  Okay.
 8                    THE COURT:  And I will go back and put it against
 9      my sense of what it is that does or doesn't have to be
10      concealed and what the case law says about what it is.  But I
11      do very much understand that that is what the government is
12      saying is --
13                    MR. GEORGE:  All right.  Thank you.
14                    THE COURT:  So we're in recess.
15                    (Court in recess at 11:11 a.m.)
16
17
18
19
20
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 30th day of April, 2024.


/s/ Robert W. Paschal
_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter