# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KINGSLEY R. CHIN and<br>ADITYA HUMAD,<br>    *Defendants*. | No. 1:21-cr-10256-IT |

### DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE ANY EVIDENCE OR ARGUMENT CONCERNING LEGITIMATE CONSULTING BY THOSE OUTSIDE THE CHARGED CONSPIRACY

Defendants Kingsley Chin and Aditya Humad respectfully oppose the government's motion *in limine* that attempts to preclude the defendants from using evidence or making arguments concerning legitimate consulting activity by surgeons who participated in the SpineFrontier consulting program but whom the government does not view (or no longer views) as co-conspirators.

In its effort to preclude evidence helpful to the defendants, the government's motion describes a theory of conspiracy to violate the Anti-Kickback Statute that deviates significantly from the Indictment's alleged conspiracy. The motion also fails to appreciate the relevance and exculpatory nature of the evidence it seeks to preclude, even if the motion's description of the conspiracy were accurate; for example, it fails to acknowledge that the defendants are entitled to introduce "good acts" evidence under Fed. R. Evid. 404(b). The relief the motion seeks is also impractical in light of the lack of clarity as to whom the government believes is "within" and whom it believes is "outside" of the conspiracy it alleges.

## The Motion Depends on a Mischaracterization of the Indictment's Conspiracy Allegations

The government's motion is premised on its assertion that "the Indictment alleges that the Defendants' consulting arrangement *in practice* was unlawful with respect to *certain* surgeons." (Govt. Mot. at 2 (first emphasis added).) From that premise, the government argues that evidence and argument of legitimate consulting by other surgeons would be inadmissible good-character evidence under Fed. R. Evid. 404. Even in making this argument, the government tries to hedge, telling the Court in a footnote that the government does not concede that there was *any* legitimate consulting. (Govt. Mot. at 2 n.2.) In any event, the motion's description of the Indictment's allegations is wrong.

For reasons that are perhaps known only to former AUSAs who presented the Indictment to the Grand Jury,[1] the government chose to charge Chin and Humad, along with SpineFrontier itself, with a conspiracy that is far different, and far broader, than that which its motion now claims. Contrary to the motion's assertion, the Indictment does not allege that the SpineFrontier consulting program was "in practice" used unlawfully with respect to only "certain" surgeons. Rather, the conspiracy that the Indictment alleges is that the defendants put in place and used a "sham consulting *program*." In fact, nowhere in the Indictment is there an allegation that the defendants' supposed conspiracy was to use an otherwise-legitimate consulting program to pay kickbacks, sometimes. To the contrary, in Paragraph 29 of the Indictment, under the heading "Overview of the Conspiracy," the Indictment alleges that defendants are responsible for directing bribes to surgeons "pursuant to a sham consulting program." Paragraph 30 also refers to "SPINEFRONTIER's sham consulting program." In Paragraph 32, the Indictment alleges that

---

[1] Three of the four AUSAs who appear in the signature block of the Indictment have left the U.S. Attorney's Office, and are thus not on the prosecution team bringing this case to trial.

Chin and Humad "designed" the consulting program for the purpose of making "bribes" to surgeons. In Paragraph 37(j), the Indictment alleges the creation of records and documents, "including purportedly legitimate contracts, designed to make the *sham consulting program* appear legitimate" (emphasis added). The Indictment also impugns the entirety of the consulting program by alleging that Impartial Medical Experts, LLC, the entity through which *all* consulting payments were made after a particular period, not just payments to alleged co-conspirators, "*purported* to manage the process pursuant to which SPINEFRONTIER's surgeons submitted hours and received payments from or on behalf of SPINEFRONTIER for *purported* consulting." (Indictment ¶ 4 (emphases added).) In fact, at the same time the motion is attempting to depict the alleged conspiracy as relating to only "certain" consulting arrangements, and even to only "certain" payments to those particular consultants, another government motion *in limine* describes IME as "a sham entity," consistent with the Indictment's actual allegations. (*See* ECF No. 248, at 7.)

In short, the sweeping conspiracy in the Indictment that the Grand Jury actually returned is one by which defendants and others supposedly "designed" and used a "sham consulting program," not one in which they conspired to sometimes use an otherwise legitimate consulting program to make kickbacks to "certain" surgeons. Since being indicted, the defendants have been defending against the originally-alleged conspiracy, not the modified one that the government, for the first time and contrary to the Indictment's allegations, now suggests in its motion that it intends to pursue at trial.[2]

---

[2] In fact, were the government to pursue at trial the alternative conspiracy theory that its motion now suggests, it would risk producing an impermissible variance from the actual Indictment returned by the Grand Jury. Because "[t]he agreement is the *sine qua non* of a conspiracy," it is "essential to determine what kind of agreement or understanding existed as to each defendant." *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011) (internal quotation marks omitted). This analysis includes asking whether the jury could find "the (express or tacit) agreement *that the indictment charges*." *Id.* at 117 n.10 (quotation marks omitted; emphasis added). An impermissible

3

When the conspiracy charge is viewed in the manner set forth in the actual Indictment, rather than the different, more limited manner described in the government's motion, evidence of legitimate consulting through the SpineFrontier consulting program is unquestionably relevant, as it counters the central allegation that the consulting *program* was a "sham." Nor is such evidence mere good-character evidence, as the government's motion dismissively argues. Rather, it directly rebuts the Indictment's allegation that the SpineFrontier consulting program was "designed" to be a "sham consulting program."

In fact, notwithstanding the position in the government's motion, the government itself has hypocritically stated an intention to call as a witness at least one surgeon - Diana Wilson - whom the government has never suggested was a member of the conspiracy that the government alleges. Presumably, the government hopes to elicit testimony from Dr. Wilson as to defendants' intentions for the consulting program as a result of their interactions with her. Yet through its motion, the government seeks to preclude defendants from similarly presenting evidence as to their intentions based on defendants' interactions with surgeons who, like Dr. Wilson, are not alleged to have joined any conspiracy. The government is thus asking the Court to conduct a trial at which only evidence that helps the government should be permitted. But unlike the proceeding through which the Grand Jury returned a particular Indictment, during jury trials defendants get to compel and confront witnesses and introduce evidence to tell their story. Defendants must be permitted to mount a defense to the actual conspiracy that the Grand Jury alleged in the Indictment.

---

variance can occur even where an indictment alleges a broader conspiracy, but the government ultimately proves only a narrower version of it, despite both being a violation of the same statutory provisions. *See, e.g.*, *id.* at 124.

4

### The Evidence and Arguments the Government Seeks to Preclude Are Relevant Even Under the Motion's Flawed Description of the Alleged Conspiracy

Even if the conspiracy had been alleged in the manner that the government's motion suggests, the evidence and arguments that the government seeks to preclude would still be relevant, or at least could not be precluded at this stage. At this point, defendants and the Court have not yet had an opportunity to see how the government attempts to prove its case, and how specific proffered defense evidence might be used to respond to the government's case. The government's effort to limit evidence and argument is particularly premature in light of the heightened *mens rea* element involved here.

Proving a violation of the Anti-Kickback Statute requires proving that defendants acted knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2). In the context of the Anti-Kickback Statue specifically, that element requires proof that defendants knew that the specific actions they took were illegal. *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024), *cert. denied*, No. 23-1293, 2024 WL 4426646 (U.S. Oct. 7, 2024) ("[T]he defendant must act with knowledge that his conduct was unlawful."); *Pfizer, Inc. v. United States*, 42 F.4th 67 (2d Cir. 2022); *United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir. 2000); *United States ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, No. CV 21-11293, 2024 WL 3633536, at *5 (D. Mass. Aug. 2, 2024) ("To establish a knowing and willful violation, Relator's complaint must allege that Zimmer acted with knowledge that its conduct was unlawful."). Putting the relatively small number of consulting arrangements on which the government intends to focus into the broader context of the SpineFrontier consulting program as a whole would offer a very different picture of the defendants' intentions than the picture that the government hopes to suggest to the jury through misleading omissions.

There is a reason that the Indictment included an allegation that the program was "designed" for bribes, as the government used such allegations to satisfy the *mens rea* element of its charging burden. In short, a potential defense strategy in this action is to compare the amounts of consulting payments made to and the consulting benefits received from those on whom the government chooses to focus as the supposed recipients of "bribes," to the amounts of consulting done by those whose consulting work was demonstrably legitimate. A jury may be far less likely to view relatively small payments to a handful of surgeons on whom the government focuses as suggesting a knowing and willful violation of law when those payments are viewed in the context of an overall productive and valuable consulting program. Inversely, a trial that focused inappropriately on only a very small portion of the consulting program's activities, cherry-picked by the government and stripped of their full context, could give the jury a misimpression that defendants must have intended to violate the law. Given the importance of the heightened *mens rea* requirement to the crimes charged, any risk of deceiving or confusing the jury in this way should not be permitted.

More specifically, defendants expect that the trial evidence (if not improperly cabined) would reveal, for example, that SpineFrontier carried industry-leading products, but remained a relatively early-stage company focused on innovation. The company valued real-world experience and feedback from surgeons as it continually attempted to improve its products and develop new ones. Thus, SpineFrontier adopted a strategy of casting a wide net of consultants, in an effort to obtain evaluations, feedback, and input from many surgeons, doing many different surgeries over time, on many different patients. Defendants would also expect to show that improvements actually occurred as a result of this business strategy. Because of the breadth of the net that SpineFrontier cast, some surgeons proved to be less valuable or less accurate in their timekeeping

than others. The government apparently intends to focus on them, depicting a small number of surgeons as having provided minimal or little value, hoping that the jury, viewing such evidence out of context, will conclude that "bribery" is thus the only reasonable explanation for the payments they received.

An alternative explanation is that some surgeons underperformed, or even violated their agreements by failing to deliver meaningful consulting or even by making dishonest submissions of consulting time, which becomes far more plausible to the extent SpineFrontier's approach was to seek a broad array of feedback from a broad network of doctors. Even if SpineFrontier's particular approach to obtaining feedback in this manner ultimately was not consistent with best practices, or inadvertently incentivized some surgeons to behave inappropriately by abusing the program, defendants cannot be convicted for putting in place a flawed program or for paying consulting fees to particular doctors, unless they *intended* to violate the law. The jury's ability to assess defendants' intent with respect to some transactions may well turn on its ability to put those transactions into the context of the consulting program as a whole. After all, a few surgeons may naturally be to blame for their own inadequate services or inaccurate timekeeping.

Nevertheless, the government has made clear that it intends to demonstrate that some surgeons billed for consulting time without actually delivering feedback, evaluations, or ideas, or by delivering work product that was not commensurate with the amount of consulting time they billed. If the jury were exposed to *only* those surgeons' involvement, in a way that suggested that the *only* consulting that was done could be characterized in that manner, and thus would have been obvious to defendants, it would be far easier, albeit incorrect, for the jury to conclude that the consulting payments must have served an improper and illegal purpose. In contrast, to the extent SpineFrontier was receiving substantial amounts of valuable feedback through its consulting

7

program from other surgeons, that value may have masked more problematic aspects of the consulting programs, such as by making SpineFrontier's executives and other personnel too inattentive to or too slow to realize the lack of value being provided by a few consultants. That explanation for how problematic consulting arrangements might have happened without defendants knowing it, much less intending to violate the law, contrasts with the government's theory that any problematic relationships reflected willful and knowing violations of the Anti-Kickback Statute. If all the jury were to see was consulting arrangements on which the government wants to focus, however, that exculpatory explanation becomes nearly impossible to appreciate. In a case where willfulness will necessarily play a central role, the government's effort to keep such information from the jury is not appropriate.

The government's motion fails to appreciate such relevance by dismissing evidence of legitimate consulting work as improper "character" evidence not permitted by Fed. R. Evid. 404(a). But character would not be the purpose of such evidence. To the extent Rule 404 applies at all, it would be Rule 404(b), not Rule 404(a), that governs. While Rule 404(b) typically concerns other "bad acts" introduced for a purpose other than character, it can also apply to "good acts" offered for non-character purposes, such as motive, intent, and knowledge. For example, in *United States v. Hayes*, 219 F. App'x 114, 115-16 (3d Cir. 2007), the court found error, and reversed a conviction, based on the District Court's having precluded "testimony from non-conspirator regional managers that [defendant] never asked them to falsify tests; and testimony from non-conspirator senior managers that [defendant] never suggested that data falsification was acceptable," as well as "particular statements or 'directives' [defendant] allegedly made in meetings with subordinates that tended to negate his involvement in a conspiracy to fabricate test results." The Third Circuit explained that such "good acts" evidence, or so-called "reverse Rule

404(b)" evidence, is "admissible for a proper purpose such as motive, intent, absence of mistake, etc." *Id.* at 116. As "a rule of inclusion rather than exclusion," Rule 404(b) "favors admission of evidence of other acts if such evidence is relevant for *any* purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime." *Id.* at *116-17 (emphasis added; quotation marks and editing omitted). The court concluded, in language equally applicable here:

> The issue here is not [defendant's] good character. Rather, it is his conduct. Evidence that he conducted himself in a manner that was consistent with [the company's] announced policy, and inconsistent with a conspiracy to fabricate test results, was clearly relevant to the charges he had to defend against.

*Id.* at 117; *see also United States v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006) (holding, in case involving charges alleging two particular instances of alleged bribery, that Rule 404(b) required the admission of "good" conduct in unrelated instances to the extent it "evidences Defendant's innocent state of mind and lack of criminal intent").

At the very least, until specific proffered evidence of legitimate consulting can be assessed in the face of how the government attempts to prove knowing and willful violations of law, the Court cannot rule categorically that evidence of legitimate consulting has no relevance.

### The Government's Request for a Categorical Ruling as to Those "Outside" the Alleged Conspiracy Is Too Vague to Be Practical, Particularly as the Government's Case Continues to Shift

Finally, there is an additional, practical reason that the government's motion must be denied. The Indictment, or even the motion, never makes clear who, specifically, the government considers to be within the alleged conspiracy, and thus in the government's view appropriate subjects of evidence and arguments, and who it views as off limits. In the Indictment, the Grand Jury identified seven surgeons – Surgeons 1-7 – whom it alleged to be co-conspirators and also referenced "others known and unknown to the Grand Jury." Under one reading of the government's

9

motion, evidence and argument concerning all surgeons other than those seven would be excluded (despite its own stated intentions with respect to Dr. Wilson), as the motion contrasts "those *outside* the Indictment" to "the Surgeons *within* the boundaries of the Indictment." (Motion at 2 (emphasis in original).) Elsewhere, however, the government has told defendants that there are other surgeons whom it considers to be unindicted co-conspirators, beyond the seven "within the boundaries of the Indictment." Injecting yet more confusion, the government has recently dismissed the two Anti-Kickback Statute counts that concerned two of the seven surgeons identified in the Indictment – Surgeons 6 and 7, the two largest recipients of consulting payments – and on February 26, 2025 filed a motion to dismiss a third count (concerning Surgeon 4). Those dismissals would leave only three of the original six counts charging substantive violations of the Anti-Kickback Statute.

The government has nonetheless left in place the conspiracy charge, in which the same three surgeons (Surgeons 4, 6 and 7) are, or perhaps were, co-conspirators in the government's view. While the government has stated an intention not to introduce evidence of those three surgeons' participation in the alleged conspiracy (another dramatic variance from the Indictment as framed), it has not conceded that those surgeons were "outside" of the conspiracy charged. Thus, even as defendants attempt to adjust to the government's new framing of its case in the weeks leading up to trial, it now also remains uncertain how the government's request to preclude evidence concerning those "outside the charged conspiracy" and "outside the Indictment" would apply. To be clear, the defendants object to any and all ongoing efforts by the government that will create an impermissible variance from the Grand Jury's actual Indictment. In this context, the government's motion should be denied.

## Conclusion

For the reasons set forth herein, defendants respectfully request that the Court deny the government's motion *in limine*.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**ADITYA HUMAD**

By his attorneys,

/s/ *Daniel N. Marx*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that this document, filed on March 3, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Joshua L. Solomon*