**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:21-cr-10256-IT-2 |
| ADITYA HUMAD, | |
| Defendant. | |

**GOVERNMENT'S TRIAL BRIEF**

The government submits this brief in advance of the May 11, 2026 trial in this case.

## I.    BACKGROUND

The Superseding Indictment charges Defendant Aditya Humad with conspiracy to violate the Anti-Kickback Statute ("AKS"), in violation of 18 U.S.C. § 371, and three substantive violations of the AKS, in violation of 42 U.S.C. § 1320a-7b(b)(2), each of which are tied to specific payments made by SpineFrontier to three surgeons (Surgeons 1–3) to induce those surgeons to use SpineFrontier's products. *See* Dkt. No. 310 ("Superseding Indictment") ¶¶ 33-36.

As described in the Superseding Indictment, Humad was the Chief Financial Officer of SpineFrontier, Inc., a manufacturer and seller of spinal implant devices. Dkt. No. 310 ¶¶ 2, 3. Under the guise of a legitimate consulting program, Humad conspired with Kingsley Chin, the CEO of SpineFrontier, and with three outside surgeons, one company sales representative, and one outside distributor to pay monetary bribes to surgeons to induce and reward these three surgeons' use of SpineFrontier products. *Id.* ¶¶ 23-30.

Pursuant to these illegal arrangements, these surgeons submitted falsified timesheets reflecting hours of consulting work that they never performed, and Humad approved payments to these surgeons—through SpineFrontier and another intermediary company that Chin owned and

1

controlled, Impartial Medical Experts ("IME")— for purported consulting hours based not on time spent consulting, but on the number and type of surgeries the three surgeons performed and the amount of revenue that they generated for SpineFrontier.  *Id.* ¶¶ 31-32.

During the course of the conspiracy, SpineFrontier paid the three doctors hundreds of thousands of dollars for consulting work that never happened, and the three doctors used millions of dollars' worth of SpineFrontier products.  *Id.* ¶¶ 29-30.

## II.    EVIDENCE

The government expects to present the following evidence at trial, subject to revision based on ongoing witness preparation and trial planning.

### A.  Witnesses

#### a.   Co-Conspirator Doctors / Independent Distributor

The government anticipates calling as witnesses the surgeons identified as Surgeons 1 – 3 in the Superseding Indictment (Drs. John Atwater, Jason Montone, and Michael Murray).

The government expects that these witnesses will testify that they entered into sham consulting arrangements with SpineFrontier and that, rather than being paid for consulting work that they actually performed, they accepted consulting payments as bribes and rewards for continued and increased use of SpineFrontier's products.  The government also anticipates that these witnesses will testify that they prepared and submitted consulting timesheets that listed hours of work far in excess of what they actually performed—and that they did so in consultation with and at the direction of Humad.

Similarly, John Balzer, a former independent distributor of SpineFrontier's products, will testify regarding the illegal agreement for SpineFrontier to pay bribes to Dr. Montone in exchange

for Montone's use of SpineFrontier's products and the preparation of falsified consulting timesheets in consultation with and at the direction of Humad.

### b. Former SpineFrontier Employees

The government anticipates calling multiple former employees of SpineFrontier. The government anticipates that Scott Autrey, a former SpineFrontier sales representative, will testify, in substance, that Humad, along with Chin, directed SpineFrontier's sales team to use the consulting program and the potential for surgeons to earn consulting fees to induce surgeons' use of SpineFrontier products and as a reward for increased use of SpineFrontier products.

The government anticipates that Sarah Cook, a former SpineFrontier engineer, will testify that SpineFrontier had no process to assimilate and incorporate the supposed feedback for which SpineFrontier paid surgeons, reflecting the fact that the consulting program was a sham intended to bribe the three surgeons referenced in the Superseding Indictment, rather than a legitimate means of gathering feedback from surgeons.

The government anticipates that Chantal Goldson, a former SpineFrontier finance employee, will testify that Aditya Humad determined the number of hours and the amount of money to pay surgeons based upon the volume and value of SpineFrontier products they used—not based upon any consulting services that the surgeons actually performed.

### c. Law Enforcement Witnesses

Robert Stull, an FBI forensic accountant, is expected to testify regarding his review of financial records and other data showing (i) the volume and value of SpineFrontier products used by Surgeons 1 – 3; (ii) the flow of payments from SpineFrontier to these surgeons (including through the intermediary IME); and (iii) specific payments made by SpineFrontier to Surgeons 1 -3, as alleged in the Superseding Indictment. Stull's testimony will likely include discussion of

summary charts prepared in advance of his testimony. The government produced drafts of these summary charts to Chin in connection with the May 2025 trial and intends to produce them to the Defendant no later than April 28, 2026, in advance of the government's typical practice.

The government also anticipates that another government "reader" witness, with no knowledge of the investigation or case, will read portions of relevant emails.

### B. Documents and Records

The government has submitted its exhibit list to the Defendant. The government anticipates that it will continue to revise and refine its exhibit list as it prepares for trial. The following are the main categories of evidence that the government intends to introduce at trial:

- Emails between and among Humad and his co-conspirators proving Humad's intent and understanding (i) that consulting fees would be used to induce surgeons to use SpineFrontier's products and/or reward them for the same; (ii) that doctors would be paid based upon the volume and/or value of the surgeries they performed using SpineFrontier products; and (iii) that Humad knew such arrangements were illegal;

- Letters provided by Strong & Hanni, SpineFrontier and IME's lawyers, describing the SpineFrontier consulting program and the Anti-Kickback Statute, which make clear that Humad knew it was illegal to pay doctors based upon the volume or value of SpineFrontier products that they used;

- Seemingly facially valid consulting agreements executed by SpineFrontier and surgeons that, again, made clear that it was illegal to pay doctors based upon the value or volume of SpineFrontier products that they used and that Humad knew it was wrongful;

- Timesheets submitted by or on behalf of Surgeons 1–3 to SpineFrontier or IME reflecting hours of consulting work that were not, in fact, performed; and

- Financial records and summaries of financial records showing the payments of hundreds of thousands of dollars in bribes to Surgeons 1–3.

## III.    EVIDENTIARY ISSUES

The parties have filed multiple motions *in limine* which are currently pending before the Court. In addition to the issues raised in those motions *in limine*, and the items the government

plans to submit further briefing following the April 24 pre-trial conference, the government raises the following additional issues for the Court's awareness:

### A. Summaries of Voluminous Records

As referenced above, in addition to seeking pre-admission of business records, the government will seek to admit charts and summaries of financial records into evidence pursuant to Federal Rule of Evidence 1006. Rule 1006 permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The financial records at issue here are voluminous (spanning thousands of pages), cannot be conveniently examined in court, are independently admissible, and were previously produced to the Defendant.

Accordingly, the government should be permitted under FRE 1006 to admit charts and summary exhibits at trial to provide the jury with easier access to the relevant information.

### B. Recording

The Defendant's exhibit list includes a lengthy July 2019 recording between Drs. Chin and Atwater. The recording was made by Dr. Atwater during a time when the investigation was overt and known to both Drs. Chin and Atwater. The government previously filed a motion to exclude the recording in Chin's trial. Dkt. No. 328. There is no theory under which the recording is admissible, even if Chin were to testify. If the defense does not intend to proffer how this exhibit is admissible, the government will refile and renew the motion in this case.

The recording is replete with self-serving references to the amount of money Chin spent on legal fees, the length and scope of the government's investigation, Chin's negative views of the FBI and DOJ, the alleged presumption that he is guilty, that Chin is "as clean as it gets," charged comments insinuating there is a racial undertone to the investigation, and statements by Chin

comparing himself to Bill Gates and Jeff Bezos.  There is even less of an argument that the jury should hear the recording in Humad's trial than there was in Chin's proceedings.  This is especially so in light of Chin's guilty plea in 2025, post-recording.  If the jury is allowed to hear Chin's self-exculpatory hearsay pre-plea, it should be made aware of the fact that he is now a convicted felon.

### C.  Quality of SpineFrontier's Products

During the April 24, 2026 Interim Pretrial Conference before the Court, the defense stated that it intended to introduce evidence and/or argument before the jury concerning the quality of SpineFrontier's products.  Specifically, the Defendant appears to want to cross-examine the surgeon-witnesses with the goal of revealing their purported views that SpineFrontier's products were "best-in-class."  As the government argued at the April 24 conference, evidence or argument directed to the supposed "best-in-class," quality of the Company's products is entirely irrelevant to the charged crimes.  The Defendant is charged with violating, and conspiring to violate the AKS, which prohibits the offer or payment of any form of remuneration to induce the use of items or services payable by Federal health care benefit programs.  42 U.S.C. § 1320a-7b(b)(2).  There is no exception to the AKS for products that are useful, great, best-in-class, etc.  Accordingly, any appeal to the jury of that nature is an argument for nullification, and the probative value of such evidence, if any, is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.  Fed. R. Evid. 403.  The government will file a very brief motion *in limine* on this issue.

### D.  Defendant's Exhibits

The Defendant's exhibits are largely hearsay, with or without a witness to testify to their contents.  Several exhibits are emails, exchanged solely between individuals that do not appear on the Defendant's witness list.  Further, many emails pre-date the conspiracy period (there are dozens

of emails from 2012), *and* contain no reference to the Defendant.  Notably, Defendant's exhibits 651 through 725 appear to be patents.  There is no evidence that the Defendant (i) had any knowledge of SpineFrontier's patents, (2) had any involvement in obtaining any SpineFrontier-related patent, or (3) had any knowledge of any connection between purported consulting and a SpineFrontier-obtained patent (nor does there appear to be any evidence that there was in fact any such connection).

### E.  Defendant's Lack of Jencks Productions and Reciprocal Discovery

To date, the government has received no reciprocal discovery from the Defendant.  Nor has it received any Jencks materials for the *seventeen* witnesses on the Defendant's witness list, despite the Defendant's representation that he expects to put on a defense case.[1]

The Federal Rules of Criminal Procedure impose reciprocal discovery obligations on the defense.  *See, e.g., United States v. Hsia*, 24 F. Supp. 2d 14, 29 (D.D.C. 1998) (referring to "reverse Jencks material" under Rule 26.2).  Specifically, the adoption of Rule 26.2 reflected the policy judgment that it is important to establish procedures for the production of defense witnesses' statements.  Rule 26.2 was "designed to place the disclosure of prior relevant statements of a defense witness in the possession of the defense on the same legal footing as is the disclosure of prior statements of prosecution witnesses in the hands of the government under the Jencks Act." Fed. R. Crim. P. 26.2 advisory committee's note to 1979 addition; *see, e.g., United States v. Giron*, No. 1:17-cr-0031, 2017 U.S. Dist. LEXIS 207269, at *18-19 (D.N.D. Dec. 18, 2017) (Rule 26.2

---

[1] The Defendant also listed the prosecutors as witnesses, but the government does not include them in this total, in light of the Court's ruling denying the Defendant's attempt to admit the government's Deferred Prosecution Agreement offer.  Dkt. No. 458.

imposes a reciprocal obligation of disclosure upon the defendant for defense witness statements); *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (upholding district court's exclusion of defense evidence due to defendant's strategic decision to withhold discovery until the last minute).

If the Defendant offers documents at trial that are not offered for impeachment and have not been properly disclosed in compliance with Fed. R. Crim. P. 16(b)(1) or the Local Rules, the government will seek to exclude these exhibits in their entirety.

## IV.    STIPULATIONS

The parties have filed stipulations concerning both the authentication and admissibility of documents, as well as other issues.  These stipulations will streamline the presentation of evidence and obviate the need to call multiple witnesses.

## V.    OTHER

The government requests that the Court designate HHS-OIG Special Agent Daniel Mancini as case agent and that Special Agent Mancini be permitted to sit in the courtroom (not at counsel table) during trial.

Respectfully Submitted,

LEAH B. FOLEY
United States Attorney

*/s/ Mackenzie Queenin*
ABRAHAM R. GEORGE
CHRISTOPHER LOONEY
MACKENZIE A. QUEENIN
Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on April 27, 2026, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) (with paper copies to be sent to those indicated as non-registered participants).

/s/ *Mackenzie Queenin*
MACKENZIE A. QUEENIN
Assistant United States Attorney