**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ADITYA HUMAD,<br><br>Defendant | No. 21-cr-10256-2-IT |

# <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The government respectfully submits this memorandum in connection with the sentencing of the defendant, Aditya Humad. The government recommends the Court impose the following sentence: 8 months of imprisonment; a fine of $9,500; 12 months' supervised release; and a mandatory special assessment of $100. The government's recommended sentence is supported by the considerations under 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth therein.

## I. BACKGROUND

As the Chief Financial Officer at SpineFrontier, Inc. ("SpineFrontier"), Aditya Humad conducted a years-long kickback scheme through two companies, SpineFrontier and Impartial Medical Expert ("IME"), linked through common ownership under Kingsley R. Chin, the defendant's co-conspirator and SpineFrontier's founder and CEO. With Chin's help, Humad directed the payment of kickbacks to certain surgeons in the form of sham consulting payments. The purpose of those payments was to induce surgeons' use of SpineFrontier's products in their surgeries. Rather than pay these surgeon-consultants based on the amount of consulting services performed, as would occur in a legitimate consulting relationship, Humad, Chin, SpineFrontier, and IME paid kickbacks to surgeons based on the number or value of the surgeries in which the

surgeons used SpineFrontier's products. Superseding Indictment, Dkt. No. 310 ¶¶ 23-28. The defendant did this despite knowing it was unlawful under the Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b)(2) ("AKS"), to pay surgeons to induce their use of SpineFrontier's products. Indeed, the defendant received multiple legal opinion letters from Strong & Hanni PC, informing him of the law firm's position that the proposed consulting agreements complied with federal healthcare laws, *provided* that, *inter alia*, any compensation paid to the consulting surgeons would "not be determined in a manner that takes into account the volume or value of any referrals or business." *United States v. SpineFrontier*, 160 F.4th 212, 216 (1st Cir. 2025).

Initially, in or around early 2013, Humad, Chin, and SpineFrontier paid these kickbacks directly through SpineFrontier. Following the March 2013 effective date of the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7h (the "Sunshine Act"), however, Humad, Chin, and SpineFrontier began to use a purportedly independent third-party company—IME—which Chin fully owned and controlled, Ex. 1 at 2 (Chin owns 99.95% of IME), to make bribe payments to certain surgeons in the form of supposed consulting payments.[1] Such payments, which were made with the intent to induce surgeons' usage of SpineFrontier's products, plainly violated the AKS, 42 U.S.C. § 1320a-7b(b)(2).

[1] The Sunshine Act required disclosure to the Center for Medicare and Medicaid Services' ("CMS") Open Payments Program database of any payments by device manufacturers, like SpineFrontier, including consulting payments. While SpineFrontier did eventually disclose (and there is no dispute that SpineFrontier's disclosures were delayed) that it had made payments to physicians in the form of "consulting" payments, neither Humad, Chin, nor SpineFrontier ever disclosed to CMS that such payments were frequently *not* for consulting services *actually* rendered, but in fact were payments to surgeons simply to induce the latter group's use of SpineFrontier's products. On May 15, 2025, Humad's co-defendant and co-conspirator, Chin, pleaded guilty to Count One of the Superseding Information, which charged him with false statements to CMS in violation of 18 U.S.C. § 1001(a)(2). Dkt. No. 378.

On May 11, 2026, Humad pleaded guilty to Count One of the Superseding Indictment: 18 U.S.C. § 371 (Conspiracy to Violate the Anti-Kickback Statute). Dkt. No. 485. Humad admitted to the following facts. *First*, the defendant was the Chief Financial Officer of SpineFrontier. Ex. 2 at 18 (May 11, 2026 Rule 11 Hrg. Tr.). *Second*, along with his co-defendant, the defendant conspired to pay bribes in the form of sham consulting payments with the intent to induce surgeons, including Surgeons 1-3 (identified in the Superseding Indictment), to order and use SpineFrontier's products and to reward surgeons' use of SpineFrontier's products, and the surgeons used those products in federal health care program surgeries. *Id*. at 18-20. *Third*, Surgeons 1-3 participated in SpineFrontier's "consulting" program and accepted payments for purported "consulting" work, when, in fact, they spent only a small fraction of their reported time performing actual consulting activities for SpineFrontier. *Id.* at 20. *Fourth*, the defendant determined the amount of the bribe payments from SpineFrontier to the surgeons, including Surgeons 1-3, by reviewing how many surgeries the surgeons performed using SpineFrontier's products and how much revenue those surgeries generated for SpineFrontier. *Id*. at 21. *Fifth*, the defendant told Surgeon 1 and Surgeon 1's distributor that Surgeon 1 would receive 10% of the revenue Surgeon 1 generated from his use of SpineFrontier's products. *Id*. *Sixth*, the defendant told Surgeon 2 that he would approve more of Surgeon 2's reported consulting hours if Surgeon 2 used more expensive SpineFrontier products. *Id*. *Seventh*, the defendant told Surgeon 3 that SpineFrontier would compensate Surgeon 3 based on the number of surgeries Surgeon 3 performed using SpineFrontier's products. *Id.* at 22. *Eighth*, the defendant paid or directed the payment of at least $540,000 in payments to Surgeons 1-3 in exchange for their use of SpineFrontier's products. *Id*. at 20.

With respect to SpineFrontier's payments, the Company, at Humad and Chin's direction paid hundreds of thousands of dollars in kickbacks to Surgeon 1 (approx. $379,719), Surgeon 2

(approx. $125,288), and Surgeon 3 (approx. $35,625) in the form of sham consulting fees. Surgeon 1 pleaded guilty to receiving kickbacks from SpineFrontier and awaits sentencing. Dkt. No. 310 ¶ 29. *United States v. Jason Montone*, No. 20-cr-10159 (2020). In addition, Surgeon 1's SpineFrontier product distributor John Balzer, who worked with SpineFrontier as an independent contractor, also pleaded guilty to receiving kickbacks from SpineFrontier and is awaiting sentencing. *United States v. John Balzer*, No. 20-cr-10158 (2020).

Humad himself, as well as Chin, Chin's wife (Vanessa Dudley), SpineFrontier, and several physicians separately settled with the United States to resolve the government's civil claims under the False Claims Act, 31 U.S.C. § 3729 ("FCA"), which were predicated on violations of the AKS. Humad's own AKS-FCA settlement, which was based on his attested-to documentation of his inability-to-pay, requires him to pay (i) at least $100,000 during the 5-year period from 2023-2028 (plus interest at 4.125%) and (ii) 50% of his Gross Income (as defined) that exceeds $120,000 each year for the 5-year period from 2023-2028. Ex. 3, Settlement Agreement, *United States v. SpineFrontier, Chin, Humad, Dudley, et al.*

## II. SENTENCING GUIDELINES CALCULATION

The government concurs with the sentencing guidelines calculation set forth by the Probation Office in the PSR. The sentencing guidelines as calculated by Probation are set forth below. PSR ¶¶ 42-52.

### A. The Sentencing Guidelines Calculation

| | |
|---|---|
| **Base Offense Level:** The guideline for 18 U.S.C. § 371 offenses is found in USSG §2X1.1. Pursuant to USSG § 2X1.1(a), USSG § 2B4.1 is referenced when determining the offense level. Pursuant to § 2B4.1, the base offense level is 8. USSG §2B4.1(a). | **8** |
| **Specific Offense Characteristics:** The value of the bribes related to Surgeons 1-3 was approximately $540,000. The value of the improper benefit conferred on SpineFrontier is unknown. As the value of the bribes was greater than $250,000, but less than $550,000, a 12-level increase is warranted. USSG § 2B4.1(b)(1) and 2B1.1(b)(1)(G). | **12** |
| **Adjustment for Role in the Offense:** As the defendant was a leader or organizer, a 4-level enhancement is warranted. USSG § 3B1.1(a). | **4** |
| **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). | **-2** |
| **Total Offense Level:** | **22** |

This total offense level of 22, combined with a lack of criminal history (Criminal History Category I), results in a Guidelines Sentencing Range of 41-51 months.

### B. The Four Level Role Adjustment for Humad's Organizing/Leading Role in the Offense Clearly Applies

The Court should apply a four-level aggravating role adjustment pursuant to § 3B1.1(a). Both the government and Probation agree that the adjustment applies. Humad attempts to argue his involvement does not warrant the application of the enhancement. The Court should reject that

assertion, which is belied by the facts and what the defendant explicitly admitted at his Rule 11 hearing.

Humad admitted at his Rule 11 hearing that he, and his co-conspirator Chin, directed and paid bribes to Surgeons 1-3, and further directed them to bill SpineFrontier through IME based on the number and type of surgeries performed. Ex. 2 at 20:8-18, 21:1-8 ("The government would show that the defendant and Chin directed and paid bribes in the form of consulting payments with the intent to induce surgeons, including Surgeons 1 through 3, to order and use SpineFrontier's products and to reward their selection and use of those products. . . . The government would prove that, during the course of this conspiracy, the defendant paid or directed the payment of over $540,000 in payments to Surgeons 1 through 3 in exchange for their use of SpineFrontier's products. . . . The government would show that the defendant directed surgeons, including Surgeons 1 through 3, to bill SpineFrontier via a purportedly independent entity called Impartial Medical Experts…").

Further, as set forth more fully in the government's June 24, 2026 letter to U.S. Probation and the exhibits included therewith (Ex. 4 and exhibits attached to Ex. 4) the defendant's aggravating role is demonstrated not only by his leadership position at SpineFrontier, but also by his intimate involvement in the offense conduct and decision-making authority over others. Humad also led and directed sales representatives (including John Balzer, who pled guilty), and SpineFrontier employees, including some of which he had a reporting relationship with. Ex. 4 at 3-4.

Both the offense conduct and his own admissions make clear that Humad was an organizer and leader of the offense, which involved five or more participants.

## III. APPLICATION OF THE SECTION 3553(a) FACTORS

In determining the defendant's sentence, the Court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the Court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the Court should consider the factors set forth in 18 U.S.C. § 3553(a).

For all the reasons set forth herein, a period of incarceration is necessary to reflect the nature and seriousness of the offense, afford adequate deterrence, promote respect for the law, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(2). The government's recommended sentence, which is well below the applicable Guidelines Sentencing Range, is sufficient, but not greater than necessary to achieve the goals of sentencing.

### A. The Recommended Sentence Reflects the Seriousness of Humad's Crimes

The nature and circumstances of Humad's offenses weigh heavily in favor of an incarcerative sentence in line with the government's recommendation of eight months' imprisonment. Engaging in a conspiracy to pay kickbacks to surgeons to induce the surgeons' use of the defendant's employer's products in complex spinal surgeries is a serious offense. The possibility for patient harm in such situations is obvious and deeply concerning. The AKS is a prophylactic statute—Congress recognized the latent possibility of patient harm attendant to all kickback schemes and acted to prevent such harm via its passage. *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 137 (1st Cir. 2020) ("The AKS was designed to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions.") (citing *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)). Thus, even though the

government did not advance evidence of patient harm in this case, the crime of paying kickbacks always carries with it the possibility of patient harm and should be treated accordingly.

Moreover, conspiring to pay and paying kickbacks causes programmatic harm to critical government programs, like Medicare, the Veteran's Health Administration, and others. Put simply, healthcare fraud, including the payment of kickbacks, is a scourge that "drains billions of dollars from public and private payers annually[.]" *United States v. Lucien*, 347 F.3d 45, 48 (2d Cir. 2003). Engaging in such fraud is obviously a serious offense, and one that threatens taxpayers' faith in the competent operation of government programs.

**B. Humad's History and Characteristics Provide No Explanation or Justification for His Criminal Conduct**

The government acknowledges that there is more to Humad than his long-running kickback scheme to pay doctors to use SpineFrontier's products and to attempt to conceal the scheme through the use of IME. The defendant immigrated to the United States to attend college at one of the country's most prestigious institutions—the University of Pennsylvania. PSR ¶ 96. He then completed a dual degree program at UPenn's School of Engineering and Applied Sciences and the Wharton School of Business. *Id.* In 2021, he graduated with a Master of Business Administration from Harvard Business School. *Id.* ¶ 99. Prior to working at SpineFrontier, the defendant worked on Wall Street as a financial analyst at J.P. Morgan for two years. *Id*. at 102. He then began working as a financial analyst at SpineFrontier in 2009, earning $60,000 annually. *Id*. ¶ 105. He became the CFO of SpineFrontier in 2011, and he earned $100,000 per year in that position. *Id*. ¶ 106. In 2014, he became the CFO of KIC Management Group, another Chin-owned entity, earning $75,000 per year. *Id*. ¶ 107; Ex. 1 at 2.

When the defendant decided in or around 2013, to participate in a scheme to pay kickbacks to surgeons to induce the latter group's use of SpineFrontier's products, he was facing no dire, nor

even difficult, financial circumstances. On the contrary, he was a graduate of two Ivy League schools with a stable job on the verge of receiving a six-figure income as the CFO of a medical device company. And as the scheme continued for several more years, the defendant's income and title only grew. Indeed, in August 2012, he was sufficiently comfortable to purchase a condominium in Cambridge for $380,000 (and the fair market value of that property today is approximately $665,000). PSR ¶ 114. In short, his decision to engage in the conspiracy seems to have been motivated by simple greed and perhaps a desire to ingratiate himself with his boss, and SpineFrontier's CEO, Kingsley Chin. In any event, Humad has enjoyed plenty of advantages in life; he successfully immigrated to this country, obtained a world-class education, commanded a six-figure salary, and even purchased a home in one of the country's most expensive cities. He knew better than to pay kickbacks, and yet, he did so anyway. His kickback scheme was intended to influence independent physician medical decision-making, and his sentence should reflect that reality.

**C. The Recommended Sentence is Necessary to Promote Respect for the Law and Provide Adequate Deterrence**

The recommended sentence also would "promote respect for the law," 18 U.S.C. § 3553(a)(2)(A), and "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B).

Sentencing the defendant to a significant term of incarceration would promote respect for the law by sending a clear message that conspiring to pay kickbacks in the healthcare industry is an unacceptable offense. Such a message is particularly important here, where Humad waited until the eve of trial to admit to his criminal conduct in the form of the kickback scheme he directed. Notwithstanding his official position and title at SpineFrontier, and more importantly

notwithstanding the *actual* role he played in the offense, Humad continues to maintain that he was not a leader or organizer. Ex. 5, July 15, 2026 Ltr. from Humad's Counsel.[2]

Additionally, Humad continues to insist that SpineFrontier's (misleading) disclosure to CMS's Open Payments Program—that it made "consulting" payments to surgeons—is of any import. Ex. 5 at ¶ 24. It is not. Neither Humad, Chin, IME, SpineFrontier, nor anyone else disclosed to CMS that the payments to Surgeons 1-3 (let alone any others), which were *labeled* "consulting," were *actually* bribes. In fact, the Court should see Humad's involvement in the misleading disclosure to the Open Payments Program for what it is: confirmation of his criminal intent. Humad was well aware of the law and what it prohibited—namely, kickbacks for bogus consulting. And Humad and his co-conspirators attempted to conceal what they were actually doing (paying kickbacks) by merely paying lip service to the required compliance under the Sunshine Act.

On the issue of the need for the sentence to afford adequate deterrence, both specific deterrence and general deterrence are necessary here. Specific deterrence is important because although Humad has accepted responsibility by pleading guilty to Count One (Conspiracy to Violate the AKS), he did so only on the very eve of trial—indeed, the day the trial was scheduled to commence. He also remains unwilling to acknowledge in full his role in and responsibility for the offense.

The need for the sentence imposed to promote general deterrence is even more critical. "As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as

---

[2] As detailed above, and in the government's response to that argument, the evidence is overwhelming that Humad meets the criteria for the leader or organizer enhancement. Ex. 4 at 3-4, June 24, 2026 Ltr. from Gov't Counsel to U.S. Probation.

particularly important in the area of white collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citations omitted). Health care fraud cases especially cry out for deterrence as the system is built on trust. *See United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (insurers "must rely on the honesty and integrity of medical practitioners"). The Medicare program is a behemoth; it does not, and cannot, review every claim for payment *prior* to its submission to determine whether it was kickback tainted. *See, e.g., United States v. Chin*, No. 21-cr-10256-1, Dkt. No. 348 at 4*,* Gov't Opp. To Def.'s Mot. In Limine To Preclude Testimony Of CMS Representative (citing testimony of government witness in another case that Medicare is a "trust-based system in that we trust that the claims that will be submitted will be accurate and truthful, and we have to look retrospectively to evaluate those claims to determine after the fact if they're a problem and recoup those").

Moreover, as is evident from the length of time that it continued, schemes like the instant one are typically difficult to detect and prosecute. This only elevates the need for general deterrence. A sentence consistent with the government's recommendation here would send a strong message to others who might engage in submitting false and kickback-tainted claims to the government, specifically about health care fraud, that trading on the trust of the Medicare program is a significant offense that will result in a jail sentence.

**D. The Recommended Sentence Would Avoid Unwarranted Sentencing Disparities**

Finally, the government's proposed sentence serves the purpose of avoiding unwarranted sentencing disparities. *First*, the government's recommended sentence falls below the sentencing guidelines range as calculated by Probation (41-51 months). *Second*, the JSIN data, as relayed by Probation, demonstrates that from FY 2021-2025, after excluding § 5K1.1 substantial assistance departures, there were 7 defendants whose primary guideline was USSG § 2B4.1, Total Offense

Level 22, and Criminal History Category I. Six of those defendants (86%) received an incarcerative sentence, and for those 6, the average term of imprisonment was 30 months, and the median length of term imposed was 36 months. For all 7 defendants, the average term was 26 months, and the median sentence was 30 months. PSR ¶ 139. *Third*, while it is accurate that the defendant reported to and was supervised by Kingsley Chin, and that Chin stood to gain more financially from the scheme than Humad, Humad pleaded guilty to a more serious offense than Chin and should be held responsible for the offense he has pled guilty to—not the lesser offense that Chin pled to. Chin pleaded guilty to a false statement charge, 18 U.S.C. 1001(a)(2), related to his directing employees to make false reports to CMS's Open Payments Program, and this Court sentenced him to: (i) Time Served (1 day); (ii) 1 year of supervised release; (iii) a $9,500 fine; and (iv) a $100 special assessment (the government had recommended 8 months' imprisonment). Humad pleaded to Conspiracy to Violate the AKS, a far more serious offense. Dkt. No. 397. As such, sentencing Humad to the top of the government's recommendation—8 months' imprisonment—would create no unwarranted disparity with Chin, nor with anyone else.

Finally, in recognition of Chin's executive role and its recommendation in Chin's case of an 8-month sentence, the government agreed to limit its recommendation to 8 months for Humad—mirroring its recommendation for Chin. Nevertheless, Humad played *the key* operational role in organizing and carrying out the long-running kickback scheme, which included an attempt to conceal the scheme through a third party (IME) that he controlled with his co-defendant. *See, e.g.,* Ex. 6 (Email from V. Dudley: "I don't have access to IME's accounts. As far as I know, only Aditya [Humad] and Kingsley do."). Anything less than the full 8 months' imprisonment would both create an unwarranted sentencing disparity vis-à-vis the other defendants in the JSIN data and diminish the seriousness of the offense in which the defendant engaged.

## CONCLUSION

For the reasons set forth above, the government submits that the recommended sentence consisting of 8 months of imprisonment, a fine of $9,500, 12 months of supervised release, and a mandatory special assessment of $100, is justified and appropriate in this case.

Dated: July 30, 2026

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ *Abraham R. George*
ABRAHAM R. GEORGE
CHRISTOPHER LOONEY
MACKENZIE A. QUEENIN
Assistant United States Attorneys
1 Courthouse Way
John J. Moakley U.S. Courthouse
Boston, MA 02210
(617) 748-3100

## CERTIFICATE OF SERVICE

I, Abraham R. George, certify that on this 30th day of July 2026, I caused this document to be filed through the ECF system.

/s/ *Abraham R. George*
ABRAHAM R. GEORGE
Assistant United States Attorney