# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | Criminal Action No. 1:21-cr-10256-IT-2 |
| ADITYA HUMAD, Defendant. | ) | |

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

RULE 11 HEARING

Monday, May 11, 2026
9:03 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

# A P P E A R A N C E S

On behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
BY: MACKENZIE A. QUEENIN
ABRAHAM R. GEORGE
CHRISTOPHER R. LOONEY
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3338
mackenzie.queenin@usdoj.gov
abraham.george@usdoj.gov
christopher.looney@usdoj.gov

On behalf of the Defendant:

FICK & MARX LLP
BY: DANIEL N. MARX
WILLIAM W. FICK
24 Federal Street
4th Floor
Boston, MA 02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

P R O C E E D I N G S

(In open court at 9:03 a.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cr-10256, United States v. Humad. Will counsel please identify themselves for the record.

MS. QUEENIN: Good morning, Your Honor. MacKenzie Queenin, Abe George, and Chris Looney for the United States.

THE COURT: Good morning.

MR. MARX: Good morning, Your Honor. Daniel Marx and William Fick for Aditya Humad, who is here in court with us.

THE COURT: Good morning.

THE DEFENDANT: Good morning.

THE COURT: Good morning.

And we're here for a Rule 11, correct?

MR. MARX: Yes, Your Honor.

THE COURT: If you could swear in the defendant, please.

THE DEPUTY CLERK: Yes, Your Honor.

Sir, could you please rise. Raise your right hand.

(Defendant duly sworn.)

THE DEPUTY CLERK: Please state your name for the record.

THE DEFENDANT: Aditya Humad.

THE DEPUTY CLERK: Thank you.

THE COURT: Mr. Humad, do you understand that you're now under oath and that, if you answer any of my questions falsely, your answers may later be used against you in another prosecution for perjury or making a false statement? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At any point, if you need to, please feel free to consult with your counsel.

Mr. Humad, how old are you?

THE DEFENDANT: Forty-one.

THE COURT: And what education level have you attained?

THE DEFENDANT: I've done bachelor's, bioengineering, finance, and the executive program in business at HBS.

THE COURT: And as you stand here today, are you under the influence of any drug or alcoholic beverage of any kind?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you taken any medicine, prescription or otherwise, that could affect your ability to understand these proceedings and to testify truthfully?

THE DEFENDANT: No, Your Honor.

THE COURT: And have you received any recent treatment for any mental illnesses or psychological problems of any kind?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you received a copy of the superseding indictment in this case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you are charged in Count 1 with conspiracy to violate the anti-kickback statute in violation of 18 USC Section 371; and, in Counts 2 through 4, with violations of the anti-kickback statute, 42 USC Section 1320a-7b(b)(2); and there are forfeiture allegations in the superseding indictment.

Do you understand these charges?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you're represented by counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you fully discussed the charges against you and the facts and circumstances of this case with your counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you fully satisfied with the counsel, representation, and advice given to you in this case by your attorneys?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Counsel, have you communicated all formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused?

MR. MARX: Yes, Your Honor.

THE COURT: And to the government, pursuant to Local Rule 116.2(b)(4), the government is required before any plea to provide the defendant with a written summary of any information in the government's possession that tends to diminish the degree of his culpability or his offense level under the guidelines.

Has the government done so?

MS. QUEENIN: Yes, Your Honor.

THE COURT: Thank you.

I understand you have entered into a plea agreement with the United States Attorney's Office; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you sign the agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I have a document that was docketed on May 9th. Is that your signature at the bottom of that, or in the middle of that page?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you have an opportunity to read the agreement and discuss it with your attorney before you

signed it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Does the plea agreement contain all the terms to which you have agreed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand the terms of the plea agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that this agreement is the only agreement you have with the United States government? That may not be true. Is there a civil agreement?

MR. MARX: There is, Your Honor.

THE COURT: Do you understand that, other than the civil agreement, this is the only agreement you have with the United States government?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has anyone made any promises or assurances to you that are not in the plea agreement?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone threatened you or pressured you in any way to persuade you to accept this agreement?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you understand that the terms of the plea agreement as to your sentence are only recommendations

to me and that I can reject those recommendations without permitting you to withdraw your plea of guilty, and I can impose a sentence that may be more severe than you anticipate?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that the offense to which you're pleading guilty is a felony?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand, if I accept your plea, you will be judged guilty of these offenses or that -- sorry.

Is the plea agreement to one offense, and the others are being dismissed?

MR. MARX: Correct, Your Honor.

THE COURT: Do you understand, if I accept your plea, you will be -- you will be judged guilty of that offense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you a United States citizen?

THE DEFENDANT: Yes, Your Honor.

THE COURT: My colloquy here, which I realize is -- I wrote some years ago, says that if you're not a United States citizen, you may be, et cetera, et cetera. And I realized recently that the plea agreements for the last

probably four years or more have changed that language, and it no longer says "if you're not a United States citizen." It says "if you're not a United States citizen by birth," or "if you're a naturalized citizen," or something of that sort.

Are there any circumstances in this case that I should do an inquiry different than just, "Are you a United States citizen?"

MS. QUEENIN: No, Your Honor. I will tell you I was the one that put the plea agreement together; and as I was doing it, I did not have access to that information, and I was trying to get it filed. So I included it out of an abundance of caution, but I see no reason why the Court needs to go further on that.

THE COURT: Okay. The reason I'm raising a question is that, in certain circumstances, the government is taking action against people for -- who have been naturalized. And so in the event that that is some potential, I would have to do, and I would think it would be appropriate to do, a further inquiry here. But it doesn't sound like there is any issue of that sort here on the table.

So do you understand that, by being judged guilty, you may lose valuable civil rights, including the right to vote in many states, to hold public office, to serve on a jury, and the right to possess a gun or any kind of firearm or ammunition? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So I understand -- let's make sure I understand the potential -- what we're looking at as potential penalties here.

And, Counsel, please correct me if I'm -- have this wrong, that the maximum imprisonment on Count 1 is -- by statute -- is five years; there's no mandatory minimum. The maximum supervised release is three years, no mandatory minimum.

The maximum fine is 250,000 or twice the gross pecuniary gain or loss, whichever is greater; special assessment of $100; and forfeiture as alleged in the superseding indictment.

Any disagreement with that?

MS. QUEENIN: No, Your Honor.

MR. MARX: No, Your Honor, except that, as the agreement goes on to say, the government is not seeking forfeiture in this case; but, otherwise, those are the maximum penalties.

THE COURT: Thank you. Okay.

So do you understand, Mr. Humad, that by statute, those are the maximum penalties applicable to this criminal violation?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And I want to make sure you

understand a little bit about the sentencing guidelines and how they may affect your sentence. Those guidelines have been issued by the United States Sentencing Commission for judges to consider when determining your sentence. They're not mandatory. I do not have to follow them. I do have to consider them.

Have you and your attorney talked about the guidelines and how they may apply in your case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that I will not be able to determine your guideline sentence until after the probation office has prepared a presentence report?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that the presentence report will contain information about you, any criminal history, crimes you've committed, and other uncharged or dismissed conduct; and I may consider all of this information in applying the guidelines?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you'll have the chance to review the presentence report and to challenge the facts reported into it, as well as the legal construction there; and as to the facts, do you understand that I need only find these facts to a preponderance of the evidence,

more likely true than not true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand, again, that, although I'm not required to follow the guidelines, I am required to consider the guideline sentence before I impose sentence on you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that, under the guideline system, I have the authority to depart from the guideline sentence and impose a sentence that is more severe than what the guidelines call for?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that I can also impose a sentence less severe than what the guidelines call for?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that you will not be permitted to withdraw your plea of guilty if your sentence is different than you expected?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And so do you understand that what this means here is I will have the authority to give you a term of imprisonment of up to five years, a term of supervised release of up to three years, a fine of up to 250,000 or twice the gross gain or loss, special assessment of $100; and

I will have the authority to do that, and you will not have the right to withdraw your plea of guilty if I impose such a sentence?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I simply -- the requirement here is that I need to impose a sentence that's reasonable under the circumstances. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Next thing I need to do is to make sure you understand your trial rights that you're giving up by proceeding here by plea.

Do you understand you have the right to plead not guilty to the offenses charged against you and to go to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you have the right to a trial by jury?

THE DEFENDANT: Yes.

THE COURT: Do you understand that a jury is composed of 12 jurors who must unanimously find beyond a reasonable doubt that you committed the crime with which you're charged before you may be found guilty?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand at trial you would be

presumed to be innocent, and the government would have to prove your guilt beyond a reasonable doubt?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand at trial you'd have the right to the assistance of counsel for your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to see and hear all the witnesses against you and have them cross-examined in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right, if you chose to exercise it, to testify and to put on evidence in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to require witnesses to come to court to testify in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to refuse to testify and refuse to put on evidence unless you voluntarily elected to do so?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that if you decided not to testify or not to put on any evidence, those facts could not be used against you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you further understand that by entering a plea of guilty here today, if I accept your plea, there will be no trial, and you will have waived or given up your right to a trial as well as the rights that come with a trial that I have just described?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, your plea agreement contains a waiver of appellate rights, and so I need to make sure again that you understand what your rights would be in the absence of such a provision and what your rights are given this provision.

Do you understand that, but for the terms set forth in the plea agreement, you may have been able to argue in another proceeding, collateral or otherwise, that your conviction should be set aside or reduced?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that, but for the terms set forth in the plea agreement, any sentence that I impose could have been appealed by you on direct appeal or challenged in a future proceeding, collateral or otherwise?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you have the following appeal waiver provisions in your plea agreement:

You will not challenge your conviction on direct appeal or in any other proceeding, including a separate civil lawsuit, and that you will not challenge your sentence, including any court orders relating to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including a separate civil lawsuit?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, notwithstanding this waiver, you, as all defendants, reserve the right to claim that your lawyer was ineffective in connection with the negotiation of the plea agreement or the entry of the guilty plea or to claim serious prosecutorial misconduct serious enough to entitle you to have your conviction or sentence overturned.

But other than those two very narrow exceptions, you're giving your right up -- your rights to appeal. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. The next thing I need to do is to make sure you understand what it is that the government would have to prove if the case went to trial. And then I'm going to ask the assistant US attorney about the evidence that they were prepared to come forward with, and then I'm going to come back and see if you have any disagreement.

So for the conspiracy charge, the government would

have to prove that the agreement specified in the superseding indictment, and not some other agreement, that that agreement existed between at least two people to violate the anti-kickback statute as charged in the superseding indictment; that you willfully joined in that agreement; and that one of the co- -- one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.

The underlying charge that the -- to violate the anti-kickback statute, you're not being -- you're not pleading guilty today to those counts, and I understand the government will withdraw it.

But to be clear what that required, since that's a part of the conspiracy, since the conspiracy element is violating the anti-kickback statute, for the underlying crime, which the conspiracy is directed at, is knowingly and willfully offering to pay -- offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce that person to, in this case, purchase or arrange for or recommend the purchasing of an item for which payment may be made in whole or in part under a federal healthcare program.

And I think I said at the beginning that that was -- and that you did so knowingly and willfully.

So that's -- any disagreement, Counsel?

MS. QUEENIN: No.

MR. MARX: No, Your Honor.

THE COURT: Okay. So that's what the government -- do you understand that's what the government would have to prove if the case went to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Now, I'm going to have you sit down, and I'm going to ask the government as to the evidence that they're prepared to come forward with.

And I'm going to ask you to go slowly since I don't have a copy of this here, so --

MS. QUEENIN: Okay. Your Honor, if the case were to proceed to trial, the government would prove the following based on witness testimony and documentary evidence:

The defendant was the chief financial officer of SpineFrontier, Inc., which is a Massachusetts-based company that designed, manufactured, marketed, and sold spinal products.

Surgeons, including 1 through 3 as identified in the superseding indictment, used those products in spine surgeries that federal healthcare programs paid for throughout the United States. Those programs included Medicare, Medicaid, and the Veterans Health Administration, which are each a federal healthcare program as defined by the anti-kickback statute.

Often there were two types of payments and reimbursements associated with spine surgeries: one for the cost of the procedure itself and the other for the labor provided by the surgeon.

Hospitals typically submitted a bill to a patient and a claim for reimbursement to an insurance carrier, which included federal healthcare programs, for the cost associated with the surgery, including the cost of spinal products and -- that were used during those procedures.

Surgeons typically submitted or caused to be submitted a separate bill to patients and a claim to those federal healthcare programs for the surgeons' services rendered during those procedures.

SpineFrontier's implant devices were often held on a consignment basis at a hospital or a surgical center, and the prices of those products ranged from hundreds to thousands of dollars.

The government would prove that when a surgeon used a specific spinal implant in a surgery, the hospital or surgical center ordered a replenishment implant and paid SpineFrontier for the implant used in the procedure.

The government would show that between in or about late 2012 and in or about March 2017, the defendant and Kingsley Chin, the former CEO of SpineFrontier, and their co-conspirators, including Surgeons 1 through 3, conspired to

pay and receive kickbacks through SpineFrontier's consulting program.

The object of the conspiracy was to pay bribes in connection with the use of SpineFrontier products in healthcare services reimbursed in whole or in part by those federal healthcare programs, and the purpose was for the co-conspirators to enrich themselves.

The government would show that the defendant and Chin directed and paid bribes in the form of consulting payments with the intent to induce surgeons, including Surgeons 1 through 3, to order and use SpineFrontier's products and to reward their selection and use of those products. Those surgeons were paid typically between 250 and $1,000 for each hour the surgeon supposedly spent consulting.

The government would prove that, during the course of this conspiracy, the defendant paid or directed the payment of over $540,000 in payments to Surgeons 1 through 3 in exchange for their use of SpineFrontier's products.

Surgeons 1 through 3 participated in SpineFrontier's consulting program and accepted payments for purported consulting work when, in fact, they only spent a small fraction of their reported time performing actual consulting activities for SpineFrontier. They accepted the sham consulting payments as a bribe and reward for their continued selection and usage of the products.

The government would show that the defendant directed surgeons, including Surgeons 1 through 3, to bill SpineFrontier via a purportedly independent entity called Impartial Medical Experts, which was actually owned by Chin, for purported consulting hours based not on time spent consulting, but on the number and type of surgeries that the surgeon performed, including those surgeries paid for by federal healthcare programs.

The government would show that on numerous occasions the defendant determined the amount of bribes SpineFrontier would pay to surgeons by reviewing how many surgeries the surgeons performed using SpineFrontier's products and how much revenue those surgeries generated for SpineFrontier. The government would prove SpineFrontier received millions of dollars in net revenue from the sales of its products used by Surgeons 1 through 3.

The government would prove that, during the conspiracy, this defendant caused to be committed the following overt acts, among others, in furtherance of the conspiracy: The defendant told Surgeon 1 and Surgeon 1's distributor that Surgeon 1 would receive 10 percent of the revenue he generated from using SpineFrontier's products.

The defendant told Surgeon 2 that SpineFrontier would approve more of Surgeon 2's submitted consulting hours if he used more expensive SpineFrontier products.

And the defendant had a conversation with Surgeon 3 in which the defendant informed Surgeon 3 that SpineFrontier would compensate him based on the number of surgeries Surgeon 3 performed with SpineFrontier's products. At no time did the defendant or anyone else from SpineFrontier ask Surgeon 3 how much time he had actually spent consulting.

Your Honor, that's a summary of the evidence the government would submit at trial.

THE COURT: Okay. Thank you.

Mr. Humad, back to you: Did you understand the factual basis for the plea just recited by the assistant US attorney?

THE DEFENDANT: Yes.

THE COURT: And briefly, the government contends you were the CFO of SpineFrontier and that you and SpineFrontier and others entered into an agreement which included at least the three surgeons identified as 1, 2, and 3 in the indictment; and that as to -- that the agreement was to use SpineFrontier's product in return for pay which occurred through a consulting program; and that the purpose of the agreement was to have the surgeons use those products and increase and provide revenue for SpineFrontier.

Any disagreement with those facts so far?

MR. MARX: Your Honor, did you say "the purpose"?

THE COURT: I did, because that's what she said,

and I'm asking if there's any disagreement with that.

MR. MARX: I think our understanding was that Mr. Humad is prepared to acknowledge and accept responsibility for it having -- a purpose, and this has, obviously, been extensively negotiated with the government; and I think they acknowledged that some of the money paid under the consulting program may have been for consulting purposes.

He acknowledges that some of that money was also paid for as an inducement for the use of SpineFrontier products, and I --

THE COURT: I have no -- either way, we get there. I just -- the government said "the purpose," and I was asking if there's any disagreement. Whether it was the purpose or a purpose, you're welcome to make clear.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So my question at that point wasn't so good, but it was a purpose of the consulting program to provide additional revenue and to sell additional products, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And that, specifically with regard to these three surgeons, you agreed with Spine- -- with Surgeon 1 or Surgeon 1's related company that Surgeon 1 would receive 10 percent back on products used, the cost of

products used?

Is that the allegation?

MS. QUEENIN: Yes, Your Honor. I believe what I said is the agreement was with Surgeon 1 and Surgeon 1's independent distributor as well as the Defendant Kingsley Chin or --

THE COURT: And as part of that, there would be return of 10 percent of the revenue to Surgeon 1 or the distributor for Surgeon 1?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And then as to Surgeon 2, that you conveyed to Surgeon 2 that you would approve more hours if Surgeon 2 used more products -- more consulting hours if Surgeon 2 used more products?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And with regard to Surgeon 3, I'm not sure that was an overt act. Surgeon 3, you said that they did not ask how much time was spent in the consulting as --

MS. QUEENIN: The overt act that I had named was there was a conversation with Surgeon 3 in which the defendant informed Surgeon 3 that SpineFrontier would compensate him based on the number of surgeries SpineFrontier -- sorry -- based on the number of surgeries that surgeon performed with SpineFrontier's products.

You're correct; I also did add at no time did the

defendant ask Surgeon 3 how much time he had actually spent consulting.

THE COURT: Any disagreement with those facts?

THE DEFENDANT: No, Your Honor.

THE COURT: Are you then, in fact, guilty of the conspiracy charge?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Any reason the Court should not take the change of plea at this time?

MR. MARX: No, Your Honor.

THE COURT: Ms. Marchione, if you could please take the change of plea.

THE DEPUTY CLERK: Yes, Your Honor.

Mr. Humad, you are charged in an indictment with Count 1, conspiracy to violate the anti-kickback statute, all in violation of Title 18 United States Code Section 371. You have previously pleaded not guilty to this charge. Do you wish to now change your plea?

THE DEFENDANT: Yes, Your Honor.

THE DEPUTY CLERK: How do you now plead to Count 1s? Guilty or not guilty?

THE DEFENDANT: Guilty.

THE DEPUTY CLERK: Thank you.

THE COURT: The Court finds the defendant is fully competent and capable of entering an informed plea; he's

aware of the nature of the charges and the consequences of the plea; and that the plea is a knowing and voluntary plea supported by an independent basis in fact, containing each of the essential elements of the offense charged.

The plea is, therefore, accepted; and the defendant is now judged guilty of this offense.

And with that, you may sit down.

I want to touch base again about the presentence report. That will be prepared by the probation office to assist me in determining your sentence. You'll be asked to give information. Your attorney may be present if you wish.

It is important that the report is accurate. It will not only affect what sentence you receive, but it also happens -- to you after you are sentenced. For example, if you are sent to prison, it will affect where you're sent, what happens to you when you get there, so even minor mistakes in the report should be brought to your counsel and my attention.

And you'll have a chance at sentencing -- both you and your counsel will have a chance to speak on your behalf.

And so with that, I do refer you to the probation office for the presentence investigation. I'm assuming that hasn't been arranged given the timeline on this, but if you could kindly do so quickly. Thank you.

Do we have a date for sentencing?

THE DEPUTY CLERK: Yes, Your Honor. We have August 6, 2026, at 2:30 p.m.

THE COURT: What day of the week is that?

THE DEPUTY CLERK: It's a Thursday, Your Honor.

THE COURT: Okay. Okay. That's fine.

And there's been no issues during the release, so you're continued on release on all the previously set conditions. And I do find by clear and convincing evidence that you're not likely to flee or pose a danger to the community if released pending sentencing.

So with that, is there anything else we need to do today?

MS. QUEENIN: No, Your Honor.

MR. MARX: No, Your Honor.

THE COURT: Okay. Thank you, everyone, and -- for all your work on this, and I will see everybody in August.

MR. MARX: Thank you, Your Honor.

THE DEPUTY CLERK: We are in recess.

(Court in recess at 9:36 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of June, 2026.

/s/ Robert W. Paschal

____________________________

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter