# Exhibit 4

**U.S. Department of Justice**

***Leah B. Foley***
*United States Attorney*
*District of Massachusetts*

***Main Reception: (617) 748-3100***

***John Joseph Moakley United States Courthouse***
***1 Courthouse Way***
***Suite 9200***
***Boston, Massachusetts 02210***

June 24, 2026

**By Email**
Ms. Samantha Jackson
U.S. Probation Officer
District of Massachusetts
1 Courthouse Way, Suite 1-200
Boston, MA 02210
Samantha.Jackson@map.uscourts.gov

**Re:** ***United States v. Aditya Humad*, No. 1:21-cr-10256-IT**

Dear Ms. Jackson:

We write in response to Defendant Aditya Humad's letter to you dated June 17, 2026, and address below each of the points the Defendant articulated in that letter.

*First*, the Defendant argued that your Presentence Report should "include the important facts that [the] offense conduct did not cause any patient harm, result in any medically unnecessary services, or lead to any financial loss to any federal healthcare program." Def.'s Ltr. at 1. While it is true that the government did not allege that the Defendant caused patient harm or medically unnecessary services, it is not accurate that the government conceded that Defendant's offense conduct caused no harm.

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) ("AKS"), prohibits the offer or payment of any remuneration to induce a provider to use, purchase, prescribe, or recommend or arrange for the use, purchase, or prescription of an item or service reimbursable by a federal healthcare program. The purpose of the AKS is to "prevent medical providers making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions." *United States ex rel. Banigan v. Pharmerica, Inc.*, 950 F.3d 134, 137 (1st Cir. 2020). Put differently, the AKS is a *prophylactic* statute. Congress recognized the potential for compromised medical judgment inherent in the provision of remuneration to providers; thus, it sought to outlaw the mere possibility that providers' medical judgments would be clouded or conflicted. *See United States v. Vora*, 488 F. Supp. 3d 554, 565 (W.D. Ky. 2020) ("Medical necessity is not relevant for the AKS theory of liability.") (citing *United States v. Eggleston*, 823 Fed. App'x 340, 344 (6th Cir. 2020)). Indeed,

the AKS's text even outlaws the *offer* of remuneration. Accordingly, the Presentence Report should focus on the Defendant's intent—which was to offer and pay kickbacks to induce use of SpineFrontier's products—as, after all, the "gravamen of Medicare Fraud is inducement." *United States v. BayState Ambulance and Hosp. Rental Servs., Inc., et al.*, 874 F.2d 20, 29 (1st Cir. 1989).

*Second*, in his June 17 Letter, the Defendant argued that the assertion that he sought to enrich himself was not "entirely accurate," as "Mr. Humad had no direct financial interest in the consulting program." Def.'s Ltr. at 1. Based on its review of available documents, and as described below, the government believes this argument to be misleading.

Kinglsey Chin (a co-defendant in the case, who previously pleaded guilty in May 2025, Dkt. No. 378), was the CEO and founder of SpineFrontier, the Defendant's employer. Chin was also the owner and founder of Kingsley Investment Company, LLC, which owned KICVentures, LLC, which in turn owned 98.26% of SpineFrontier, and together with another Chin-owned company (KIC Management Group), owned 100% of Impartial Medical Expert, LLC ("IME"). The relationship between all these Chin-owned and Chin-controlled companies is laid out in a document that SpineFrontier produced to the government during the investigation. *See* Ex. 1 at 1-2.

On or about January 1, 2016, Chin, acting through KIC Management Group, Inc., as manager of KICVentures, LLC, executed an "Assignment Transaction," pursuant to which Chin granted 10% of KICVentures, LLC to Defendant Humad, as the "Assignee" in the Agreement. *See* Ex. 2 at 1. The Defendant signed the Assignment transaction, as reflected in the attached Exhibit 2. *See* Ex. 2 at 10. Moreover, per the Assignment Transaction, the Defendant, as the Assignee, was entitled up to "an additional 5% of [Chin's] membership interest in the Company in 1% increments over a 5 year period . . . to the Assignee. . ." Ex. 2 at 1.

In summary, Chin and the Defendant agreed that Chin would provide 10%, and up to 15%, of Chin's ownership of KICVentures to the Defendant. And KICVentures effectively owned SpineFrontier and IME in full. *See* Ex. 1 at 2 (KICVentures owned 98.26% of SpineFrontier and 99.95% of IME). So, at a minimum, the Defendant's argument concerning ownership in his June 17 Letter is misleading. Although the government does not know whether Chin and Defendant Humad in fact executed the Assignment Transaction—i.e., whether Chin actually conveyed 10% (or up to 15%) of his ownership of KICVentures to the Defendant—that is of no consequence for present purposes. Either the Defendant had a 10% (or greater) ownership interest in KICVentures (and thus SpineFrontier and IME), as the Assignment Transaction stated, or he was promised that he would obtain ownership as the Agreement contemplated. In all events, based on the Assignment Transaction, the Defendant plainly had a financial motive to engage in the kickback conspiracy, regardless of whether the Assignment was in fact executed. And even if the Assignment did not exist, the Defendant enjoyed his continued employment as the CFO of SpineFrontier, which was contingent on SpineFrontier's continued viability and profitability. The consulting program undeniably contributed to that viability. *See* Ex. 3, Rule 11 Transcript, at 21:14-16) (stating "[t]he government would prove SpineFrontier received millions of dollars in net revenue from the sales of its products used by Surgeons 1 through 3.").

*Third*, the Defendant argues that he was not an "organize or leader" in the criminal activity, and therefore the 4-level role enhancement should not apply. Def.'s Ltr. at 2. You should reject this argument in full. The enhancement applies by the Defendant's own admissions alone. The Defendant was both the President and Chief Financial Officer of SpineFrontier. Ex. 4 at 1. Per his own signature block he also was the "Co-Founder" and "Chief Financial Officer" of KICVentures, LLC. Ex. 5 at 1.

The Defendant admitted at his Rule 11 hearing that he, and his co-conspirator Chin, directed and paid bribes to Surgeons 1-3, and further directed them to bill SpineFrontier through IME based on the number and type of surgeries performed. Ex. 3 at 20:8-18, 21:1-8 ("The government would show that the defendant and Chin directed and paid bribes in the form of consulting payments with the intent to induce surgeons, including Surgeons 1 through 3, to order and use SpineFrontier's products and to reward their selection and use of those products. . . . The government would prove that, during the course of this conspiracy, the defendant paid or directed the payment of over $540,000 in payments to Surgeons 1 through 3 in exchange for their use of SpineFrontier's products. . . . The government would show that the defendant directed surgeons, including Surgeons 1 through 3, to bill SpineFrontier via a purportedly independent entity called Impartial Medical Experts…").

The Defendant also organized and led the criminal activity of outside sales representatives, including J.B. (who the Defendant referenced in his letter, and who pleaded guilty and is awaiting sentencing). Indeed, the Defendant admitted he directed and coordinated with J.B. that Dr. J.M., who worked with J.B., would receive 10 percent of the revenue Dr. J.M. generated from using SpineFrontier's products. Ex. 3 at 21:20-22. Documents also reflect that the Defendant directed that J.B. would receive a 25% commission on his sales of SpineFrontier products to Dr. J.M. (who pleaded guilty and is awaiting sentencing), and a 35% commission on his sales of SpineFrontier products to surgeons who did not have a "consulting" arrangement with SpineFrontier. Ex. 6 at 2. This meant, in effect, that SpineFrontier was not paying Dr. J.M. for consulting, but rather for use of the product.

Similarly, the Defendant emailed Chin and another SpineFrontier employee in response to Chin's directive to pay outside sale representatives different amounts based on whether the associated surgeon was a "consultant" for SpineFrontier. The Defendant responded to Chin's proposal by stating, "We cannot state that explicitly in agreement around consulting payments." Ex. 7 at 1. The Defendant handled questions from outside distributors about the "consulting" arrangements and how surgeons should import purported "consulting" time. In addition to J.B., as discussed above, this included another sales representative, M.D., who was the representative for Dr. M.M., who was the subject of Count 2 of the Superseding Indictment. *See* Ex. 8 at 1.

Many people at SpineFrontier and KICVentures also reported to the Defendant. This includes former sales representative S.A., who testified in grand jury that the information he shared with surgeons concerning, among other things, SpineFrontier offering payment on a per case basis, came from his discussions with the Defendant and Chin.[1] It also includes V.D., Chin's now-wife,

[1] After S.A. left documents at Harris Methodist Hospital outlining how SpineFrontier would pay doctors $500 per case for a cervical surgery, a doctor at Harris Methodist emailed the

who ostensibly was the IME Business Administrator, but in fact reported directly to the Defendant and Chin. For example, V.D. wrote that she did not "have access to IME's accounts[.] As far as I know, only Aditya and Kingsley do." Ex. 9 at 1.

C.G., a junior financial analyst, also reported to the Defendant.[2] As she testified in grand jury, at the Defendant's direction, C.G. created a monthly report that listed total surgical cases by surgeons, total reported "consulting hours," total "expected" "consulting hours" (based on a flat rate of 1 hour of consulting time for every cervical case and 2 hours for every lumbar case), and total sales. Ex. 10 at 1; Exs. 11.1, 11.2. The purpose of this report was for the Defendant to determine whether SpineFrontier would pay the surgeon's submitted and purported consulting hours, based on the profitability of the surgeon's usage of SpineFrontier's products. That is, the Defendant determined how much to pay the surgeon not based on consulting work actually performed (if any), but based on how much money the surgeon made SpineFrontier. The Defendant himself had sole authority to approve, or not, the surgeons' submitted consulting hours. *See*, *e.g*., Ex. 12.1 at 1.

Finally, the Defendant also directed false Sunshine Act reporting by SpineFrontier. *See* the Physician Payment Sunshine Act, 42 U.S.C. § 1320a-7h (the "Sunshine Act"). Chin pleaded guilty to directing false Sunshine Act reporting in violation of 18 U.S.C. § 1001(a)(2). *See* Dkt. No. 378 (Chin Plea Agreement). The Defendant was intimately involved in SpineFrontier's mandatory Sunshine Act reporting to the Centers for Medicare and Medicaid Services ("CMS"). He oversaw SpineFrontier's submissions to CMS's Open Payments Program. At one point, in 2014, in response to Chin's idea to provide free Miami Heat tickets to surgeons (itself likely violative of the AKS), the Defendant responded that Chin had a "Great idea!" Ex. 14 at 1. The Defendant suggested, however, that "[s]ince we are going to be inviting surgeons, lets buy this under LESS Institute [another Chin-owned entity) AMEX to *avoid sunshine reporting* with SpineFrontier." Ex. 14 at 1 (emphasis added). In doing so, the Defendant was directing false reporting by Chin, V.D., and others on the email.

Finally, the Defendant argues that he is unlikely to recidivate because he has received a notice of exclusion from the healthcare industry by the State of New York and because he no longer works for SpineFrontier or KICVentures. The government is unable at present to assess the veracity of the Defendant's claim that he no longer works for SpineFrontier or KICVentures; as of the date of his Plea Agreement the government had every indication that he remained an employee of both entities. For the duration of this long-running case, the Defendant was employed by and personally close to Chin. If that has changed since May 11, 2026, it has only been a very

---

Defendant detailing how this had occurred. The Defendant responded about a secondary issue, ignoring the $500 per case communication from S.A. As S.A. testified in grand jury, the message he left with Harris Methodist was consistent with the direction he received from the Defendant and Chin, and the fact that the Defendant deliberately declined to address that portion of the email from Harris Methodist is consistent with S.A.'s grand jury testimony on this point. See Ex. 13 at 1.

[2] As noted above, based on the defendant's admissions at the Rule 11 hearing alone, Probation should conclude the enhancement applies. The government can provide a transcript of his testimony or C.G.'s testimony (discussed below) upon request.

recent change. Moreover, as Exhibit 1 makes clear, the scope of Chin's business ventures is broad and includes multiple entities that are within the healthcare industry (Axiomed; IME; KIC, LLC; KIC Management Group, Inc; KICVentures, LLC; LESS Institute, SpineFrontier, etc.). Thus, even assuming the Defendant's claim is accurate, the government respectfully suggests that you may want to consider probing the nature and scope of any current relationship (whether employee, contractor, consultant, etc.) between the Defendant and Chin or any Chin-owned, -controlled, or -involved entity, following the Defendant's plea. Lastly, the fact that one state Medicaid agency has excluded the Defendant does not support the claim that the Defendant is unlikely to recidivate.

Sincerely,

*/s/Abraham R. George*
Abraham R. George
Christopher Looney
Mackenzie Queenin
Assistant U.S. Attorneys

cc: Daniel Marx
William Fick

# Exhibit 1
## (to Ex. 4)




**ORGANIZATIONAL CHART 7-1-16**

| Company | Owner | Manager |
|---|---|---|
| KICVentures, LLC | KIC, LLC (100%) | KIC Management Group Inc. |
| Spinefrontier, Inc. | KICVentures, LLC (98.26%), Chris Chang (1.63%), Bagby Family Members (0.11%) | KIC Management Group Inc. |
| KIC, LLC | Kingsley R. Chin | Kingsley R. Chin |
| IME, LLC | KICVentures, LLC (99.95%), KIC Management Group, Inc. (0.05%) | KIC Management Group Inc. |
| KIC Management Group, Inc. | Kingsley R. Chin | Kingsley R. Chin |

**OWNERSHIP CHART 7-1-16**

SIK-000002

| Document title: | SpineFrontier Organizational Chart | | |
|---|---|---|---|
| Document number: | OC-00003 | Revision: | B |




*Indicates Management Representative

# Exhibit 2
## (to Ex. 4)

**RESOLUTIONS ADOPTED BY UNANIMOUS WRITTEN CONSENT OF KIC MANAGEMENT GROUP, INC, MANAGER OF KICVENTURES, LLC**

Effective as of January 1, 2016

**WHEREAS**, KIC Management Group, Inc., a Delaware corporation ("**the Manager**") is the manager of KICVentures LLC, a Delaware limited liability company (the "**Company**") must approve, under Section 1.12(a) of the Company's Limited Liability Company Agreement (as last amended on 1 July 2014) (the "**Operating Agreement**"), any transfers by a member of the Company in order for such transfers to be valid; and

**WHEREAS**, the sole member, Kingsley Investments Company, LLC, a Delaware limited liability company (the "**Sole Member**") has requested the Manager to approve future assignments of portions of the Sole Member's interest in the Company to Mr. Aditya Humad, (the "**Assignee**"), who is President and Chief Financial Officer of the Company, as contemplated in the Assignment and Assumption Agreement, by and between the Sole Member and the Assignee, dated January 1, 2016 attached hereto as Exhibit A (the "**Assignment Agreement**"); and

**WHEREAS**, the Manager of this Company deems it to be in the best interests of the Company and the Sole Member to enter into the Assignment Agreement which will have the effect on the Assignment Effective Date (as defined in the Assignment Agreement) of initially transferring 10% of the Sole Member's membership interest in the Company to the Assignee, and transferring up to an additional 5% of the Sole Member's membership interest in the Company in 1% increments over a 5 year period (collectively, the "**Assignment Transaction**") to the Assignee, and the Operating Agreement to be amended accordingly;

**WHEREAS**, the Manager deems it to be in the best interests of the Company to further amend the Operating Agreement to formally establish a Board of Directors, with Kingsley R. Chin, MD and Mr. Aditya Humad serving as the initial board members, and the creation of a new Strategic Advisory Board with members to be appointed by the newly established Board of Directors;


SF-HUM-00283081

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that the form, terms and provisions of the Assignment Agreement, including all exhibits and schedules attached thereto, be, and hereby are, approved;

**RESOLVED**, that Kingsley R. Chin, MD, Chairman & CEO of the Manager of the Company ("**Authorized Person**"), be, and hereby is, authorized and empowered to execute and deliver the Assignment Agreement, including all exhibits and schedules attached thereto, in the name and on behalf of the Company with such additions, deletions or changes therein (including, without limitation, any additions, deletions or changes to any schedules or exhibits thereto) as the Authorized Person executing the same shall approve the execution and delivery thereof by the Authorized Person to be conclusive evidence of his or her approval of any such additions, deletions or changes;

**RESOLVED**, that the Sole Member and the Company be, and hereby are, authorized and empowered to perform all of their obligations under the Assignment Agreement, including but not limited to, the Assignment Transaction;

**RESOLVED**, that the Operating Agreement be amended and restated in substantially the form attached hereto as Exhibit B to (A) establish a new Board of Directors ("BofD"), with the initial voting members being Dr. Kingsley R. Chin and Mr. Aditya Humad; and (B) establish a Strategic Advisory Board ("**SAB**") with up to 10 members to be appointed by the Company's new BofD, and who will serve in an advisory capacity without voting rights in, fiduciary duties owed to, or ownership interest in, the Company, with business expenses related to each such members' service on the SAB to be covered by the Company;

**RESOLVED**, that the Authorized Person be, and hereby is, authorized and empowered to take all such further actions and to execute and deliver all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company; to pay or cause to be paid all expenses; to take all such other actions as the Authorized Person shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions;

**RESOLVED**, that in connection with the transactions contemplated in the preceding resolutions, the Authorized Person be, and hereby is, authorized in the name and on behalf of the Company, to certify any more formal or detailed resolutions as the


SF-HUM-00283082

Authorized Person may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions; and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Manager as if set forth at length herein; and

**RESOLVED**, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Person[s] to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions.

By____________________

Name: Kingsley R. Chin, Chairman & CEO



SF-HUM-00283083

SF-HUM-00283083

## EXHIBIT A

# Assignment and Assumption of Membership Interest Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is entered into as of the 1st day of January 2016 (the "**Effective Date**"), by and between Kingsley Investments Company, LLC, a Delaware limited liability company qualified to do business in the State of Massachusetts, having an address at 350 Main Street, Malden, MA 02148 ("**Assignor**"), and Mr. Aditya Humad who resides at 10 Museum Way, Unit 2027, Cambridge, MA 02141 ("**Assignee**").

**WHEREAS**, Assignor is the owner of a one hundred percent (100%) of the uncertificated membership interest in the control, capital and profits of KICVentures, LLC, a Delaware limited liability company ("**Company**") pursuant to that certain Limited Liability Company Operating Agreement of the Company, dated December 13, 2013, amended on January 2, 2014 and again on July 1, 2014 (the "**Operating Agreement**"), which shall, as a result of the transactions contemplated herein, be amended and restated on the Assignment Effective Date (defined below) in the form attached hereto as **Exhibit B**; and

**WHEREAS**, subject to the terms and conditions contained herein, Assignor desires to assign, transfer and sell to Assignee all right, title and interest in: a) ten percent (10%) of the membership interest in the control, capital and profits of the Company (the "**Assigned Interest**"); and b) provided all conditions stated in this Agreement have been satisfied, an additional one percent (1%) membership interest in the control, capital and profits of the Company per year for a period of up to five (5) years (with each 1% increase in assigned membership interest in the Company being hereinafter referred to as "**Additional Assigned Interest**"), which could potentially result in Assignee owning up to a fifteen percent (15%) total membership interest in the control, capital and profits of the Company by January 1, 2021.

**WHEREAS**, right, title and interest in and to the Assigned Interest and the Additional Assigned Interest will transfer from Assignor to Assignee at the time set forth in a written notice of Assignee's intention to effect the transfer on a designated effective date (the "**Assignment Effective Date**") as set forth in the Notification of Assignment Effective Date attached hereto as **Exhibit A**, and

WHEREAS, subject to the conditions set forth in this Agreement, the quantum of membership interest in the control, capital and profits of the Company transferred to





SF-HUM-00283084

Assignee from Assignor on the Assignment Effective Date will be as follows: ten percent (10%) if the Assignment Effective Date is on or earlier than December 31, 2016; eleven percent (11%) if the Assignment Effective Date is on or earlier than December 31, 2017; twelve percent (12%) if the Assignment Effective Date is on or earlier than December 31, 2018; thirteen percent (13%) if the Assignment Effective Date is on or earlier than December 31, 2019; fourteen percent (14%) if the Assignment Effective Date is on or earlier than December 31, 2020; or fifteen (15%) if the Assignment Effective Date is on or later than 1 January, 2021.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Initial Assignment. Effective as of the Assignment Effective Date (as set forth Assignee's Notice of Assignment Effective Date delivered to Assignor in the form attached hereto **Exhibit A**), and provided all conditions stated in this Agreement have been satisfied, Assignor hereby irrevocably assigns and transfers to Assignee the Assigned Interest, including all voting, consent and financial rights now or hereafter existing and associated with full ownership of the Assigned Interest, including, without limitation, indirect or derivative interests in any of the Company's now or hereafter existing subsidiaries or portfolio companies.

2. Additional Assignments. Effective as of the Assignment Effective Date and provided all conditions stated in this Agreement have been satisfied, Assignor hereby irrevocably assigns and transfers to Assignee the right, title and interest in and to Additional Assigned Interest, which may constitute up to five percent (5%) (accruing at a rate of one percent (1%) increase per year) of the total membership interest in the control, capital and profits of the Company by January 1, 2021. The Additional Assigned Interest includes all voting, capital, consent and financial rights now or hereafter existing and associated with full ownership of the Additional Assigned Interest, including, without limitation, indirect or derivative interests in any of the Company's now or hereafter existing subsidiaries or portfolio companies; and with each such assignment and transfer of Additional Assigned Interest being subject to the following conditions being satisfied or met during each calendar year of this Agreement:

2.1 Assignee shall have, and continues on a full time employment basis to have, diligently, faithfully and with due care, carried out all of the duties and responsibilities normally associated in his role as Chief Financial Officer ("CFO") of the Company and/or the Company's Manager, KIC Management Group, Inc. and/or any other executive role which Assignee may hold and in a manner consistent with promoting the best interests of the Company, including, without limitation, dedicate all of his efforts in successfully carrying out the financial management of the Company and the Company's portfolio companies in all material respects, to the





SF-HUM-00283085

exclusion of all other employment related interests, unless and until the Board of Directors (to be constituted under the Amended and Restated Operating Agreement) provides prior written consent to Assignee being employed elsewhere; and

2.2 Assignee shall have consistently maintained a good reputation in the financial community consistent with his status as an executive officer, free of any criminal convictions (other than minor traffic violations) or any exposure to civil litigation that could potentially tarnish the image of, or bring into disrepute, the Company or any subsidiary or affiliate of the Company or any of the Company's investments and/or any directors or officers of the aforementioned companies.

2.3 Notwithstanding any provisions to contrary contained in this Agreement or the Revised and Restated Operating Agreement, should Assignee voluntarily cease to be fully employed by the Company or any subsidiary of the Company during the period commencing on the Effective Date and ending ten (10) years after the Effective Date inclusive, then Assignee shall be deemed to have automatically forfeited the initial Assigned Interest (as defined above), provided that the actual amount of membership interest forfeited is adjusted so that Assignee retains at least a five percent (5%) membership interest in the Company. Assigned Interest (or lesser amount if so adjusted to provide for Assignee's minimum five percent (5%) retained membership interest) shall be returned to Assignor as of the date such forfeiture takes effect. Assignee hereby grants a special power of attorney to Assignor's and/or the Company's authorized representative ("Authorized Person") to effect the aforesaid forfeiture and transfer back to Assignor provided for in this Section 2.3 and to take all such further actions and to execute and deliver all such further agreements, certificates, instruments and documents, in the name and on behalf of Assignee; to pay or cause to be paid all expenses; to take all such other actions as the Authorized Person shall deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of this Section 2.3.

2.4 Assignor hereby acknowledges and guarantees that, for so long as Assignee maintains his full employment status with the Company (or any subsidiaries or affiliates of the Company), (1) Assignee's employment with the Company and/or any of its subsidiaries or affiliates cannot be terminated (except by Assignee's voluntary resignation without duress) at any time; and (2) Assignee shall have the right to serve on the board of the Company and/or any of its subsidiaries or affiliates, unless Assignee has been charged and found guilty of the commission of a crime (under any relevant state, federal, foreign or international law) punishable by a year or more in prison or a fine in excess of $10,000 at any time during the term of his employment, is legally declared mentally incapacitated or disqualified from serving as CFO and/or a member of the board of directors of a company by a court of law.





SF-HUM-00283086

3. Exercising the right to effect transfer of Assigned Interest and Additional Assigned Interest. Assignee may at his sole discretion, and at any time, submit to Assignor a Notice of Assignment Effective Date in the form attached hereto as **Exhibit A**, setting forth the date upon which the transfer of the right, title and interest in the Assigned Interest and the Additional Assigned Interest (as the case may be) shall take immediate effect, provided all conditions stated in this Agreement have been satisfied. For example and for the removal of any doubt, should Assignee decide to effect transfer of the Assigned Interest and Additional Assigned Interest by providing a notice to Assignor declaring the Assignment Effective Date to be January 1, 2019, Assignee will own thirteen percent (13%) of the total membership interest in the control, capital and profits of the Company (i.e., ten percent (10%) in Assigned Interest and three percent (3%) in Additional Assigned Interest). And, provided all conditions stated in the Agreement have been met, a one percent (1%) Additional Assigned Interest shall automatically be transferred to Assignee on 1 January 2020 and 1 January 2021, respectively, up to a maximum of fifteen percent (15%) being transferred to Assignee.

4. Proportionate Share of Indirect Ownership Interest in Subsidiaries and other Portfolio Companies. Assignor and Assignee shall have a share in any distribution, stock or unit split, dividend or other change occurring in any of the Company's current or hereafter existing subsidiaries and portfolio companies, in direct proportion to their then proportionate membership interest in the Company.

5. Representations and Warranties of Assignor. Assignor represents and warrants, on the Effective Date, the Assignment Effective Date as shall be set forth in Assignee's Notice of Assignment Effective Date, and each anniversary date of after the Effective Date of this Agreement, that, prior to any transfer to Assignee as contemplated herein: (a) Assignor is the true and lawful owner of the Assigned Interest and the Additional Assigned Interest and has good title to the same; (b) Assignor has made no prior assignment or sale of the Assigned Interest or any Additional Assigned Interest and that no other person or entity has any right, title or interest therein; (c) the execution and delivery hereof by Assignor and the assignment of all its right, title and interest in and to the Assigned Interest and any Additional Assigned Interest does not and will not contravene any agreement to which Assignor is a party or by which it or its property, or the Company's property, is bound; (d) no liens, encumbrances, charges or security interests of any kind exist on the date hereof against the Assigned Interest and Assignor covenants to ensure that no liens, encumbrances, charges or security interest of any kind shall exist on any Additional Assigned Interest; and (e) Assignor hereby warrants and defends title to the Assigned Interest and any Additional Assigned Interest to Assignee against the claims and demands of all persons.

6. Representations and Warranties of Assignee. Assignee has been advised that the Assigned Interest and any Additional Assigned Interest is not registered under the Securities Act of 1933 (as amended) nor under any relevant state securities acts and





SF-HUM-00283087

represents, warrants and agrees that: (a) Assignee is acquiring the securities represented by the Assigned Interest and any Additional Assigned Interest for his own account, solely for investment purposes, and not with a view to resale of said securities; (b) Assignee has such knowledge and experience in business and financial matters which enables him to be capable of evaluating the risks and merits of this investment; (c) Assignee is able to bear the economic risks of this investment; (d) the Assigned Interest will not be resold or otherwise transferred or assigned by Assignee without appropriate compliance with the registration provisions of the Securities Act of 1933 (as amended) and applicable state blue sky laws or exemption therefrom; and (e) Assignee has been provided with access to all information which he deems material to formulating an investment decision and that such information has been sufficient to make an informed decision.

7. Approval. Assignor and Assignee acknowledge that this assignment of Assignor's Assigned Interest and any Additional Assigned Interest is contemplated by Section 1.12(a) of the Operating Agreement, and has been approved, as of the Assignment Effective Date, by KIC Management Group, Inc., the Manager of the Company, such that no further action will be required to effect this assignment after its execution by Assignor and Assignee, though Assignor will deliver a copy of this Agreement to the Company to keep with its copy of the Operating Agreement, which shall be amended and restated in a form identical to the one attached hereto as **Exhibit B**, to reflect Assignee's Assigned Interest and any Additional Assigned Interest in the Company.

8. Acceptance by Assignee. As of the Assignment Effective Date, Assignee: (a) accepts and assumes the assignment of all of Assignor's right, title and interest in and to the Assigned Interest and any Additional Assigned Interest to be assigned; and (b) agrees to be bound by all of the terms, covenants and conditions of this Agreement and of the Operating Agreement. Assignee hereby indemnifies and holds Assignor, and its manager, directors, employees, members and agents harmless against any and all losses, costs and expenses (including reasonable attorneys' fees) incurred by Assignee arising out of any obligations of Assignee relating to the Assigned Interest and any Additional Assigned Interest which occur on or after, or arise from events occurring on or after, the date hereof or any anniversary date hereof, as the case may be.

9. Absolute Conveyance. The conveyance of the Assigned Interest and any Additional Assigned Interest hereunder is an absolute transfer to Assignee, free and clear of all liens and restrictions.

10. Further Assurances. Assignor shall promptly execute and deliver to Assignee any additional instrument or other document which Assignee reasonably requests to evidence or better effect the assignment of the Assigned Interest and any subsequent assignments of Additional Assigned Interest contained herein.





SF-HUM-00283088

11. Heirs, Successors and Assigns. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and/or assigns.

12. Governing Law. This Agreement and all other instruments referred to herein shall be governed by, and shall be construed according to, the laws of the State of Delaware, without regard to conflict of law rules.

13. Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Agreement delivered by either facsimile or e-mail shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment, provided such original signed copy is delivered within ten (10) business days thereafter. Notwithstanding the foregoing, each party hereto shall deliver original counterpart signatures to the other parties on or before the date hereof.

14. Amendments and Modifications. This Agreement may not be modified or amended in any manner other than by a written agreement signed by the party to be charged.

15. Defined Terms. Capitalized terms used herein, but not otherwise defined shall have the meanings ascribed to such terms in the Operating Agreement.

[THIS PAGE IS IMMEDIATELY FOLLOWED BY THE SIGNATURE PAGE]


SF-HUM-00283089

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

| | |
|---|---|
| **Assignor:** | **Assignee:** |
| KINGSLEY INVESTMENTS COMPANY, LLC, a Delaware limited liability company | MR. ADITYA HUMAD |
| By ______ | By ______ |
| Name: Dr. Kingsley R. Chin | |
| Title: CEO and Sole Owner | |

Agreed to and accepted:

**Company:**

KICVentures, LLC, a Delaware limited liability company

By ______

Name: Dr. Kingsley R. Chin

Title: CEO





SF-HUM-00283090

**<u>Exhibit A to the Assignment and Assumption of Membership Interest Agreement</u>**

## FORM OF NOTICE OF ASSIGNMENT EFFECTIVE DATE

WHEREAS, with reference to that certain Assignment and Assumption of Membership Interest Agreement (the "**Agreement**") entered into as of the 1st day of January 2016 (the "**Effective Date**"), by and between Kingsley Investments Company, LLC, a Delaware limited liability company qualified to do business in the State of Massachusetts, having an address at 350 Main Street, Malden, MA 02148 ("**Assignor**"), and Mr. Aditya Humad who resides at 10 Museum Way, Unit 2027, Cambridge, MA 02141 ("**Assignee**"), Assignee hereby wishes to make the transfer of membership interest in contemplated in the Agreement effective by delivering to Assignor this Notice of Assignment Effective Date (this "**Notice**").

No therefore, Assignee hereby in this Notice that the Assignment Effective Date (as defined in the Agreement) is ____________, 20__, the date on which the transfer of the Assigned Interest and the Additional Assigned Interest as contemplated in the Agreement takes effect.

Signed at ________________________on ______________________ 20__.

______________

Aditya Humad



SF-HUM-00283091

SF-HUM-00283091

# EXHIBIT B

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT is made effective as of January 1, 2016 (the "**Effective Date**"), by the undersigned sole member of KICVentures, LLC, a Delaware limited liability company (the "**Company**"), being Kingsley Investment Company, LLC, a Delaware limited liability company ("**KIC**"), and any persons who may, after the Effective Date hereof, become members (each being hereafter referred to as a "**Member**" and with KIC, the "**Members**").

WHEREAS, effective as of December 18, 2013, KIC executed a Limited Liability Company Operating Agreement for the Company, which was subsequently amended on January 2, 2014 and further amended on July 1, 2014 (as amended, the "Operating Agreement"); and

WHEREAS, the Manager resolved, and the Member approved, the establishment of a Board of Directors of the Company responsible for setting the objectives and strategic direction of the company and giving guidance to the Manager, and having the authority to establish and oversee a Strategic Advisory Board;

WHEREAS, effective as of January 1, 2016, the Member now desires to amend and restate the Operating Agreement to incorporate the changes listed above.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby covenant and agree as follows:

## ARTICLE I – Definitions

(a) "**Accounting Period**" shall mean the period beginning on the day following any Adjustment Date (or, in the case of the first Accounting Period, beginning on the day of formation of the Company) and ending on the next succeeding Adjustment Date.

(b) "**Act**" shall mean the Delaware Limited Liability Company Act ("DLLCA") and its default provisions, 6 Del. C. § 18-101 et. seq. (as amended from time to time).

(c) "**Adjustment Date**" shall mean (i) the last day of each Fiscal Year, (ii) the date of any adjustment pursuant to clause (i) or (ii) of the definition of Book Value, and (iii) any other date determined by the Managers as appropriate for a closing of the Company's books.

(d) "**Available Cash**" shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions, Capital Event Proceeds and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) reasonable provisions for payment of all obligations of the Company as of such time, and (iii) reasonable provisions for working capital and other reserves for identified future needs.




SF-HUM-00283092

(e) "**Book Value**" shall mean, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset;

(ii) the Book Values of all of the Company's assets shall be adjusted by the Company to equal their respective gross fair market values as of the following times: (a) the admission of a Person (other than a transferee) as a new Member of the Company; (b) the distribution by the Company of money or property to a Member in consideration of the retirement of all or a portion of such Member's Interest; and (c) any time that either one or more Members, but fewer than all Members, or all Members but not in proportion to their Percentage Interests, make a Capital Contribution to the Company;

(iii) the Book Value of any or all of the Company's assets shall be adjusted to the gross fair market value thereof if the Managers determine that such adjustment is necessary in order to ensure that the allocations of Net Profits and Net Losses provided for under this Agreement comply with the Treasury Regulations issued under section 704(b) of the Code; and

(iv) if the Book Value of any asset has been adjusted pursuant to clause (i), (ii) or (iii) hereof, such Book Value shall thereafter be adjusted by any Depreciation taken into account with respect to such asset.

(f) "**Capital Account**" shall have the meaning set forth in Section 5.3 hereof.

(g) "**Capital Contributions**" shall mean, with respect to any Member, the amount of cash or the gross fair market value of any property contributed by such Member to the Company pursuant to Article V and the other provisions of this Agreement.

(h) "**Capital Event Proceeds**" shall consist of the net amount of cash received by the Company from the sale, exchange, refinancing, condemnation, casualty loss or other disposition by the Company of its assets outside of the ordinary course of business, less (i) the portion thereof disbursed by the Managers for the payment of the Company's debts and expenses and (ii) such other reserves as the Managers in their business judgment may see fit to establish.

(i) "**Certificate**" shall mean Certificate of Formation of the Company as filed with the Delaware Secretary of State.

(j) "**Class A Units**" shall mean Units issued by the Company that have voting rights.

(k) "**Class B Units**" shall mean Units issued by the Company that have no voting rights and only vest (i) upon the occurrence of a Dissolution Event (as defined in Section 12.1 of this Agreement); (2) on the decision of the Manager to make any cash distribution to the Members in accordance with the provisions of Article VII of this Agreement; or (3) upon the Manager or Members taking any action that leads to the distribution of Capital Event Proceeds.





SF-HUM-00283093

(l) "**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor act thereto.

(m) "**Depreciation**" shall mean, for any Accounting Period and with respect to any asset, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to such asset for such period for U.S. federal income tax purposes, provided that if the Book Value of an asset differs from its adjusted basis for U.S. federal income tax purposes at the beginning of any such period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for tax purposes with respect to such asset for the applicable period bears to the adjusted tax basis of such asset at the beginning of such period, or if such asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by the Managers.

(n) "**Dissolution Event**" shall have the meaning set forth in Section 11.1 hereof.

(o) "**Fiscal Year**" shall mean the Company's fiscal year which shall end on December 31 in each year and which shall be the same for income tax and financial and accounting purposes.

(p) "**Indemnified Person**", "**Indemnitee**", and "**Indemnitees**" means any person(s) entitled to indemnification pursuant to the terms set forth in Article VIII.

(q) "**Interest**" of a Member shall mean the "limited liability company interest" (as defined in the Act) of a Member of the Company and such Member's rights and obligations with respect to the Company pursuant to this Agreement and applicable law.

(r) "**Majority**" or "**Majority-In-Interest**" shall mean more than fifty percent (50%) of all Class A Units in the Company.

(s) "**Manager**" shall mean a Manager of the Company, whose rights, powers and duties are specified in Article IV hereof.

(t) "**Member**" shall mean each person that is identified as a Member in Schedule A hereto or is admitted as a Member as provided in Article IX hereof. A Person shall cease to be a Member at such time as such Person no longer owns an Interest as a Member.

(u) "**Net Profits**" and "**Net Losses**" shall mean, with respect to any Accounting Period, the net income or net loss of the Company for such Accounting Period, determined in accordance with section 703(a) of the Code, including any items that are separately stated for purposes of section 702(a) of the Code, as determined in accordance with U.S. federal income tax accounting principles with the following adjustments:

(i) any income of the Company that is exempt from U.S. federal income tax shall be included as income;





SF-HUM-00283094

(ii) any expenditures of the Company described in section 705(a)(2)(B) of the Code or treated as section 705(a)(2)(B) of the Code expenditures pursuant to section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations shall be treated as current expenses;

(iii) any items of income, gain, loss or deduction specially allocated pursuant to this Agreement shall be excluded from the determination of Net Profits and Net Losses;

(iv) without giving effect to any adjustments made pursuant to sections 734 or 743 of the Code;

(v) treating as an item of gain (loss) the excess (deficit), if any, of the gross fair market value of property distributed in such Accounting Period over (under) such property's Book Value;

(vi) treating as an item of gain (or loss) the amount of any adjustment to the Book Value of any asset pursuant to clause (ii) or (iii) of the definition of Book Value; and

(vii) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such net income or loss, there shall be taken into account Depreciation for such Accounting Period.

(v) "**Percentage Interest**" shall mean with respect to any Member, (i) for the initial Percentage Interest, the percentage set forth opposite such Member's name on Schedule A hereto, and is subject to annual adjustment over a 5 year period as provided in the Assignment Agreement attached as Schedule B hereto, and (ii) upon the occurrence of any event described in clause (ii) of the definition of Book Value herein, the percentage obtained by dividing the Capital Account of such Member by the aggregate Capital Accounts of all of the Members.

(w) "**Permitted Transferee**" shall mean a person or entity entitled to receive a transfer of an interest without the consent or written consent of the Managers pursuant to Section 9.4 hereof.

(x) "**Person**" shall mean any natural person or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such person where the context so admits.

(y) "**Treasury Regulations**" shall mean the U.S. federal income tax regulations promulgated under the Code, as they may be amended from time to time.

(z) "**Units**" shall mean the interests issued by the Company to the Members.

(aa) "**Unreturned Capital**" consists of so much of a Member's Capital Contributions that have not been returned to such Member by way of distributions under Section 7.1(b) hereof.


SF-HUM-00283095

## ARTICLE II – Purpose, Principal Office, Etc.

The Company is formed to engage in any lawful activity for which limited liability companies may be formed under the Act, and to engage in any and all activities necessary or incidental to the foregoing, including, without limitation, acquiring, operating, managing, holding and disposing of real estate (and interests therein), stocks, bonds, notes, debentures, limited liability company interests, limited partner interests and other securities and assets of any kind.

2.1 Principal Office. The principal office of the Company shall be located at 350 Main Street, Malden, MA, 02148. The location of the Company's principal place of business may be changed by the Managers from time to time in accordance with the then applicable provisions of the Act and any other applicable laws.

2.2 Registered Office and Registered Agent. The Managers shall designate a registered office and a registered agent for service of process in accordance with the Act. The initial registered agent is Corp1, Inc., located at 28 Old Rudnick Lane, Dover, Delaware, 19901. The Managers may from time to time in accordance with the Act change the Company's registered office or registered agent or both. The Managers shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

2.3 Term. The term of the Company shall begin upon the acceptance of the Certificate of Formation by the Office of the Secretary of State of the State of Delaware and shall continue in existence until terminated pursuant to Section 11.1 hereof.

2.4 Limited Liability. Except as otherwise provided by Act or herein, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither the Managers nor the Members shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member of the Company.

2.5 Other Business. The Members, the Managers, and any affiliates of any of them may engage in and possess, directly or indirectly, interests in real property, business ventures and investment opportunities of every kind and description, independently or with others, including serving as managers, Members, general partners and/or limited partners of other limited liability companies and partnerships with purposes similar to those of the LLC. Neither the LLC nor any other Member or Manager have any rights in or to such ventures or opportunities or the income or profits therefrom.

2.6 Conflicts of Interest. Except as otherwise provided in any other agreement with the Company a Member may have, each of the Members recognizes and agrees that the other Members and their respective Members, partners, shareholders, officers, directors, employees, agents, representatives, and affiliates:

(a) have, or may have, other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company; and





SF-HUM-00283096

(b) are entitled to carry on such other business interests, activities and investments. Notwithstanding any duty otherwise existing, each of the Members may engage in, or possess an interest in, any other business or venture of any kind, independently or with others (including, but not limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating, managing and servicing real property on its own behalf or on behalf of other entities with which any of the Members is affiliated or otherwise), and each of the Members may engage in any such activities (whether or not competitive with the Company) without any obligation to offer any interest in such activities to the Company or to the other Members. Notwithstanding any duty otherwise existing, neither the Company nor the other Members shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper, subject, however, to the provisions of Section 2.7 or any other agreement a Member may have with the Company.

2.7 Use of Company Information. Notwithstanding anything to the contrary contained in Section 2.6, in the event that any Member acquires an ownership interest in a business, such Member and its affiliates shall not use any Company information, or otherwise act in violation of any fiduciary duties to the other Members that it may have hereunder, to solicit or induce existing or prospective business interests of the Company.

2.8 Transaction of Business. With the prior written consent of the Managers, any Member shall have the authority to lend money to, borrow money from, act as surety, guarantor or endorser for, guarantee or assume one (1) or more obligations of, provide collateral for, and transact other business with the Company. Any Member transacting business with the Company shall have the same rights and obligations with respect to such matter as a person who is not a Member or Manager.

2.9 Filings. The Managers and any Authorized Person (as hereinafter defined) are hereby designated as authorized persons, within the meaning of the Act, and shall be authorized to execute and file (or direct the execution and filing of) a Certificate of Formation with the Office of the Secretary of State of the State of Delaware. The Managers are hereby authorized to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the Company may own property or conduct business.

## ARTICLE III – Voting Powers, Meetings, Etc. of Members

3.1 In General. The Members shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Members' right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate or this Agreement vest in the Members the right to so vote or otherwise participate. Notwithstanding any other provisions to the contrary in this Operating Agreement, Class A Units shall have voting rights and Class B Units shall have no voting rights.





SF-HUM-00283097

3.2 Actions Requiring Approval of Members.

(a) Notwithstanding any other provision of this Operating Agreement, the approval of the Members holding a Majority-In-Interest in Class A Units shall be required in order for any of the following actions to be taken on behalf of the Company:

(i) Amending the Certificate or this Operating Agreement in any manner that materially alters the preferences, privileges or relative rights of the Members;

(ii) Electing the Managers as provided in Article IV hereof;

(iii) Taking any action that would make it impossible to carry on the ordinary business of the Company;

(iv) Confessing a judgment against the Company in excess of $150,000;

(v) Filing or consenting to filing a petition for or against the Company under any federal or state bankruptcy, insolvency or reorganization act; or

(vi) Taking any action that would have the end result of diluting KIC's membership interest below 51% on a fully diluted basis.

(b) Unless the express terms of this Operating Agreement specifically provide otherwise, the affirmative vote of a Majority-In-Interest of the Members holding Class A Units shall be necessary and sufficient in order to approve or consent to any of the matters set forth in Section 3.2(a) above or any other matters that require the approval or consent of the Members.

3.3 Action by Members. In exercising their rights as provided above, the Members holding Class A Units shall act collectively through meetings or written consents as provided in this Article.

3.4 Special Meetings. Special meetings of the Members holding Class A Units, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Managers, and shall be called by the Managers at the request of any two Members holding Class A Units, or such lesser number of Members as are Members of the Company.

3.5 Place of Meeting. The place of any meeting of the Members shall be the principal office of the Company, unless another place is designated by the Managers.

3.6 Notice of Meetings. Written notice stating the place, day and hour of any meeting of the Members and the purpose or purposes for which the meeting is called shall be delivered not less than 10 nor more than 60 days before the date of the meeting, either personally or by mail, by or at the direction of the Managers, to each Member, unless the Act or the Certificate requires different notice.



SF-HUM-00283098

3.7 Conduct of Meetings. All meetings of the Members shall be presided over by a chairperson of the meeting, who shall be the Managers, or a Member, being a holder of Class A Units, designated by the Managers. The chairperson of any meeting of the Members shall determine the order of business and the procedure at the meeting, including regulation of the manner of voting and the conduct of discussion, and shall appoint a secretary of such meeting to take minutes thereof.

3.8 Participation by Telephone or Similar Communications. Members holding Class A Units may participate and hold a meeting by means of conference telephone or similar communications equipment by means of which all such Members participating can hear and be heard, and such participation shall constitute attendance and presence in person at such meeting.

3.9 Waiver of Notice. When any notice of a meeting of the Members is required to be given, a waiver thereof in writing signed by a Member entitled to such notice, whether given before, at, or after the time of the meeting as stated in such notice, shall be equivalent to the proper giving of such notice.

3.10 Action by Written Consent. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if one or more written consents to such action are signed by the Members who are entitled to vote on the matter set forth in the consents and who constitute the requisite number or percentage of such Members necessary for adoption or approval of such matter on behalf of the Company. By way of example and not limitation, a Majority-In-Interest of the Members holding Class A Units may take action as to any matter specified in Section 3.2(a) hereof by signing one or more written consents approving such action, without obtaining signed written consents from any other Members. Such consent or consents shall be filed with the minutes of the meetings of the Members. Action taken under this Section shall be effective when the requisite Members have signed the consent or consents, unless the consent or consents specify a different effective date.

## ARTICLE IV – Management of the Company

4.1 Board of Directors. The Company shall have a Board of Directors to set objectives and provide for the strategic direction of the Company, formulate the business plans of the Company, including the Company's investments and to offer guidance to the Managers. The sole voting members of the Board of Directors shall be Kingsley R. Chin, MD and Mr. Humad Aditya. Other members may be appointed by a majority vote of the Class A Unit Holders. Except as otherwise provided in Section 3.11 of this Operating Agreement, but notwithstanding any other provisions to the contrary contained herein, the Board of Directors may, by resolution at a meeting, or by written consent, or by electronic conference call, may take any action on behalf of the Company and in the best interests of the Company.





SF-HUM-00283099

4.2 Strategic Advisory Board. The Board of Directors may also establish, appoint to, and remove members from, a Strategic Advisory Board ("**SAB**") with up to 10 members, to serve the Board of Directors and the Company in an advisory capacity, without voting rights in, fiduciary duties owed to, or ownership interest in, the Company, with business expenses related to each such members' service on the SAB to be reimbursed by the Company. The Board of Directors shall determine what form and quantum of compensation and/or incentives the Company shall provide to members of the SAB, as and when persons are appointed to serve on the SAB.

4.3 Management and Control. Except as otherwise expressly provided in the Act, the Certificate or this Operating Agreement, the Managers are authorized and empowered on behalf of and in the name of the Company to carry out any and all of the purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that they may, in their sole discretion, deem necessary, advisable or incidental thereto. Notwithstanding the foregoing and Section 18-402 of the Act, no member other than a Manager shall have authority to manage or specifically bind the Company except as specifically provided in this Operating Agreement.

4.4 Election, Etc. of Managers.

(a) KIC Management Group, Inc. shall serve as the initial Manager of the Company until its respective successors shall be duly elected and qualified. Notwithstanding any other provisions to the contrary contained in this Operating Agreement, in the event that Dr. Kingsley R. Chin becomes deceased or is lawfully declared mentally incapacitated by a court of law, Humad shall be deemed the Manager of the Company and all of the Company's subsidiaries, and shall assume all of KIC Management Group Inc.'s management rights in the Company and its subsidiaries, and shall maintain the role of Manager until such time as he resigns as Manager or is deceased or legally declared incapacitated by a court of law.

(b) If any Person resigns or otherwise vacates the office of Manager, the Members holding Class A Units shall elect a replacement Manager to serve the remaining term of such office, unless one or more other Persons then serve as Managers and the Members determine not to fill such vacancy. A Person may be removed as a Manager by the Members, holding Class A Units, with or without cause at any time. A Manager may, but shall not be required to, be elected from among the Members. A Manager may be a natural person or an Entity.

4.5 Powers. Except as otherwise expressly provided in the Act, the Certificate or this Operating Agreement, the Managers shall have full, exclusive and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:



SF-HUM-00283100
SF-HUM-00283100

(a) acquire by purchase, lease or otherwise, any real or personal property, tangible or intangible;

(b) construct, operate, maintain, finance and improve and to own, sell, convey, assign, mortgage or lease any property owned or held by the Company;

(c) enter into agreements and contracts in connection with the Company's business;

(d) borrow money for and on behalf of the Company and execute any guaranty on behalf of a third party and pledge Company property to secure any such obligation;

(e) execute or modify agreements or contracts with respect to any part or all of the property owned or held by the Company;

(f) repay, in whole or in part, refinance, amend, modify or extend any mortgages or deeds of trust that may affect any property owned or held by the Company and, in connection therewith, to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

(g) execute any and all other instruments and documents that may be necessary, or in the reasonable opinion of the Managers, desirable to carry out the intent and purpose of this Agreement;

(h) make any and all expenditures that the Managers, in their sole discretion, deem necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all operating, capital, legal, accounting, investment advisory and other related expenses incurred in connection with the organization, financing and operation of the Company or in connection with its property;

(i) enter into any kind of activity necessary for, in connection with, or incidental to, the accomplishment of the purposes of the Company;

(j) open bank accounts, and invest and reinvest Company monies in short term instruments or money market funds or any securities or other investments, whether or not publicly traded or readily marketable;

(k) loan money on behalf of the Company;

(l) carry out the Company purposes through other limited liability companies, joint ventures, partnerships, corporations, trusts or other entities;

(m) purchase liability and other insurance to protect the Company's property and business, including policies of life insurance which insure the life of any Member;

(n) pay all Company debts, obligations and expenses;

(o) employ accountants, attorneys, appraisers or other professionals to perform services for or on behalf of the Company and to compensate them from Company funds;





SF-HUM-00283101

(p) obtain or provide additional financing for the Company by any method appropriate under the circumstances, including issuance of additional Units;

(q) establish an employee incentive ownership scheme enabling the employees of the Company and/or any of its subsidiaries to hold direct or indirect equity ownership interest in the Company up to a maximum aggregate amount of five percent (5%); and to

(r) perform any and all other acts as the Managers may deem necessary or appropriate to the conduct of the Company's business.

4.6 Officers.

(a) The Company shall have a Chief Executive Officer (CEO), a Chief Financial Officer (CFO), a Chief Business Development Officer (CBDO) as well as one or more Vice Presidents (collectively, the "**Senior Management**") who shall be appointed by, and serve at the pleasure of, the Manager. The Senior Management shall report to, and shall be compensated as determined by, the Manager. The Senior Management shall have whatever duties and whatever powers the Manager shall deem necessary or appropriate to effectuate the provisions of this Agreement and to conduct the day-to-day business and affairs of the Company. As of the Effective Date of this Operating Agreement, Kingsley R. Chin, MD is hereby appointed Chairman and CEO, Aditya Humad is hereby appointed President and CFO, and Shyam Desigan is appointed as CBDO.

(b) The Manager may also appoint such other officers, employees and agents of the Company, and grant such officers, employees and agents such responsibilities and duties, as it may deem necessary or appropriate to effectuate the provisions of this Agreement and to conduct the day-to-day business and affairs of the Company.

(c) No member of Senior Management, nor any other officer, employee or agent of the Company shall engage in any activity on behalf of the Company or authorize or effect any matter that is not within the power or responsibility granted to such party by the Manager or which is contrary to this Agreement.

4.7 IRC Section 754 Elections. The Manager shall have the power, in its sole discretion, to (a) cause an election under section 754 of the Code to be made with respect to the Company, (b) determine the method (or methods) adopted by the Company for making any income tax allocations required by section 704(c) of the Code or the Treasury Regulations issued thereunder, (c) make such allocations for Federal, state and local income tax purposes as may be necessary to maintain substantial economic effect, or to ensure that such allocations are in accordance with the Interests of the Members in the Company, within the meaning of the Code and the Treasury Regulations, and (d) determine all other tax matters relating to the Company, including accounting procedures, not expressly provided for by the terms of this Agreement.




SF-HUM-00283102

4.8 Reliance by Directors, Manager and Senior Management. The members of the Board of Directors, Manager and Senior Management shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person or entity as to matters the Manager or Senior Management reasonably believes are within such person's or entity's professional or expert competence.

4.9 Reimbursement. The members of the Board of Directors and the Manager shall be entitled to reasonable compensation for services rendered to the Company in that capacity as well as to be reimbursed for all expenses reasonably incurred by the Manager in connection with the business and purposes of the Company.

## ARTICLE V - CONTRIBUTIONS AND CAPITAL ACCOUNTS

5.1 Initial Capital Contributions. KIC initially contributed to the Company's capital the following assets:

(a) 100% of KIC's membership interest in the capital and profits of INVUHoldings, LLC, a Delaware limited liability company; and

(b) all of KIC's 450,000 shares in SmartHUD, Inc., a Delaware corporation.

5.2 Additional Contributions. No Member shall be required to make any Capital Contribution in addition to his initial Capital Contribution, and the Members may make additional Capital Contributions to the Company only if such additional Capital Contributions are made pro rata by all the Members or all the Members holding Class A Units consent in writing to any non-pro rata contribution. The fair market value of any property other than cash or publicly traded securities to be contributed as an additional Capital Contribution shall be (a) agreed upon by the contributing Member and a Majority-in-Interest of the Members holding Class A Units before the contribution, or (b) determined by a disinterested appraiser selected by the Managers.

5.3 Capital Accounts. For each Member, there shall be established a separate Capital Account to which such Member's initial Capital Contribution shall be credited. As of the end of each Accounting Period, the balance in each Member's Capital Account shall be adjusted by (a) increasing such balance by such Member's (i) allocable share of Net Profits for such Accounting Period (allocated in accordance with Section 6.1 hereof) and (ii) Capital Contributions, if any, made during such Accounting Period and (b) decreasing such balance by (i) the amount of cash and the fair market value of property distributed to such Member during such Accounting Period and (ii) such Member's allocable share of Net Losses for such Accounting Period (allocated in accordance with Section 6.1 hereof). The Capital Accounts shall also be adjusted to reflect any special allocations made pursuant to this Agreement and any Member indebtedness transferred to the Company and any Company indebtedness transferred to a Member.



SF-HUM-00283103

5.4 Negative Capital Accounts. No Member shall be required to make up a negative balance in his, her or its Capital Account.

5.5 Loan. No loan or promissory note made to the Company by any Member (whether or not evidenced by a promissory note) shall constitute a Capital Contribution to the Company for any purpose.

## ARTICLE VI - ALLOCATIONS AND TAX MATTERS

6.1 Allocations to Capital Accounts. Net Profits or Net Losses with respect to any Accounting Period shall be allocated among the Capital Accounts of the Members in proportion to their Percentage Interests in effect during such Accounting Period.

6.2 Tax Allocations and Other Tax Matters. Except as otherwise provided in the following sentence, each item of income, gain, loss and deduction recognized by the Company shall be allocated among the Members, for U.S. federal, state and local income tax purposes, to the extent permitted under the Code and the Treasury Regulations, in the same manner that each such item is allocated to the Members' Capital Accounts, provided that the Managers may adjust such allocations as long as such adjusted allocations have substantial economic effect or are in accordance with the interests of the Members in the Company, within the meaning of the Code and the Treasury Regulations. Each item of income, gain, loss and deduction with respect to property contributed to the Company shall be allocated in accordance with the principles of section 704(c) and section 737 of the Code and the Treasury Regulations thereunder. Tax credits and tax recapture shall be allocated in accordance with the Members' interests in the Company as provided in Treasury Regulations section 1.704-1(b)(4)(ii). The Managers shall have the power, in their sole discretion, to (a) cause an election under section 754 of the Code to be made with respect to the Company, (b) determine the method (or methods) adopted by the Company for making any income tax allocations required by section 704(c) of the Code or the Treasury Regulations thereunder, and (c) determine all other tax matters relating to the Company, including accounting procedures, not expressly provided for by the terms of this Agreement.

6.3 Allocation of Income and Loss in Respect of Interests Transferred or Reduced. If a Member shall Transfer an Interest pursuant to Section 9.3 of this Agreement (or a Member shall be admitted to the Company) other than on the first day of the Company's taxable year, the Company books shall not be closed but instead the Net Profits and Net Losses allocable in respect of such Interest (or all Interests) for such taxable year shall be apportioned between the transferor and the transferee (or between the Persons who were Members immediately before such admission and the persons who are Members immediately after such admission) based on the portion of the taxable year that has elapsed prior to such transfer (or admission), as provided in section 1.706-1(c)(2)(ii) of the Treasury Regulations, unless the Manager shall otherwise elect


SF-HUM-00283104

or as may otherwise be required by section 1.706-1(c)(5) of the Treasury Regulations in the case of a Transfer by gift.

6.4 Taxation as a Partnership. The Company shall be treated as a Partnership for income tax purposes.

6.5 Tax Classification. The Company shall not elect to be treated as an association taxable as a corporation for U.S. federal, state or local income tax purposes under Treasury Regulations section 301.7701-3(a) or under any corresponding provision of state or local law.

## ARTICLE VII – Distributions

7.1 Distributions of Cash Flow.

(a) Distribution of Available Cash. Available Cash shall be distributed to the Members according to their Percentage Interests in such amounts and at such times as the Manager shall determine.

(b) Distribution of Capital Event Proceeds. Capital Event Proceeds shall be distributed to the Members in such amounts and at such times as the Manager shall determine in their discretion but always in the following rank and order:

(i) Among the Members in proportion to, and to the extent of, their Unreturned Capital.

(ii) The remainder, if any, among the Members according to their Percentage Interests.

7.2 Member Tax Liability. The amount of tax which is required to be paid or withheld by the Company with respect to any Member's allocable share of the income of the Company shall be assessed to such Member, who shall pay the same to the Company or the taxing authority forthwith upon demand of the Manager. The Manager may in their discretion set off any such tax against any amounts otherwise distributable to a Member under this Agreement. Each Member hereby indemnifies the Company and every other Member and agrees to hold them harmless from any liability or loss they might incur by virtue of any such tax with respect to such Member's allocable share of the income of the Company.

7.3 Restrictions on Distributions. Notwithstanding the distributions contemplated by this Section, if the Company has creditors, no distribution may be made if, after giving effect to such distribution, either (i) the Company would be unable to pay its debts as they become due in the usual course of business or (ii) the net assets of the Company would be less than zero.


SF-HUM-00283105

7.4 Liquidating Distributions. Distributions of proceeds resulting from a termination and dissolution of the Company shall be distributed by the Manager in the manner set forth in Section 11.4 hereof.

7.5 Authorized Units. Membership Interests shall be represented as Units. The Company may issue a total of 100,000,000 Units, consisting of Class A and Class B Units as determined by the Manager.

## ARTICLE VIII - Exculpation, Indemnification, and Insurance

8.1 Exculpation. So long as a member of the Board of Directors, a Manager, or member of Senior Management (each an "**Indemnitee**" and together, "**the Indemnitees**"), as the case may be, acts in good faith with respect to the conduct of the business and affairs of the Company, no such Indemnitee shall be liable or accountable to the Company or to any of the other Managers and Members, in damages or otherwise, for any error of judgment, for any mistake of fact or of law, for any other act or thing that the Indemnitee may do or refrain from doing in connection with the business and affairs of the Company or for any act or omission performed or omitted by an Indemnitee or Authorized Person, except for willful misconduct or gross negligence. Whenever in this Agreement an Indemnitee is, or Indemnitees are permitted or required to make decisions in good faith, then such Indemnitee or Indemnitees shall act under such standard imposed by this Agreement or any relevant provisions of law or in equity or otherwise.

8.2 Reliance. An Indemnitee shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any of the Members, officers, employees or committees, or by any other person as to matters the Indemnitee reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company (including, without limitation, information, opinions, reports or statements as to the value and the amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid). In addition, the Indemnitee may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisors selected by him or her, and any opinion of any such person as to matters which the Indemnitee reasonably believes to be within such person's professional or expert competence shall be a full and complete authorization and shall provide full and complete protection in respect of any action taken or suffered or omitted by the Indemnitee hereunder in good faith and in accordance with such opinion.

8.3 Indemnification.

(a) The Company shall, to the fullest extent permitted by the DLLCA, indemnify, defend (using counsel reasonably satisfactory to the Company) and hold harmless





SF-HUM-00283106

each Indemnitee from and against any claims, demands, liabilities, costs, expenses, penalties, damages and losses (collectively, a "**Claim**") to which such Indemnitee may become subject due to the Indemnitee's affiliation with the Company or in connection with the defense, settlement or adjudication (actually and reasonably paid) of any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal arising out of, or in connection with, this Agreement or the Company's business or affairs, irrespective of the nature of the legal or equitable theory upon which a Claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law, except for any Claim to the extent attributable to the Indemnitee's fraud, and willful misconduct. The termination of any action, suit, or proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner believed to be in the best interests of the Company, and with respect to any criminal action or proceeding, believed that his or its conduct was unlawful.

(b) If any Indemnitee becomes involved in any capacity in any Claim, then the Company shall reimburse such Indemnitee for his, her, or its reasonable legal and other reasonable out-of-pocket expenses (including, but not limited to, the cost of any investigation and preparation and establishing a right to indemnification under this Section 8.3; "**Defense Costs**") as they are incurred in connection therewith; provided that such Indemnitee shall have executed an agreement satisfactory to the Company promptly to repay to the Company the amount of any such reimbursed expenses paid to it if it shall ultimately be determined that such Indemnitee was not entitled to be indemnified by the Company in connection with such action, proceeding, or investigation. If such conditions are not satisfied, then reimbursement of Defense Costs shall be made after successful defense of the Claim by the Indemnitee.

(c) The provisions of this Section 8.3 shall survive for a period of four (4) years from the date of winding up and termination of the Company, provided that:

(i) if, at the end of such period, there are any actions, proceedings, or investigations then pending, and the Indemnitee notifies any Member thereof at such time, which notice shall include a brief description of each such action, proceeding or investigation and the liabilities asserted therein, then the provisions of this Section 8.3 shall survive with respect to each such action, proceeding, or investigation set forth in such notice (or related action, proceeding, or investigation based upon the same or similar claim) until such date that such action, proceeding, or investigation is finally resolved; and

(ii) the obligations of the Company under this Section 8.3 shall be satisfied solely out of Company assets.

8.4 <u>Insurance</u>. The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Director, Manager, Member, Authorized




SF-HUM-00283107

Person, employee or agent of the Company, or is or was serving at the request of the Company as a Director, Manager, Member, Authorized Person, director, officer, employee or agent of another Company, partnership, joint venture, trust or other enterprise against any liability asserted against the Indemnified Person and incurred by the Indemnified Person in any such capacity or arising out of the Indemnified Person's status as such, whether or not the Company would have the power to indemnify the Indemnified Person against such liability under the provisions of this section.

8.5 Expenses. To the fullest extent permitted by the DLLCA, expenses (including, without limitation, attorneys' fees and disbursements) incurred by an Indemnified Person in defending any claim, demand, action (a civil or criminal), suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding, subject to recapture by the Company following a later determination that such Indemnified Person was not entitled to be indemnified hereunder.

## ARTICLE IX - Resignation; Admission of Members
## Voluntary Transfers of Interests; Involuntary Transfers of Interests

9.1 Resignation.

(a) Resignation by a Board Member. A member of the Board of Directors may resign at any time by giving written notice to the other member(s) of Board of Directors, or if none, to the Members of the Company. The resignation of a Board member shall take effect upon delivery of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation may be revoked at any time before its effective date by delivery of a notice of revocation to the other member(s) of Board of Directors, or if none, to the Members of the Company. The resignation of a Board member shall not affect such member's rights and liabilities as a Member.

(b) Resignation by Manager. A Manager may resign at any time by giving written notice to the other Manager of the Company, or if none, to the Members of the Company. The resignation of a Manager shall take effect upon delivery of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation may be revoked at any time before its effective date by delivery of a notice of revocation to the other Manager, or if none, to the Members. The resignation of a Manager shall not affect such Manager's rights and liabilities as a Member.

(c) Resignation by Member. In accordance with the Act, no Member shall have the right to resign from the Company, except as a result of a transfer of his, her or its Interest pursuant to Section 9.4 hereof.




SF-HUM-00283108

9.2 Admission of Members.

(a) Admission of New Members. No person shall be admitted to the Company as a Member without the consent of Members holding at least a sixty percent (60%) Percentage Interest of Class A Units. Except that, if the Manager(s) request additional capital from the then existing Members and the Members do not vote unanimously to make the additional capital contributions, then a person may be admitted to the Company as a Member with the consent of those Members holding a Majority-In-Interest of Class A Units. The Percentage Interest to be granted to the new Member and the adjustment to the Percentage Interest of the then existing Members shall be determined by Members holding at least a sixty percent (60%) Percentage Interest in Class A Units. If Members holding at least a sixty percent (60%) Percentage Interest in Class A Units cannot agree on any such adjustment, the adjustment shall be based upon the value of the Company at the time of admission of the new member, determined by a disinterested appraiser chosen by the Manager(s). Upon the admission of one or more new Members, the Managers are authorized to adjust the Percentage Interests of the Members to reflect the dilution. Any such dilution shall be in proportion to the Members' Percentage Interests in the Company, unless otherwise agreed by each such Member who's Percentage Interest may be diluted in excess of that proportion. Each new Member shall have all of the rights, duties and obligations of the original Members holding that Unit class hereunder and in all respects each new Member's admission shall be subject to all of the terms and provisions of this Agreement.

(b) Admission of Substitute Member. In the event a Member transfers all or any part of his, her or its Interest in accordance with this Agreement, the transferee of such Member shall be admitted to the Company as a Substitute Member provided that:

(i) the transferring Member and his, her or its transferee execute and deliver such instruments as the Managers deem necessary or desirable to effect such substitution;

(ii) such transferring Member furnishes to the Managers such assurances as the Managers may request, including, without limitation, an opinion of counsel, which opinion and which counsel are satisfactory to the Managers, that the transfer of such Member's Interest complies with, or does not require the registration under applicable Federal and state securities laws, and that such transfer shall not require the Company to be registered under the Investment Company Act of 1940, as amended; and

(iii) the Members holding Class A Units consent to the substitution of such transferee as a Substitute Member.

Substituted Members shall have all of the rights, duties and obligations of the original Members hereunder, and in all respects their admission shall be subject to all of the terms and provisions of this Agreement.





SF-HUM-00283109

(c) Unadmitted Assignee. A person who acquires all or any portion of a Member's Interest but who is not admitted as a Substitute Member pursuant to Section 9.2(b) shall be a mere assignee (herein an "Unadmitted Assignee") under the Act and shall have the right to receive such distributions to which the assignor was entitled to the extent assigned and shall be allocated the share of Net Profits and Net Losses attributable to such Interest transferred to such person and shall otherwise be treated as a Member for Federal and state income tax purposes and for purposes of the distribution of cash or other assets to such person upon dissolution of the Company pursuant to Section 11.1 hereof but shall have no right to participate in the management of the business or affairs of the Company or exercise any rights as a Member under this Agreement, to require any information or account of Company transactions, or to inspect the Company books and records.

9.3 Transferability of Interest. Subject to Section 10.1 below, a Member shall be free to Transfer all or any portion of such Member's interest in the Company at any time to any Person on any terms and conditions, except no Transfer otherwise permitted hereunder may be made if, in the opinion of counsel for the Company, such Transfer, when added to the total of all other interests in the Company transferred within the period of twelve (12) consecutive months prior to the proposed date of Transfer, would result in the termination of the Company for tax purposes under IRC Section 708, unless such Transfer is specifically consented to, in writing, by all of the Managers.

9.4 Effect of Transfer; Status of Transferee. The Transfer of any interest in the Company, voluntary or involuntary, permissible or impermissible, if effective at all, shall be effective only to Transfer the transferring Member's economic rights in such interest and not to Transfer such Member's voting, management and other rights of ownership with respect to such interest. Accordingly, any transferee of such interest shall have the status of a mere assignee under the DLLCA and shall not be entitled to become, nor to exercise any of the rights of, a Member in the Company unless and until such transferee is admitted as a Substituted Member in accordance with Section 9.2, above. In any event, the transferee shall be subject to all the obligations of Members hereunder and the transferring Member shall cease to have any rights at all with respect to the transferred interest.

9.5 Internal Revenue Service Reporting Requirements. In the event of a sale or exchange of an interest in the Company, the Members shall comply with the reporting requirements of IRC Section 6050K.

## ARTICLE X – Transfer of Units

10.1 Generally. All Units at any time and from time to time outstanding and held by the Members shall be held subject to the conditions and restrictions set forth in this Agreement, the provisions of which shall apply equally to the Members and their transferees (except as otherwise expressly stated). By executing this Agreement or by accepting a certificate or other





SF-HUM-00283110

indicia of ownership therefor from the Company, each Member agrees with the Company and with each other Member to such conditions and restrictions. Without limiting the generality of the foregoing, the Company shall require as a condition to the transfer of record ownership of any Units that the transferee of such Units execute and deliver this Agreement as evidence that such Units are held subject to the terms, conditions and restrictions set forth herein.

1.1 10.2 Restrictions on Transfer.

1.2 (a) No Member shall sell, assign, transfer, give, exchange, pledge, encumber or otherwise dispose of any Units or any interest therein (in each case, a "**Disposition**"), except in accordance with the terms of this Agreement.

1.3 (b) Each Member shall be entitled to make a Disposition of any Units it owns or in which it has an ownership interest:

1.4 (i) upon receipt of the written consent of the Manager; or

(ii) by operation of law.

10.3 Restrictive Legend. Each certificate representing Units issued by the Company to the Members shall have the following legend endorsed conspicuously thereupon:

"THE TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AN AMENDED AND RESTATED OPERATING AGREEMENT, DATED AS OF JANUARY 1, 2016, AND AGREEMENTS WITH RESPECT TO THE VOTING OF SUCH UNITS HAVE BEEN GIVEN PURSUANT TO SUCH AMENDED AND RESTATED OPERATING AGREEMENT, A COPY OF WHICH ARE AVAILABLE FOR INSPECTION BY ANY PERSON DURING NORMAL BUSINESS HOURS AT THE OFFICE OF THE SECRETARY OF THE COMPANY."

10.4 Delaware Multiple Class Legend. Each certificate representing Units issued by the Company to the Members shall have the following legend endorsed conspicuously thereupon:

"THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH UNIT HOLDER WHO SO REQUESTS A STATEMENT OF THE DESIGNATIONS, RELATIVE RIGHTS, PREFERENCES AND LIMITATIONS APPLICABLE TO EACH CLASS, AND SERIES WITHIN A CLASS, OF UNITS OF THE COMPANY AND THE VARIATIONS IN RIGHTS, PREFERENCES AND LIMITATIONS APPLICABLE TO EACH SERIES (AND THE AUTHORITY OF THE COMPANY'S





SF-HUM-00283111

BOARD OF MANAGERS TO DETERMINE VARIATIONS FOR FUTURE CLASSES AND SERIES)."

10.5 Further Assurances. Each Member, whether in his capacity as a Member or Manager shall take or cause to be taken all such commercially reasonable actions in order to expeditiously consummate each Disposition and any related transactions, including, without limitation, executing, acknowledging and delivering written consents, assignments, waivers and other documents or instruments as may be reasonably requested, and otherwise cooperating with the Member initiating such Dispositions or transactions (the "**Prospective Selling Member**") and the purchaser to whom such Prospective Selling Member proposes to make such Disposition (the "**Prospective Buyer**"); *provided, however*, that the participating Member shall be obligated to become liable in respect of any representations, warranties, covenants, indemnities or otherwise solely to the extent provided in the immediately following sentence. Each participating Member agrees to execute and deliver such agreements as may be reasonably specified by the Prospective Selling Member, including, without limitation, agreements to (a) make individual representations, warranties, covenants and other agreements as to the unencumbered title to its Units and the power, authority and legal right to Dispose of such Units, and (b) be liable (whether by purchase price adjustment, indemnity payments or otherwise) in respect of representations, warranties, covenants and agreements in respect of the Company and its subsidiaries; *provided, however*, that, (i) except with respect to individual representations, warranties, covenants, indemnities and other agreements of participating Members of the type described in clause (a) above, each participating Member's liability shall be limited to the pro rata portion of the proceeds received by such participating Member in connection with such Disposition or such lesser amount applied consistently to all other participating Members, and (ii) the terms and conditions of such agreements reasonably specified by the Prospective Selling Member shall be no less favorable to the other participating Members as are contemplated to be binding on the Prospective Selling Member.

## ARTICLE XI - Books and Records; Bank Accounts; Tax Matters Partner

11.1 Books and Records. The Managers shall keep or cause to be kept complete and accurate books and records of the Company, using the same methods of accounting which are used in preparing the required tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied. Such books and records shall be maintained and be available, in addition to any documents and information required to be kept under the Act, at its principal office, for examination and copying by any Member, or his or her duly authorized representative, at his or her reasonable request and at his or her expense during ordinary business hours. A current list of the full name and last known address of each Member, a copy of this Agreement, any amendments thereto and the Certificate, executed copies of all powers of attorney, if any, pursuant to which this Agreement or the Certificate or any amendment has been executed, copies of the Company's financial statements and required tax returns and reports, if any, for the three most recent years, shall also be maintained at such office.





SF-HUM-00283112

11.2 Bank Accounts. Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Managers, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Managers.

11.3 Filing Returns and Other Writings; Tax Matters Partner.

(a) The Managers shall cause the preparation and timely filing of all required Company tax returns and shall, on behalf of the Company, timely file all other writings required by any governmental authority having jurisdiction to require such filing. On or before the date which is 15 days before the due date (including extensions) of any required federal income tax return of the Company for each year, each Member shall be furnished with a copy of his or her Form K-1 with respect to the Company's federal income tax return for the year.

(b) The "Tax Matters Partner," as defined in Section 6231(a)(7) of the Code, shall be KIC Management, Inc.

(c) Promptly following the written request of the Tax Matters Partner, the Company shall, to the fullest extent permitted by law, reimburse and indemnify the Tax Matters Partner for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the Tax Matters Partner in connection with any administrative or judicial proceeding with respect to the federal income taxation of the Company and/or the Members.

(d) The provisions of this Section 10.3 shall survive the termination of the Company or the termination of any Member's Interest and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company and/or the Members.

## ARTICLE XII – Sale of Assets, Dissolution and Winding Up

12.1 Dissolution Events. The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following (each a "Dissolution Event"):

(a) Upon the vote of (i) the Managers; and (ii) a Majority-In-Interest of the Members holding Class A Units;

(b) The entry of a decree of judicial dissolution;

(c) At any time there are no Members, unless the Company is continued as permitted under the Act;





SF-HUM-00283113

(d) the sale of all or substantially all of the Assets of the Company or the Company is not the successor company in the merger or consolidation of two or more companies; or

(e) any event which makes it unlawful for the business of the Company to be carried on by the Members.

The death, financial insolvency, legal incompetence, withdrawal, retirement, resignation, expulsion or dissolution of any Member shall not of itself cause the dissolution of the Company

12.2 Deemed Distribution and Reconstitution. Notwithstanding any other provisions of this Article, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but no Dissolution Event has occurred, the assets of the Company shall not be sold or distributed, the Company's debts and other liabilities shall not be paid or otherwise provided for and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed its assets in-kind to the Members, who shall be deemed to have taken subject to all debts of the Company and other liabilities all in accordance with their respective Capital Accounts. Immediately thereafter, the Members shall be deemed to have recontributed the assets in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

12.3 Winding Up.

(a) Upon the occurrence of a Dissolution Event, the Managers shall wind up the Company's affairs.

(b) The Managers shall sell such assets as the Managers deem proper to pay or provide for the Company's debts or liabilities and to generate cash for distribution to the Members.

(c) Any cash or other assets, based on their fair market values, remaining, after paying or providing for payment of the debts and liabilities of the Company, in any order of priority required by the Act, shall be distributed to the Members as provided in Section 12.4 hereof, provided that no Member shall be required to accept more than such Member's pro rata share of any asset.

12.4 Tax Law Requirements; Deficit Capital Accounts. In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 704-1(b)(2)(ii)(g) following a Dissolution Event, distributions shall be made to the Members who have positive Capital Accounts (after giving effect to all contributions, distributions and allocations for all tax years, including the tax year during which such liquidation occurs) in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his Capital Account after giving effect to all such contributions, distributions and allocations, such Member shall have no



SF-HUM-00283114

SF-HUM-00283114

obligation to make any contributions to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to another person or entity for any purpose whatsoever.

12.5 State Law Compliance.

(a) The Managers may utilize any provisions of the Act designed to limit liability of the Members after distribution of the Company's assets.

(b) The Managers shall take all steps which are required by the Act to complete the dissolution of the Company of record.

12.6 Drag-Along.

(a) In the event that Members holding at least a sixty percent (60%) Percentage Interest in all outstanding Units of the Company (the "**Approving Members**") determine that it is appropriate to: (i) sell or otherwise dispose of all of the Units of the Company or (ii) to cause the Company to sell all or substantially all of its assets or merge with or into or consolidate with another entity (any such transaction, a "**Sale**" and in each case, such purchaser the "**Buyer**"), each of the Members, including any of their respective permitted transferees, shall be obligated to and shall upon the written request of the Approving Members: (i) sell, transfer and deliver, or cause to be sold, transferred and delivered to the Buyer its Units, on the same terms applicable to, and for the same consideration per Unit that each such Member would receive if the Sale were a sale of the assets of the Company and the Company made distributions with respect to such Sale in accordance with the terms of this Operating Agreement and (ii) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such Units in favor of any Sale proposed by the Approving Members and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as the Approving Members or the Buyer may reasonably require in order to carry out the terms and provisions of this Section 12.6.

(b) Not less than 10 days prior to the date proposed for the closing of any Sale, the Approving Members shall give written notice to each of the Members, setting forth in reasonable detail the name or names of the Buyer, the terms and conditions of the Sale, including the purchase price, and the proposed closing date. In furtherance of the provisions of this Section 12.6, each of the Members hereby (i) irrevocably appoints the Approving Members as its attorney-in-fact (with full power of substitution) to execute all agreements, instruments and certificates and take all actions necessary or desirable to effectuate any Sale hereunder and (ii) grants to the Approving Members a proxy (which shall be deemed to be coupled with an interest and irrevocable) to vote the Units held by such Member and exercise any consent rights applicable thereto in favor of any Sale hereunder; provided, however, that the Approving Members shall not exercise such powers-of-attorney or proxies with respect to any Member unless such Member is in breach of its obligations under this Section 12.6.



**SF-HUM-00283115**

SF-HUM-00283115

## ARTICLE XIII – Miscellaneous

13.1 Binding Effect, Not for Benefit of Creditors. Subject to the restrictions on transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors-in-title, heirs, legal representatives and assigns; and each and every successor-in-interest to any Member, whether such successor acquires his, her or its interest by way of inheritance, gift, purchase, foreclosure or any other method, and each Member shall hold his, her or its interest subject to all of the terms and provisions of this Agreement. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or of any Member (including any Member acting in his or her capacity as a creditor of the Company).

13.2 Amendment. No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment shall be in writing and duly adopted by a Majority-in-Interest of Members. Any amendment made pursuant to this Section 13.2 may be made effective as of the date of this Agreement.

13.3 Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

13.4. Severability of Provisions. Each provision of this Agreement shall be considered severable and, if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

13.5 Waiver of Partition. Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, except as may be otherwise expressly authorized in this Agreement, each Member agrees that he, she or it shall not, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his, her or its successors and assigns) accepts the provisions of this Agreement as his, her or its sole entitlement on termination, dissolution or liquidation of the Company and hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale or other liquidation with respect to his, her or its Interest, in or with respect to, any assets or properties of the Company; and each Member agrees that he, she or it will not petition a court for the dissolution, termination or liquidation of the Company.

13.6 Title to Assets. Title to the assets and to any other property, real or personal, owned by or leased to the Company shall be held in the name of the Company unless, in the opinion of counsel to the Company or if the Managers so determine, it is advisable to hold record title in a


SF-HUM-00283116

nominee or in a limited liability company or other entity wholly owned, directly or indirectly, by the Company.

13.7 Applicable Law. This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary.

13.8 Entire Agreement. This Agreement, including the Certificate, which is hereby incorporated herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

13.9 Non-Waiver. The failure of any Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, expressed or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation hereunder.

13.10 Notices. Any and all notices provided under this Agreement shall be treated as having been received (i) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (ii) on the first business day after being sent by commercial expedited delivery service providing a receipt for delivery or by telecopy or e-mail by a machine providing automatic, printed confirmation of successful transmission (if the telecopy number or e-mail address, as the case may be, of the person to whom the notice is addressed is set forth as part of such person's address for purposes of this Agreement) or by United States Postal Service express mail. All such notices in order to be effective shall be addressed, if to a Manager or the Company at the principal office of the Company, if to a Member at the last address of record on the Company's books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

13.11 Titles, etc. Article and paragraph titles are for descriptive purposes only and shall not control or alter the meaning of the Agreement as set forth in the text. As used herein, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

13.12 Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all parties notwithstanding that all parties have not signed the same counterpart. Signatures sent via facsimile or other electronic transmission shall constitute original signatures.

[THE NEXT PAGE IS THE SIGNATURE PAGE]





SF-HUM-00283117

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates shown below, effective on the first date shown above.

Kingsley Investments Company, LLC

Date: _______________

_______________________

By: Kingsley R. Chin, MD
Its: Chairman & CEO



SF-HUM-00283118

SF-HUM-00283118

SCHEDULE A
(Attached to and forming part of the Operating Agreement)

CAPITALIZATION

| Name and Address | Issued Class A Units | Percentage Interest* |
|---|---|---|
| Kingsley Investment Company, LLC (sole member) | Uncertificated | 100% |
| **TOTALS** | **1,000,000** | **100%** |



**SF-HUM-00283119**
SF-HUM-00283119

# Exhibit 3
## (to Ex. 4)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. ADITYA HUMAD, Defendant. | ) | Criminal Action No. 1:21-cr-10256-IT-2 |

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

RULE 11 HEARING

Monday, May 11, 2026
9:03 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
BY: MACKENZIE A. QUEENIN
ABRAHAM R. GEORGE
CHRISTOPHER R. LOONEY
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3338
mackenzie.queenin@usdoj.gov
abraham.george@usdoj.gov
christopher.looney@usdoj.gov

On behalf of the Defendant:

FICK & MARX LLP
BY: DANIEL N. MARX
WILLIAM W. FICK
24 Federal Street
4th Floor
Boston, MA 02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**P R O C E E D I N G S**

(In open court at 9:03 a.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cr-10256, United States v. Humad. Will counsel please identify themselves for the record.

MS. QUEENIN: Good morning, Your Honor. MacKenzie Queenin, Abe George, and Chris Looney for the United States.

THE COURT: Good morning.

MR. MARX: Good morning, Your Honor. Daniel Marx and William Fick for Aditya Humad, who is here in court with us.

THE COURT: Good morning.

THE DEFENDANT: Good morning.

THE COURT: Good morning.

And we're here for a Rule 11, correct?

MR. MARX: Yes, Your Honor.

THE COURT: If you could swear in the defendant, please.

THE DEPUTY CLERK: Yes, Your Honor.

Sir, could you please rise. Raise your right hand.

(Defendant duly sworn.)

THE DEPUTY CLERK: Please state your name for the record.

THE DEFENDANT: Aditya Humad.

THE DEPUTY CLERK: Thank you.

THE COURT: Mr. Humad, do you understand that you're now under oath and that, if you answer any of my questions falsely, your answers may later be used against you in another prosecution for perjury or making a false statement? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At any point, if you need to, please feel free to consult with your counsel.

Mr. Humad, how old are you?

THE DEFENDANT: Forty-one.

THE COURT: And what education level have you attained?

THE DEFENDANT: I've done bachelor's, bioengineering, finance, and the executive program in business at HBS.

THE COURT: And as you stand here today, are you under the influence of any drug or alcoholic beverage of any kind?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you taken any medicine, prescription or otherwise, that could affect your ability to understand these proceedings and to testify truthfully?

THE DEFENDANT: No, Your Honor.

THE COURT: And have you received any recent treatment for any mental illnesses or psychological problems of any kind?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you received a copy of the superseding indictment in this case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you are charged in Count 1 with conspiracy to violate the anti-kickback statute in violation of 18 USC Section 371; and, in Counts 2 through 4, with violations of the anti-kickback statute, 42 USC Section 1320a-7b(b)(2); and there are forfeiture allegations in the superseding indictment.

Do you understand these charges?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you're represented by counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you fully discussed the charges against you and the facts and circumstances of this case with your counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you fully satisfied with the counsel, representation, and advice given to you in this case by your attorneys?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Counsel, have you communicated all formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused?

MR. MARX: Yes, Your Honor.

THE COURT: And to the government, pursuant to Local Rule 116.2(b)(4), the government is required before any plea to provide the defendant with a written summary of any information in the government's possession that tends to diminish the degree of his culpability or his offense level under the guidelines.

Has the government done so?

MS. QUEENIN: Yes, Your Honor.

THE COURT: Thank you.

I understand you have entered into a plea agreement with the United States Attorney's Office; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you sign the agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I have a document that was docketed on May 9th. Is that your signature at the bottom of that, or in the middle of that page?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you have an opportunity to read the agreement and discuss it with your attorney before you

signed it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Does the plea agreement contain all the terms to which you have agreed?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand the terms of the plea agreement?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that this agreement is the only agreement you have with the United States government? That may not be true. Is there a civil agreement?

MR. MARX: There is, Your Honor.

THE COURT: Do you understand that, other than the civil agreement, this is the only agreement you have with the United States government?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has anyone made any promises or assurances to you that are not in the plea agreement?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone threatened you or pressured you in any way to persuade you to accept this agreement?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you understand that the terms of the plea agreement as to your sentence are only recommendations

to me and that I can reject those recommendations without permitting you to withdraw your plea of guilty, and I can impose a sentence that may be more severe than you anticipate?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that the offense to which you're pleading guilty is a felony?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand, if I accept your plea, you will be judged guilty of these offenses or that -- sorry.

Is the plea agreement to one offense, and the others are being dismissed?

MR. MARX: Correct, Your Honor.

THE COURT: Do you understand, if I accept your plea, you will be -- you will be judged guilty of that offense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you a United States citizen?

THE DEFENDANT: Yes, Your Honor.

THE COURT: My colloquy here, which I realize is -- I wrote some years ago, says that if you're not a United States citizen, you may be, et cetera, et cetera. And I realized recently that the plea agreements for the last

probably four years or more have changed that language, and it no longer says "if you're not a United States citizen." It says "if you're not a United States citizen by birth," or "if you're a naturalized citizen," or something of that sort.

Are there any circumstances in this case that I should do an inquiry different than just, "Are you a United States citizen?"

MS. QUEENIN: No, Your Honor. I will tell you I was the one that put the plea agreement together; and as I was doing it, I did not have access to that information, and I was trying to get it filed. So I included it out of an abundance of caution, but I see no reason why the Court needs to go further on that.

THE COURT: Okay. The reason I'm raising a question is that, in certain circumstances, the government is taking action against people for -- who have been naturalized. And so in the event that that is some potential, I would have to do, and I would think it would be appropriate to do, a further inquiry here. But it doesn't sound like there is any issue of that sort here on the table.

So do you understand that, by being judged guilty, you may lose valuable civil rights, including the right to vote in many states, to hold public office, to serve on a jury, and the right to possess a gun or any kind of firearm or ammunition? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So I understand -- let's make sure I understand the potential -- what we're looking at as potential penalties here.

And, Counsel, please correct me if I'm -- have this wrong, that the maximum imprisonment on Count 1 is -- by statute -- is five years; there's no mandatory minimum. The maximum supervised release is three years, no mandatory minimum.

The maximum fine is 250,000 or twice the gross pecuniary gain or loss, whichever is greater; special assessment of $100; and forfeiture as alleged in the superseding indictment.

Any disagreement with that?

MS. QUEENIN: No, Your Honor.

MR. MARX: No, Your Honor, except that, as the agreement goes on to say, the government is not seeking forfeiture in this case; but, otherwise, those are the maximum penalties.

THE COURT: Thank you. Okay.

So do you understand, Mr. Humad, that by statute, those are the maximum penalties applicable to this criminal violation?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And I want to make sure you

understand a little bit about the sentencing guidelines and how they may affect your sentence. Those guidelines have been issued by the United States Sentencing Commission for judges to consider when determining your sentence. They're not mandatory. I do not have to follow them. I do have to consider them.

Have you and your attorney talked about the guidelines and how they may apply in your case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that I will not be able to determine your guideline sentence until after the probation office has prepared a presentence report?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that the presentence report will contain information about you, any criminal history, crimes you've committed, and other uncharged or dismissed conduct; and I may consider all of this information in applying the guidelines?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you'll have the chance to review the presentence report and to challenge the facts reported into it, as well as the legal construction there; and as to the facts, do you understand that I need only find these facts to a preponderance of the evidence,

more likely true than not true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand, again, that, although I'm not required to follow the guidelines, I am required to consider the guideline sentence before I impose sentence on you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that, under the guideline system, I have the authority to depart from the guideline sentence and impose a sentence that is more severe than what the guidelines call for?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that I can also impose a sentence less severe than what the guidelines call for?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that you will not be permitted to withdraw your plea of guilty if your sentence is different than you expected?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And so do you understand that what this means here is I will have the authority to give you a term of imprisonment of up to five years, a term of supervised release of up to three years, a fine of up to 250,000 or twice the gross gain or loss, special assessment of $100; and

I will have the authority to do that, and you will not have the right to withdraw your plea of guilty if I impose such a sentence?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I simply -- the requirement here is that I need to impose a sentence that's reasonable under the circumstances. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Next thing I need to do is to make sure you understand your trial rights that you're giving up by proceeding here by plea.

Do you understand you have the right to plead not guilty to the offenses charged against you and to go to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you have the right to a trial by jury?

THE DEFENDANT: Yes.

THE COURT: Do you understand that a jury is composed of 12 jurors who must unanimously find beyond a reasonable doubt that you committed the crime with which you're charged before you may be found guilty?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand at trial you would be

presumed to be innocent, and the government would have to prove your guilt beyond a reasonable doubt?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand at trial you'd have the right to the assistance of counsel for your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to see and hear all the witnesses against you and have them cross-examined in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right, if you chose to exercise it, to testify and to put on evidence in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to require witnesses to come to court to testify in your defense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand you'd have the right to refuse to testify and refuse to put on evidence unless you voluntarily elected to do so?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that if you decided not to testify or not to put on any evidence, those facts could not be used against you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you further understand that by entering a plea of guilty here today, if I accept your plea, there will be no trial, and you will have waived or given up your right to a trial as well as the rights that come with a trial that I have just described?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, your plea agreement contains a waiver of appellate rights, and so I need to make sure again that you understand what your rights would be in the absence of such a provision and what your rights are given this provision.

Do you understand that, but for the terms set forth in the plea agreement, you may have been able to argue in another proceeding, collateral or otherwise, that your conviction should be set aside or reduced?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that, but for the terms set forth in the plea agreement, any sentence that I impose could have been appealed by you on direct appeal or challenged in a future proceeding, collateral or otherwise?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you have the following appeal waiver provisions in your plea agreement:

You will not challenge your conviction on direct appeal or in any other proceeding, including a separate civil lawsuit, and that you will not challenge your sentence, including any court orders relating to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including a separate civil lawsuit?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, notwithstanding this waiver, you, as all defendants, reserve the right to claim that your lawyer was ineffective in connection with the negotiation of the plea agreement or the entry of the guilty plea or to claim serious prosecutorial misconduct serious enough to entitle you to have your conviction or sentence overturned.

But other than those two very narrow exceptions, you're giving your right up -- your rights to appeal. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. The next thing I need to do is to make sure you understand what it is that the government would have to prove if the case went to trial. And then I'm going to ask the assistant US attorney about the evidence that they were prepared to come forward with, and then I'm going to come back and see if you have any disagreement.

So for the conspiracy charge, the government would

have to prove that the agreement specified in the superseding indictment, and not some other agreement, that that agreement existed between at least two people to violate the anti-kickback statute as charged in the superseding indictment; that you willfully joined in that agreement; and that one of the co- -- one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.

The underlying charge that the -- to violate the anti-kickback statute, you're not being -- you're not pleading guilty today to those counts, and I understand the government will withdraw it.

But to be clear what that required, since that's a part of the conspiracy, since the conspiracy element is violating the anti-kickback statute, for the underlying crime, which the conspiracy is directed at, is knowingly and willfully offering to pay -- offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce that person to, in this case, purchase or arrange for or recommend the purchasing of an item for which payment may be made in whole or in part under a federal healthcare program.

And I think I said at the beginning that that was -- and that you did so knowingly and willfully.

So that's -- any disagreement, Counsel?

MS. QUEENIN: No.
MR. MARX: No, Your Honor.
THE COURT: Okay. So that's what the government -- do you understand that's what the government would have to prove if the case went to trial?
THE DEFENDANT: Yes, Your Honor.
THE COURT: Okay. Now, I'm going to have you sit down, and I'm going to ask the government as to the evidence that they're prepared to come forward with.
And I'm going to ask you to go slowly since I don't have a copy of this here, so --
MS. QUEENIN: Okay. Your Honor, if the case were to proceed to trial, the government would prove the following based on witness testimony and documentary evidence:
The defendant was the chief financial officer of SpineFrontier, Inc., which is a Massachusetts-based company that designed, manufactured, marketed, and sold spinal products.
Surgeons, including 1 through 3 as identified in the superseding indictment, used those products in spine surgeries that federal healthcare programs paid for throughout the United States. Those programs included Medicare, Medicaid, and the Veterans Health Administration, which are each a federal healthcare program as defined by the anti-kickback statute.

Often there were two types of payments and reimbursements associated with spine surgeries: one for the cost of the procedure itself and the other for the labor provided by the surgeon.

Hospitals typically submitted a bill to a patient and a claim for reimbursement to an insurance carrier, which included federal healthcare programs, for the cost associated with the surgery, including the cost of spinal products and -- that were used during those procedures.

Surgeons typically submitted or caused to be submitted a separate bill to patients and a claim to those federal healthcare programs for the surgeons' services rendered during those procedures.

SpineFrontier's implant devices were often held on a consignment basis at a hospital or a surgical center, and the prices of those products ranged from hundreds to thousands of dollars.

The government would prove that when a surgeon used a specific spinal implant in a surgery, the hospital or surgical center ordered a replenishment implant and paid SpineFrontier for the implant used in the procedure.

The government would show that between in or about late 2012 and in or about March 2017, the defendant and Kingsley Chin, the former CEO of SpineFrontier, and their co-conspirators, including Surgeons 1 through 3, conspired to

pay and receive kickbacks through SpineFrontier's consulting program.

The object of the conspiracy was to pay bribes in connection with the use of SpineFrontier products in healthcare services reimbursed in whole or in part by those federal healthcare programs, and the purpose was for the co-conspirators to enrich themselves.

The government would show that the defendant and Chin directed and paid bribes in the form of consulting payments with the intent to induce surgeons, including Surgeons 1 through 3, to order and use SpineFrontier's products and to reward their selection and use of those products. Those surgeons were paid typically between 250 and $1,000 for each hour the surgeon supposedly spent consulting.

The government would prove that, during the course of this conspiracy, the defendant paid or directed the payment of over $540,000 in payments to Surgeons 1 through 3 in exchange for their use of SpineFrontier's products.

Surgeons 1 through 3 participated in SpineFrontier's consulting program and accepted payments for purported consulting work when, in fact, they only spent a small fraction of their reported time performing actual consulting activities for SpineFrontier. They accepted the sham consulting payments as a bribe and reward for their continued selection and usage of the products.

The government would show that the defendant directed surgeons, including Surgeons 1 through 3, to bill SpineFrontier via a purportedly independent entity called Impartial Medical Experts, which was actually owned by Chin, for purported consulting hours based not on time spent consulting, but on the number and type of surgeries that the surgeon performed, including those surgeries paid for by federal healthcare programs.

The government would show that on numerous occasions the defendant determined the amount of bribes SpineFrontier would pay to surgeons by reviewing how many surgeries the surgeons performed using SpineFrontier's products and how much revenue those surgeries generated for SpineFrontier. The government would prove SpineFrontier received millions of dollars in net revenue from the sales of its products used by Surgeons 1 through 3.

The government would prove that, during the conspiracy, this defendant caused to be committed the following overt acts, among others, in furtherance of the conspiracy: The defendant told Surgeon 1 and Surgeon 1's distributor that Surgeon 1 would receive 10 percent of the revenue he generated from using SpineFrontier's products.

The defendant told Surgeon 2 that SpineFrontier would approve more of Surgeon 2's submitted consulting hours if he used more expensive SpineFrontier products.

And the defendant had a conversation with Surgeon 3 in which the defendant informed Surgeon 3 that SpineFrontier would compensate him based on the number of surgeries Surgeon 3 performed with SpineFrontier's products. At no time did the defendant or anyone else from SpineFrontier ask Surgeon 3 how much time he had actually spent consulting.

Your Honor, that's a summary of the evidence the government would submit at trial.

THE COURT: Okay. Thank you.

Mr. Humad, back to you: Did you understand the factual basis for the plea just recited by the assistant US attorney?

THE DEFENDANT: Yes.

THE COURT: And briefly, the government contends you were the CFO of SpineFrontier and that you and SpineFrontier and others entered into an agreement which included at least the three surgeons identified as 1, 2, and 3 in the indictment; and that as to -- that the agreement was to use SpineFrontier's product in return for pay which occurred through a consulting program; and that the purpose of the agreement was to have the surgeons use those products and increase and provide revenue for SpineFrontier.

Any disagreement with those facts so far?

MR. MARX: Your Honor, did you say "the purpose"?

THE COURT: I did, because that's what she said,

and I'm asking if there's any disagreement with that.

MR. MARX: I think our understanding was that Mr. Humad is prepared to acknowledge and accept responsibility for it having -- a purpose, and this has, obviously, been extensively negotiated with the government; and I think they acknowledged that some of the money paid under the consulting program may have been for consulting purposes.

He acknowledges that some of that money was also paid for as an inducement for the use of SpineFrontier products, and I --

THE COURT: I have no -- either way, we get there. I just -- the government said "the purpose," and I was asking if there's any disagreement. Whether it was the purpose or a purpose, you're welcome to make clear.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So my question at that point wasn't so good, but it was a purpose of the consulting program to provide additional revenue and to sell additional products, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And that, specifically with regard to these three surgeons, you agreed with Spine- -- with Surgeon 1 or Surgeon 1's related company that Surgeon 1 would receive 10 percent back on products used, the cost of

products used?

Is that the allegation?

MS. QUEENIN: Yes, Your Honor. I believe what I said is the agreement was with Surgeon 1 and Surgeon 1's independent distributor as well as the Defendant Kingsley Chin or --

THE COURT: And as part of that, there would be return of 10 percent of the revenue to Surgeon 1 or the distributor for Surgeon 1?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And then as to Surgeon 2, that you conveyed to Surgeon 2 that you would approve more hours if Surgeon 2 used more products -- more consulting hours if Surgeon 2 used more products?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And with regard to Surgeon 3, I'm not sure that was an overt act. Surgeon 3, you said that they did not ask how much time was spent in the consulting as --

MS. QUEENIN: The overt act that I had named was there was a conversation with Surgeon 3 in which the defendant informed Surgeon 3 that SpineFrontier would compensate him based on the number of surgeries SpineFrontier -- sorry -- based on the number of surgeries that surgeon performed with SpineFrontier's products.

You're correct; I also did add at no time did the

defendant ask Surgeon 3 how much time he had actually spent consulting.

THE COURT: Any disagreement with those facts?

THE DEFENDANT: No, Your Honor.

THE COURT: Are you then, in fact, guilty of the conspiracy charge?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Any reason the Court should not take the change of plea at this time?

MR. MARX: No, Your Honor.

THE COURT: Ms. Marchione, if you could please take the change of plea.

THE DEPUTY CLERK: Yes, Your Honor.

Mr. Humad, you are charged in an indictment with Count 1, conspiracy to violate the anti-kickback statute, all in violation of Title 18 United States Code Section 371. You have previously pleaded not guilty to this charge. Do you wish to now change your plea?

THE DEFENDANT: Yes, Your Honor.

THE DEPUTY CLERK: How do you now plead to Count 1s? Guilty or not guilty?

THE DEFENDANT: Guilty.

THE DEPUTY CLERK: Thank you.

THE COURT: The Court finds the defendant is fully competent and capable of entering an informed plea; he's

aware of the nature of the charges and the consequences of the plea; and that the plea is a knowing and voluntary plea supported by an independent basis in fact, containing each of the essential elements of the offense charged.

The plea is, therefore, accepted; and the defendant is now judged guilty of this offense.

And with that, you may sit down.

I want to touch base again about the presentence report. That will be prepared by the probation office to assist me in determining your sentence. You'll be asked to give information. Your attorney may be present if you wish.

It is important that the report is accurate. It will not only affect what sentence you receive, but it also happens -- to you after you are sentenced. For example, if you are sent to prison, it will affect where you're sent, what happens to you when you get there, so even minor mistakes in the report should be brought to your counsel and my attention.

And you'll have a chance at sentencing -- both you and your counsel will have a chance to speak on your behalf.

And so with that, I do refer you to the probation office for the presentence investigation. I'm assuming that hasn't been arranged given the timeline on this, but if you could kindly do so quickly. Thank you.

Do we have a date for sentencing?

THE DEPUTY CLERK: Yes, Your Honor. We have August 6, 2026, at 2:30 p.m.

THE COURT: What day of the week is that?

THE DEPUTY CLERK: It's a Thursday, Your Honor.

THE COURT: Okay. Okay. That's fine.

And there's been no issues during the release, so you're continued on release on all the previously set conditions. And I do find by clear and convincing evidence that you're not likely to flee or pose a danger to the community if released pending sentencing.

So with that, is there anything else we need to do today?

MS. QUEENIN: No, Your Honor.

MR. MARX: No, Your Honor.

THE COURT: Okay. Thank you, everyone, and -- for all your work on this, and I will see everybody in August.

MR. MARX: Thank you, Your Honor.

THE DEPUTY CLERK: We are in recess.

(Court in recess at 9:36 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of June, 2026.

/s/ Robert W. Paschal

______________________________

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter

# Exhibit 4
## (to Ex. 4)

**From:** Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD>
**Sent:** Monday, October 13, 2014 3:01 PM
**To:** jasontinleymd <jasontinleymd@gmail.com>; Kingsley R. Chin MD (offices) <kingsleychin@gmail.com>
**Cc:** JohnMiller@spinefrontier.comb60; PaulSpeidel@spinefrontier.comd28
**Subject:** RE: Lee Bearden - Harris Methodist FW

---

Dr. Tinley,

Thanks for the information. We have an executed agreement with THR and can clarify physician ownership issue with memo from our attorneys and communication.

Copied VP Sales and Counsel to look into this urgently.

Best
Aditya

Aditya Humad
President
Chief Financial Officer

SpineFrontier, Inc.
500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.
www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: [redacted]3968

-----Original Message-----
From: jasontinleymd@gmail.com [mailto:jasontinleymd@gmail.com]
Sent: Monday, October 13, 2014 2:28 PM
To: Aditya Humad (Biz); Kingsley R. Chin MD (offices)
Subject: Lee Bearden - Harris Methodist FW

Aditya,

Attached is the contact for the spine coordinator at Harris Methodist hospital. She is not the contact that you need, but will be able to give you the appropriate contact. She informed Greg last week that we are not allowed to use SF products at all because Scott Autry sent out several letters to physicians (that he had never met) last year offering $500 per cervical case for consulting fees - this letter was passed on by one or more of the physicians to the administration who subsequently "banned" SF because of "physician-ownership". This likely can be resolved with communication and clarification, knowing how much effort you guys have put into re-structuring for these exact issues, but they are not easy at all to work with. Thx

J Tinley

Sent from my iPhone

# Exhibit 5
## (to Ex. 4)

# FW: IME payroll - Dr. Montone - hours submitted via vax for Jan and Feb, 2015

| | |
|---|---|
| **From:** | Aditya Humad <adityahumad@kicventures.com> |
| **To:** | bioinnovations@sbcglobal.net |
| **Date:** | Mon, 06 Apr 2015 18:21:52 -0400 |
| **Attachments:** | DOC150406-150406.pdf (95.45 kB) |

John

Attached fax came over, can barely see anything on the form except total hours.

Anyway you can take a picture on your phone that shows actual form/categories against which hours are submitted?

Thx

Aditya Humad
Co-Founder
Chief Financial Officer

KICVentures, LLC
www.kicventures.com
D: 978.236.7984
M: [redacted]3968

-----Original Message-----
From: Jenna Santarelli
Sent: Monday, April 6, 2015 5:13 PM
To: Vanessa Dudley
Cc: Mike Barbin; Aditya Humad
Subject: IME payroll - Dr. Montone - hours submitted via vax for Jan and Feb, 2015

The information contained in this electronic message and any attachments are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify KIC Ventures immediately at (844) KIC-FUND ((844) 542-3863), or by replying to this message, and destroy all copies of this message and any attachments. Thank you.

Vanessa Dudley,

Fax# (855) 411-6463

Fax# (978) 522-8400

Jason Montone IME

- January
- February

2 pages



p.1

USAO-MA-OATH_00192895

# SpineFrontier, Inc.

| | |
|---|---|
| Arena-C | Arena-L |
| Invue | Arena-L Allo |
| Invue Max | S-LIFT |
| Inset | P-LIFT |
| | T-LIFT |
| | E-LIFT |
| | TILT |
| | FacetFuse |
| | FacetFuse Allo |
| | PedFuse Return |
| | PedFuse Respond |
| | PedFuse Reset |
| | Pedfuse Remind |
| | MISquito |
| | ✗ InSpan |
| | ✗ InSpan Slim |
| | Allo-Span |

18

18

10 meet w/ Gabriel

46 hrs

✗ DBMPure Micro
✗ DBMPure Macro
✗ Cancellous Chips
✗ DBMForm
✓ Amniotic Tissue

IME Consultant [ To be submitted to IME ] Month: [ ] Jan [ Feb ] [ ] Mar [ ] Apr [ ] May [ ] Jun [ ] July [ ] Aug [ ] Sep [ ] Oct [ ] Nov [ ] Dec

Signature ____ 20 15

p.3

SpineFrontier, Inc.

20

15

5

40 hrs

IME Consultant [ To be submitted to IME ] Month: [X] Jan [X] Feb [ ] Mar [ ] Apr [ ] May [ ] Jun [ ] July [ ] Aug [ ] Sep [ ] Oct [ ] Nov [ ] Dec

Signature ______ 2016

| | | |
|---|---|---|
| X DBMPure Micro | Arena-C | Arena-L |
| X DBMPure Macro | Invue | Arena-L Allo |
| X Cancellous Chips | Invue Max | S-LIFT |
| X DBMForm | Inset | P-LIFT |
| X Amniotic Tissue | | T-LIFT |
| | | E-LIFT |
| | | TILT |
| | | FacetFuse |
| | | FacetFuse Allo |
| | | PedFuse Return |
| | | PedFuse ~~Respond~~ |
| | | PedFuse Reset |
| | | Pedfuse Remind |
| | | MISquito |
| | | X InSpan |
| | | X InSpan Slim |
| | | Allo-Span |

# Exhibit 6
## (to Ex. 4)

## Aditya Humad

**From:** bioinnovations@sbcglobal.net
**Sent:** Thursday, June 06, 2013 1:30 PM
**To:** Aditya Humad
**Subject:** Re: Agreement

So am I Aditya,

I do appreciate the discussion and the clarification. Communication is key.

Thank you,

John
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: Aditya Humad <adityahumad@spinefrontier.com>
Sender: Aditya Humad <adityahumad@spinefrontier.com>
Date: Thu, 6 Jun 2013 13:28:07
To: 'Dr. Kingsley Chin'<kingsleychin@spinefrontier.com>; 'John Balzer'<bioinnovations@sbcglobal.net>
Subject: RE: Agreement

John

Glad we all had a chance to discuss the accounts.

I've asked Athena to release the April commissions check tomorrow with Dr Montone's cases at 25% per your conversation with Kingsley.

Look forward to the rapid growth in the region.

Best,

Aditya Humad
Chief Financial Officer
VP of Business Development

SpineFrontier, Inc.
500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.
www.spinefrontier.com

P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: 267.342.3968

This e-mail message and any attachments are confidential and may be privileged and proprietary. If you are not the intended recipient please notify SpineFrontier, Inc., immediately -- by replying to this message or by destroying all copies of this message and

any attachments.  The sender of this e-mail does not accept liability for any loss or damage arising in any way from the receipt or the use of this e-mail.  Thank you.

-----Original Message-----
From: Dr. Kingsley Chin [mailto:kingsleychin@spinefrontier.com]
Sent: Thursday, June 06, 2013 12:34 AM
To: John Balzer
Cc: Aditya Humad
Subject: Agreement

John

I appreciate our relationship.  Tonight 's call was a great reminder of what we can do together.

Per our conversation

25% on Montone
35% on your surgeons without consulting agreements

Best

Kingsley R. Chin MD, FAAOS
Orthopaedic Spine Surgeon

Specialist in Less Exposure Surgery (LES) of The Spine

Institute for Modern &
Innovative Surgeries (iMIS)
1100 W. Oakland Park Blvd Suite#3
Fort Lauderdale FL 33311

C: 617-697-5442
T:  954-640-6010
T:  561-822-2960
T:  877-MIS-SURG
F:  877-647-7874
www.iMISsurgery.com
Other locations in Miami & Palm Beaches
Sent from my iPhone

# Exhibit 7
## (to Ex. 4)

| | |
|---|---|
| **From:** | Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD> |
| **Sent:** | Wednesday, September 30, 2015 10:19 AM |
| **To:** | Frank Schnur <FrankSchnur@spinefrontier.com> |
| **Cc:** | Dr. Kingsley Chin </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=87b5aac92cd240c989699374c6d433af-KingsleyChi> |
| **Subject:** | Re: 1st Amend Chumbler Sales Rep Agrmt |

---

We cannot state that explicitly in agreement around consulting payments

On Sep 30, 2015, at 10:13 AM, Frank Schnur <FrankSchnur@spinefrontier.com> wrote:

Hi Aditya,

Kingsley explained how it would work to me:

They get:
20% if they bring a surgeon that is on IME
30% for a surgeon that is non-IME
35% for a surgeon that is non-IME and does 85,000 a month with us
40% for a surgeon that is non-IME and does 125,000 a month with us

If any surgeon decides that they want consulting, they drop back down to 20%

I will send them a revised agreement and send communicate this to them.

Thanks!

> On Sep 30, 2015, at 9:54 AM, Aditya Humad <AdityaHumad@spinefrontier.com> wrote:
>
> Why not give them exact contract as Bryan Tarrolly but 20% instead of 15% ?
>
> 20% on Dr Valdivia and surgeons brought by us
> 30% on new surgeons they bring (std deductions apply)
>
> **Aditya Humad**
> President
> Chief Financial Officer
>
> <image001.png>
>
> **SpineFrontier, Inc.**
> 350 Main Street, 3rd Floor
> Malden, MA 02148
>
> www.spinefrontier.com
> P: 978.232.3990
> F: 978.232.3991
> D: 978.236.7984
> M: [redacted]

**From:** Dr. Kingsley Chin
**Sent:** Wednesday, September 30, 2015 7:28 AM
**To:** Aditya Humad <AdityaHumad@spinefrontier.com>
**Cc:** Frank Schnur <FrankSchnur@spinefrontier.com>
**Subject:** Re: 1st Amend Chumbler Sales Rep Agrmt

20% base for Valdivia
20-40% for all surgeons all distributors based on our discretion per surgeon affected by CAB or who brings the surgeon to the table
Our goal is still to hire Kyle and Jim to get surgical techs in every location then be direct


**Kingsley R. Chin MD**
Chairman & CEO
Chief Technology Officer

Affiliate Professor
Clinical Biomedical Sciences
Charles E. Schmidt College of Medicine
Florida Atlantic University
Boca Raton Florida USA

Board Certified
Less Exposure Surgery Specialist
LESS Institute Outpatient Orthopedics & Spine Surgery
A Team Physician Jamaica Track & Field (JAAA)
Harvard Trained for 10 years

www.spinefrontier.com
www.KICventures.com
P: 978.232.3990
F: 978.232.3991
M: [redacted]

| Fort Lauderdale<br>1100 W Oakland<br>Park Blvd Ste 3<br>Fort Lauderdale FL<br>33311 US | Boston<br>500 cummings<br>center Ste 3500<br>Beverly MA<br>01915 USA | | |
|---|---|---|---|

On Sep 29, 2015, at 4:27 PM, Aditya Humad <AdityaHumad@spinefrontier.com> wrote:

Thought Kingsley had talked of 25% for all their surgeons including dr valdivia

On Sep 29, 2015, at 3:50 PM, Frank Schnur <FrankSchnur@spinefrontier.com> wrote:

Can we just make it 30% on business that they bring to us? Keep it simple?

Thanks!

On Sep 25, 2015, at 2:59 PM, Frank Schnur <FrankSchnur@spinefrontier.com> wrote:

Brian asked that we put some parameters around the percentage for new surgeons, i.e., when is it 25% and when is it 40%. Here is my suggestion. What do you think:

40% - A surgeon that we don't know, that has never interacted with us in the past
35% - A suregon does not have a relationship with Dr. Chin, but is close to one of our existing surgeons (e.g. partner, did fellowship or residency together, works in the same hospital, etc.)
30% - A surgeon that has a relationship with Dr. Chin and has attended SF events in the last 3 years
25% - A surgeon that has a relationship with Dr. Chin and/or was a customer in 2010-2015

20% - A surgeon that is targeted and closed by our SF sales rep team that is covered by Brain/Sid

Begin forwarded message:

**Date:** September 21, 2015 at 10:42:18 AM EDT
**From:** Sidd Singh <singh.sidd@ymail.com>
**Reply-To:** Sidd Singh <singh.sidd@ymail.com>
**To:** Frank Schnur <FrankSchnur@spinefrontier.com>, Brian Chumbler <brianchumbler@gmail.com>
**Cc:** "Dr. Kingsley Chin" <KingsleyChin@kicventures.com>, Aditya Humad <AdityaHumad@kicventures.com>
**Subject: Re: Fwd: 1st Amend Chumbler Sales Rep Agrmt**

Frank,

Sorry for the delay. Both Brian and I were in Miami for the week. As you can imagine, we are bit surprised with the new reduced commission. We however do need clarification on commission ranges 25-40%. Addendum states it's case by case basis. Can you please disclose what exactly that means in the addendum? We would like to know when do we make 25% vs. 40%. Please add that in the addendum and resend so we can review and understand. Also, we don't think the 2% override in listed in the contract (New surgeon who rep Andre was trained by Brian). If that

could be added.

I think we are getting close to bringing additional business which will make Spine Frontier grow. Let's finalize the numbers and move on to growing the business. Please call if any questions. Thank you.

Best,

Sidd Singh
734.634.2400

**From:** Frank Schnur <FrankSchnur@spinefrontier.com>
**To:** Brian Chumbler <brianchumbler@gmail.com>; Sidd Singh <singh.sidd@ymail.com>
**Cc:** Dr. Kingsley Chin <KingsleyChin@kicventures.com>; Aditya Humad <AdityaHumad@kicventures.com>
**Sent:** Tuesday, September 15, 2015 3:24 PM
**Subject:** Fwd: 1st Amend Chumbler Sales Rep Agrmt

Hi Brian and Sidd,

Attached below is the amendment to Brian's agreement.

We had to move the commission on Dr. Valdivia to 20% to make our numbers work, but we were able to give you more of an upside on the surgeons that you bring in, 25% to 40% based on the situation.

Please don't hesitate to contact me with any questions.

Thanks!

**Frank Schnur**
Chief Sales Officer
**SpineFrontier, Inc.**
www.spinefrontier.com
M: 508.494.3966

# Exhibit 8
## (to Ex. 4)

| | |
|---|---|
| **From:** | Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD> |
| **To:** | Vanessa Dudley |
| **CC:** | jaylokhande@spinefrontier.com; John Miller |
| **Sent:** | 10/30/2014 4:34:26 AM |
| **Subject:** | Re: Dr. Michael Murray |

Hours should be submitted at month end. If aug and sept were submitted last week thats why they have not received yet
Can review next week for approval of any outstanding

On Oct 30, 2014, at 12:01 AM, "vanessadudley@call-ime.com" <vanessadudley@call-ime.com> wrote :

Aditya,

Melissa Davis, distributor for Dr. Murray, called today and said she was asked to find out where his payment for Aug and Sep were.
I checked the website and it looks like he submitted hours for those months on Oct. 17th.

How should I advise?

She also mentioned that he has 1 case for October so far and believed he had 3 cases in Sep and 2 in Aug.
He is showing 7 cases for Sep.

**Vanessa J. Dudley**
Client Relations/Business Administrator

**Impartial Medical Experts**
3296 N. Federal Hwy #11631
Fort Lauderdale, FL 33339 USA

**Work:** 855-411-6463
**Mobile:** 480-278-1970
**Fax:** 855-411-6463
**Email:** vanessadudley@call-ime.com
**http://www.linkedin.com/in/vanessadudley1**

See who we know in common

Want a signature like this?

DISCLAIMER: this email and any attachments may be confidential or legally privileged. If you received this message in error or are not the intended recipient, you should destroy the email message and any attachments or copies, and you are prohibited from retaining, distributing, disclosing or using any information contained herein. Please inform us of the erroneous delivery by return email. Thank you for your cooperation .

spinefrontier
Less Exposure Surgery Technologies

500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.

The information contained in this electronic message and any attachments are intended for the exclusive use of

the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify SpineFrontier, Inc. immediately at 978-232-3990, or by replying to this message, and destroy all copies of this message and any attachments. Thank you.

# Exhibit 9
## (to Ex. 4)

| | |
|---|---|
| **From:** | Vanessa Dudley </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A3E1844154D04CD2A3135B521BFDD8ED-VANESSADUDL> |
| **To:** | Li Chen Zhang |
| **CC:** | Aditya Humad; Dr. Kingsley Chin |
| **Sent:** | 1/24/2014 1:45:28 PM |
| **Subject:** | FWD: IME - bank info |

Good Morning Li,

I don't have access to IME's accounts.
As far as I know, only Aditya and Kingsley do.

Thanks,


**Vanessa J. Dudley**
Client Relations/Business Administrator

**Impartial Medical Experts**
3296 N. Federal Hwy #11631
Fort Lauderdale, FL 33339 USA

**Work:** 855-411-6463
**Mobile:** 480-278-1970
**Fax:** 855-411-6463
**Email:** vanessadudley@call-ime.com
**http://www.linkedin.com/in/vanessadudley1**



See who we know in common

Want a signature like this?

DISCLAIMER: this email and any attachments may be confidential or legally privileged. If you received this message in error or are not the intended recipient, you should destroy the email message and any attachments or copies, and you are prohibited from retaining, distributing, disclosing or using any information contained herein. Please inform us of the erroneous delivery by return email. Thank you for your cooperation.


--------- Original Message ---------
Subject: IME - bank info
From: "Li Chen Zhang" <lizhang@spinefrontier.com>
Date: 1/23/14 1:03 pm
To: vanessadudley@call-ime.com

Hi Venessa,

Just updating IME books thru December, could you please download the saving account statement from Aug to December?

On December 4th, there was a transfer to 1-2410641107 for $1,950… could you please tell for what was the payment for?

Would you also be able send me the month to date operating account info? I just want to check and see if we paid Dr. Montone's Oct and Nov consulting fee.

Thank you for your help,

**LiChen Zhang**
Staff Accountant
Finance Department

**SpineFrontier, Inc.**

500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.

www.spinefrontier.com
P: 978.232.3990

F: 978.232.3991

**SpineFrontier, Inc.**
500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.

www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991

The information contained in this electronic message and any attachments are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify SpineFrontier, Inc. immediately at 978-232-3990, or by replying to this message, and destroy all copies of this message and any attachments. Thank you.



IME-DUD-00157948

# Exhibit 10
## (to Ex. 4)

**From:** Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD>
**Sent:** Thursday, February 12, 2015 8:13 AM
**To:** Jay Lokhande <JayLokhande@spinefrontier.com>; Chantal Goldson <ChantalGoldson@spinefrontier.com>; MikeBarbin@spinefrontier.comf1e
**Cc:** Vanessa Dudley <vanessadudley@call-ime.com>; RobertBlaylock@thelessinstitute.com22b; Shyam Desigan </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=66905c61b0504f3dbd0e85759dc8882a-ShyamDesiga>
**Subject:** IME reports and Approval

---

Jay

Can Chantal download a report by month in excel showing the surgeons, hours submitted by category with totals for that month? Does she also have admin rights to approve the surgeons submitted hours?

Chantal - I want you to review reports with me of hours submitted against the monthly sheet you prepare for all surgeons showing total cases and total sales and the we review monthly so you can approve final hours online

Mike - would like to get all surgeons paid by IME to be electronic via ADP as 1099s so system is accurate with their info and they automatically generate all 1099s to surgeons. Surgeons can also receive payments direct deposit then which is easier than mailing checks.

Lets discuss this morning

Thanks
Aditya

# Exhibit 11.1

## (to Ex. 4)

**From:** Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD>
**Sent:** Wednesday, September 14, 2016 9:14 AM
**To:** Chantal Goldson <ChantalGoldson@Spinefrontier.com>
**Subject:** RE: July IME Hours
**Attach:** Copy of July 2016 Total Surgeon Cases Submitted Hours.xlsx

---

Attached are my comments on far right column for approvals.


**Aditya Humad**
President
Chief Financial Officer

**SpineFrontier, Inc.**
350 Main Street, 3rd Floor
Malden, MA 02148

www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: [redacted]3968


**From:** Chantal Goldson
**Sent:** Tuesday, September 13, 2016 9:30 AM
**To:** Aditya Humad <AdityaHumad@spinefrontier.com>
**Subject:** FW: July IME Hours

Hello Aditya,

Have you had a chance to look at the July hours as yet or are we still waiting on Dr. Yu's issue to be resolved? I came down to drop off a physical but did not see you. Also double checked to see if anything has changed over the past week but nothing new.

Regards,


**Chantal Goldson**
Jr. Financial Analyst
**SpineFrontier, Inc.**
350 Main Street
Malden, MA 02148, U.S.A.
Office: 978-232-3990 X:287

www.spinefrontier.com


**From:** Chantal Goldson

**Sent:** Wednesday, September 07, 2016 12:08 PM
**To:** Aditya Humad
**Subject:** June IME Hours

Hello Aditya,

Please see the attached for the IME submitted hours for July.

Regards,

**Chantal Goldson**
Jr. Financial Analyst
**SpineFrontier, Inc.**
350 Main Street
Malden, MA 02148, U.S.A.
Office: 978-232-3990 X:287

www.spinefrontier.com

# Exhibit 11.2
## (to Ex. 4)

**Total Number of Surgeon Cases & Sales: July 2016**

| Uses IME | | Sales ($) | Cases | Submitted Hours | Type of Case | Approved | |
|---|---|---|---|---|---|---|---|
| | **Total** | **1,120,579** | **178** | **214.5** | | | |
| | **Average** | **41,502.93** | **6.14** | | | | |
| ✓ | Dr. Alastra | 12,650 | 2 | | | | |
| ✓ | Dr. Anagnost | 9,450 | 3 | | | | |
| ✓ | Dr. Bash | 189,850 | 18 | | | | |
| ✓ | Dr. Carlson | 179,485 | 28 | 50 | 15 lumbar, 13 cervical | 45 | |
| ✓ | Dr. Gabriel | 9,987 | 2 | 2 | 2 cervical | 2 | |
| ✓ | Dr. Khan | 6,648 | 1 | | | | |
| ✓ | Dr. Kushwaha | 113,337 | 13 | 27 | 7 lumbar, 6 cervical | 25 | |
| ✓ | Dr. Mcfarland | 83,284 | 10 | 18.5 | 7 lumbar, 3 cervical | 17 | |
| ✓ | Dr. Murray | 10,500 | 2 | 22.5 | 2 cervical | 21 | |
| ✓ | Dr. Ngu | 32,935 | 6 | | | | |
| ✓ | Dr. Pateder | 43,218 | 13 | 17 | 6 lumbar, 7 cervical | 13 | |
| ✓ | Dr. Rosenstein | 120,621 | 8 | 12.5 | 4 lumbar, 4 cervical | 8 | USMD Arlington |
| | | | 1 | | 1 cervical | | Med. Ctr. of Arlington |
| | | | 1 | | 1 lumbar | | Pine Creek |
| ✓ | Dr. Shiau | 22,450 | 5 | 8 | 3 lumbar, 2 cervical | 6 | |
| ✓ | Dr. Simela | 17,858 | 3 | 8 | 3 lumbar | 4.5 | |
| ✓ | Dr. Sung | 80,708 | 15 | 33 | 7 lumbar, 8 cervical | 20 | |
| ✓ | Dr. Techy | 8,000 | 2 | 2 | 1 lumbar, 1 cervical | 1 | |
| ✓ | Dr. Tinley | 7,150 | 2 | | | | |
| ✓ | Dr. Wang | 51,486 | 7 | 8 | 4 lumbar, 3 cervical | 8 | |
| ✓ | Dr. Wasserman | 19,129 | 3 | 6 | 3 lumbar | 4.5 | |
| | Dr. Atwater | 9,400 | 2 | | | | |
| | Dr. Bruce | 6,300 | 1 | | | | |
| | Dr. Lowry | 24,733 | 4 | | | | |
| | Dr. Malik | 2,600 | 4 | | | | |
| | Dr. Meyer | 4,500 | 1 | | | | |
| | Dr. Okubadejo | 1,550 | 1 | | | | |
| | Dr. Parker | 1,620 | 2 | | | | |
| | Dr. Yu | 51,130 | 18 | | | | |

| | |
|---|---|
| **Average Revenue per Case** | $ 6,295 |

**Late Submissions**

| | | Sales ($) | Cases | Submitted Hours | Type of Case | Approved |
|---|---|---|---|---|---|---|
| **Jun** | Dr. Gabriel | 19,999 | 3 | 3 | 3 cervical | 2 |
| **Jun** | Dr. Pateder | 76,468 | 25 | 26 | 10 lumbar, 15 cervical | 20 |
| **Jun** | Dr. Techy | 6,800 | 2 | 2 | 1 lumbar, 1 cervical | 1 |
| **Mar** | Dr. Alastra | 8,750 | 3 | 4 | 3 cervical | 1.5 |

# Exhibit 12.1
## (to Ex. 4)

**From:** Aditya Humad <AdityaHumad@spinefrontier.com>
**Sent:** Wednesday, December 23, 2015 8:59 AM
**To:** Chantal Goldson <ChantalGoldson@spinefrontier.com>
**Subject:** RE: iME Spreadsheet
**Attach:** November 2015 Total Surgeon Cases & Submitted Hours.xlsx

---

Chantal

See attached sheet with approved hours. We could do following schedule:

1. All prior months before Nov - next week 12/30
2. Nov 1st batch (highlighted in yellow) - 1/5
3. Nov 2nd batch (not highlighted in yellow) - 1/12

Please match up with IME portal and provide schedules to Erin/Tami

Thx

Aditya Humad
President
Chief Financial Officer

SpineFrontier, Inc.
350 Main Street, 3rd Floor
Malden, MA 02148
www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: [redacted]3968

-----Original Message-----
From: Chantal Goldson
Sent: Tuesday, December 22, 2015 10:30 PM
To: Aditya Humad <AdityaHumad@spinefrontier.com>
Subject: RE: iME Spreadsheet

Hello Aditya,

Please see the attached. I just checked and there are no new additions.

Regards,

Chantal Goldson
Jr. Financial Analyst
SpineFrontier, Inc.
350 Main Street
Malden, MA 02148, U.S.A.
Office: 978-232-3990 X:287

www.spinefrontier.com

-----Original Message-----
From: Aditya Humad
Sent: Tuesday, December 22, 2015 7:46 AM
To: Chantal Goldson
Subject: iME Spreadsheet

Did you send this to me to fill in? Also check if any new submissions online to capture.

Plan is to split in 3:

Oct and Prior - by Friday

Nov 1st batch - next week Friday

Nov 2nd batch - week after

Thx

# Exhibit 12.2
## (to Ex. 4)

| Total Number of Surgeon Cases & Sales: November 2015 | | | | | | |
|---|---|---|---|---|---|---|
| Uses IME | | Sales ($) | Cases | Submitted Hours | Type of Case | Approved |
| | Total | 2,342,520 | 359 | 309 | | |
| | Average | 60,064.60 | 9.45 | | | |
| ✓ | Dr. Aferzon | 59,075 | 5 | | | |
| ✓ | Dr. Anagnost | 14,630 | 4 | 22.5 | 4 lumbar | 20 |
| ✓ | Dr. Atwater | 46,550 | 7 | 29 | 4 lumbar, 3 cervical | 10 |
| ✓ | Dr. Bash | 193,175 | 17 | | | |
| ✓ | Dr. Carlson | 201,055 | 30 | 43 | 22 lumbar, 8 cervical | 40 |
| ✓ | Dr. Chang | 4,240 | 1 | | | |
| ✓ | Dr. Degenova | 141,725 | 22 | | | |
| ✓ | Dr. Gabriel | 68,353 | 13 | | | |
| ✓ | Dr. Gabriel - Ohio | 17,105 | 3 | | | |
| ✓ | Dr. Khan | 37,103 | 4 | 8.5 | 2 cervical, 2 inspan slim | 8 |
| ✓ | Dr. Kushwaha | 285,091 | 28 | 50.5 | 20 lumbar, 8 cervical | 50 |
| ✓ | Dr. Mcfarland | 140,235 | 17 | 33 | 13 lumbar, 4 cervical | 30 |
| ✓ | Dr. Moore | 58,925 | 6 | 14.5 | 6 lumbar | 12 |
| ✓ | Dr. Murray | 28,230 | 2 | | | |
| ✓ | Dr. Ngu | 46,309 | 9 | 8 | 2 lumbar, 7 cervical | 8 |
| ✓ | Dr. Pateder | 72,498 | 24 | 30 | 7 lumbar, 17 cervical | 25 |
| ✓ | Dr. Rosenstein | 122,210 | 26 | 19.5 | 21 lumbar, 5 cervical | 18 |
| ✓ | Dr. Shiau | 7,750 | 3 | | | |
| ✓ | Dr. Simela | 41,377 | 5 | 10 | 5 lumbar | 10 |
| ✓ | Dr. Sung | 49,703 | 9 | 30 | 4 lumbar, 5 cervical | 20 |
| ✓ | Dr. Techy | 9,800 | 1 | 2 | 1 lumbar | 2 |
| ✓ | Dr. Tinley | 113,030 | 14 | | | |
| ✓ | Dr. Valdivia | 2,000 | 1 | | | |
| ✓ | Dr. Wang | 69,857 | 16 | | | |
| ✓ | Dr. Wasserman | 24,846 | 5 | 8.5 | 2 lumbar, 3 cervical | 6 |
| ✓ | Dr. Yu | 56,133 | 22 | | | |
| | Dr. Ansell | 5,496 | 1 | | | |
| | Dr. Bruce | 12,825 | 3 | | | |
| | Dr. Chin | 245,953 | 16 | | | |
| | Dr. Gebhard | 2,500 | 1 | | | |
| | Dr. H. Small | 33,850 | 1 | | | |
| | Dr. Happ | 11,300 | 10 | | | |
| | Dr. Highland | 1,215 | 3 | | | |
| | Dr. Malik | 47,802 | 7 | | | |
| | Dr. Meyer | 48,195 | 18 | | | |
| | Dr. O Brien | 3,701 | 2 | | | |
| | Dr. Okubadejo | 2,600 | 1 | | | |
| | Dr. Reilly | 3,528 | 2 | | | |
| | Kit Replenishment | 12,550 | | | | |

| | |
|---|---|
| **Average Revenue per Case** | $ 6,525 |

## Prior Period Late Submissions

| | | Sales ($) | Cases | Submitted Hours | Type of Case | Approved |
|---|---|---|---|---|---|---|
| Oct | Dr. Techy | 19,600 | 2 | 6 | 2 lumbar | 4 |
| Oct | Dr Atwater | 14,900 | 3 | 9 | 2 lumbar, 1 cervical | 3 |
| Oct | Dr. Gabriel | 132,290 | 22 | 29 | 14 lumbar, 8 cervical | 22 |
| Oct | Dr. Anagnost | 23,930 | 6 | 2 | 6 lumbar | 2 |
| Sep | Dr Atwater | 37,200 | 3 | 11 | 3 lumbar | 6 |
| Aug | Dr Atwater | 7,250 | 4 | 17 | 1 lumbar, 3 cervical | 3 |

# Exhibit 13
**(to Ex. 4)**

| | |
|---|---|
| **From:** | Aditya Humad </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB9A2AF228044ADB9BE47CF6A4E74B5D-ADITYAHUMAD> |
| **Sent:** | Monday, October 13, 2014 3:01 PM |
| **To:** | jasontinleymd <jasontinleymd@gmail.com>; Kingsley R. Chin MD (offices) <kingsleychin@gmail.com> |
| **Cc:** | JohnMiller@spinefrontier.comb60; PaulSpeidel@spinefrontier.comd28 |
| **Subject:** | RE: Lee Bearden - Harris Methodist FW |

Dr. Tinley,

Thanks for the information. We have an executed agreement with THR and can clarify physician ownership issue with memo from our attorneys and communication.

Copied VP Sales and Counsel to look into this urgently.

Best
Aditya

Aditya Humad
President
Chief Financial Officer

SpineFrontier, Inc.
500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.
www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: [redacted]3968

-----Original Message-----
From: jasontinleymd@gmail.com [mailto:jasontinleymd@gmail.com]
Sent: Monday, October 13, 2014 2:28 PM
To: Aditya Humad (Biz); Kingsley R. Chin MD (offices)
Subject: Lee Bearden - Harris Methodist FW

Aditya,

Attached is the contact for the spine coordinator at Harris Methodist hospital. She is not the contact that you need, but will be able to give you the appropriate contact. She informed Greg last week that we are not allowed to use SF products at all because Scott Autry sent out several letters to physicians (that he had never met) last year offering $500 per cervical case for consulting fees - this letter was passed on by one or more of the physicians to the administration who subsequently "banned" SF because of "physician-ownership". This likely can be resolved with communication and clarification, knowing how much effort you guys have put into re-structuring for these exact issues, but they are not easy at all to work with. Thx

J Tinley

Sent from my iPhone

# Exhibit 14
## (to Ex. 5)

| | |
|---|---|
| **From:** | Aditya Humad <adityahumad@spinefrontier.com> |
| **To:** | Kingsley Chin MD; Meaghan Cyr; Sarah Villafana (bus); Vanessa Dudley |
| **CC:** | BobPagano@spinefrontier.com479; Shyam Desigan; Jake Lubinski |
| **Sent:** | 10/11/2014 3:54:19 PM |
| **Subject:** | Re: Fwd: Heat Tickets |

Great idea! Its actually 4 tickets per game, so total of 64 seats to give out, just have to determine pairing of the 4 people per game that fit well. Since we are going to be inviting surgeons, lets buy this under LESS Institute AMEX to avoid sunshine reporting with Spinefrontier.

---

**From:** Kingsley Chin MD [mailto:kingsleychin@gmail.com]
**To:** Meaghan Cyr [mailto:meaghancyr@spinefrontier.com], Sarah Villafana (bus) [mailto:sarahv@TheLessInstitute.com], Vanessa Dudley [mailto:vanessadudley@call-ime.com]
**Cc:** Aditya Humad [mailto:AdityaHumad@spinefrontier.com], pagano Bob [mailto:BobPagano@spinefrontier.com], Shyam Desigan [mailto:shyamdesigan@KICVentures.com], Jake Lubinski [mailto:jakelubinski@spinefrontier.com]
**Sent:** Sat, 11 Oct 2014 11:26:27 -0500
**Subject:** Fwd: Heat Tickets

Meaghan/Sarah

Please book these nights to make sure I am in town to attend these games.

Aditya/Bob/Shyam/Jake

These are prized seats all 14 home games for $13 K which is less than $200 per seat normally about $150 K season ticket for these seats.

We need to pick clients who are heavy hitters to attend these games. I can find more local contacts for emergency use

I suggest names like

1. Ish from San Francisco
2. Joanne
3. Keith from M&K
4. Dr Sung, Kushwaha. Yu
5. Hajjar and Joseph from Surgem
6. Kienzle and Rhoda from Globus
7. Bob Rubenstein and his daughter and wife
8. Mark from Intrepid
9.

Begin forwarded message:

**From:** rmsabbagh <rmsabbagh@yahoo.com>
**Subject: Heat Tickets**
**Date:** October 10, 2014 at 5:46:16 PM EDT
**To:** "Dr. Chin Heat Tickets" <kingsleychin@gmail.com>

Dr Chin the 14 games in your Miami Heat package for row 1 on the sidelines in Section 117 for four tickets per game are:

Tues, October 21st Houston

Tues, November 4th Rocket

Sun, November 16th Bucks

Tues, November 25th Warriors

Wed, December 17th Jazz

Tues, December 23rd 76ers

Mon. December 29th Magic

Fri, January 23rd Pacers

Mon, February 9th Knicks

Sat, February 28th Hawks

Sat, March 7th Kings

Mon, March 16th Cavs

Sun, March 29th Pistons

Thurs, April 9th Bulls

I will confirm with you as soon as I get have the confirmation from the bank and have the tickets in my hands so we can get together and give you your tickets. Have a great weekend

From my Android phone on T-Mobile. The first nationwide 4G network.


**Kingsley R Chin, MD**
Founder & CEO
Board Certified Outpatient Orthopedic Spine Less Exposure Surgery Surgeon(LESS)
Harvard Trained for 10 years

Affiliate Associate Professor
Clinical Biomedical Sciences
Charles E Schmidt School of Medicine
Florida Atlantic University
Boca Raton Florida USA

M:
617.697.5442
P:
855.411.4647
F:
855.411.4647

www.TheLESSInstitute.com

---

| Fort Lauderdale<br>1100 W Oakland<br>Park Blvd | Lake Worth<br>7138 Lake<br>Worth Rd | Miami<br>9570 SW<br>107th Ave | Orlando<br>121 Underwood<br>St |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Ste 3 | Ste C | Ste 201C | Orlando, FL |
| Ft Lauderdale, | Lake Worth, | Miami, FL | 32806 |
| FL 33311 | FL 33467 | 33176 | |

DISCLAIMER: this email and any attachments may be confidential or legally privileged. If you received this message in error or are not the intended recipient, you should destroy the email message, and any attachments or copies, and you are prohibited from retaining, distributing, disclosing or using any information contained herein. Please inform us of the erroneous delivery by return email. Thank you for your cooperation.

spinefrontier
Less Exposure Surgery Technologies


**SpineFrontier, Inc.**
500 Cummings Center, Suite 3500
Beverly, MA 01915, U.S.A.

www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991



The information contained in this electronic message and any attachments are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify SpineFrontier, Inc. immediately at 978-232-3990, or by replying to this message, and destroy all copies of this message and any attachments. Thank you.