UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ADITYA HUMAD,<br>Defendant. | ) | Criminal Action No.<br>1:21-cr-10256-IT-2 |

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

PRETRIAL CONFERENCE

Friday, April 24, 2026
11:02 a.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

# A P P E A R A N C E S

On behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
BY: CHRISTOPHER R. LOONEY
ABRAHAM R. GEORGE
MACKENZIE A. QUEENIN
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3287
christopher.looney@usdoj.gov
abraham.george@usdoj.gov
mackenzie.queenin@usdoj.gov

On behalf of the Defendant:

FICK & MARX LLP
BY: DANIEL N. MARX
WILLIAM W. FICK
24 Federal Street
4th Floor
Boston, MA 02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**P R O C E E D I N G S**

(In open court at 11:02 a.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cr-10256-2, USA v. Humad. Will counsel please identify themselves for the record.

MR. LOONEY: Good morning, Your Honor. Chris Looney, appearing on behalf of the United States.

THE COURT: Good morning.

MR. GEORGE: Good morning, Your Honor. Abraham George for the United States.

THE COURT: Good morning.

MS. QUEENIN: Good morning. Mackenzie Queenin on behalf of the United States as well.

THE COURT: Good morning.

MR. MARX: Good morning, Your Honor. Daniel Marx and William Fick for Mr. Humad, who is here with us in court.

THE COURT: Good morning.

Good morning, Mr. Humad.

THE DEFENDANT: Good morning.

THE COURT: I believe this was billed as an interim pretrial conference. And I would have preferred to be in a circumstance where I had resolved many of these things before we got here. I'm still working my way through it. I can assure you I'm trying to get through as much as I can as

early as I can, but that's where I am.

I have some specific questions on some of the pending matters, but I thought I'd start just to make an agenda for this hearing with what particular issues, if any, the counsel has before we -- before I get to where I'm going.

MR. LOONEY: Right now, Your Honor, to be honest, I don't think we have any particular agenda items to bring up with you.

THE COURT: Okay.

MR. MARX: I think we're sort of in the same position, Your Honor. We appreciate you setting this conference just in case there were sort of significant legal issues that it would be helpful for all the parties to get clarity on well in advance of the trial, but you have the pending motions. We're happy to try to answer any questions you have to help you make decisions.

THE COURT: Okay. So let me make my way through a few of the issues that you've raised.

It seems like a primary -- a large dispute between the parties is whether the burden on the government is to show a primary or one purpose of the payments or the primary purpose of the payments is the dispute.

And I've moved through this this (indicating) far. There's a lot of material in the -- in the -- both in the First Circuit and in this district in civil cases, but I --

it does seem that it's important to consider the standard applicable in a criminal case.

There are two First Circuit decisions of some relevance on the criminal side that have been cited by the parties. I think everyone agrees that *Bay State*, the First Circuit does what it does, which is it expressly didn't reach the issue that we're having a dispute about.

But -- and the second case, the *Woodward* case cited by the government, is concerning a different statute, although it does reference the -- I guess, it's the Sixth Circuit decision, with some approval.

There then are, I think, four or five out-of-circuit cases that the parties have discussed, criminal cases. And I believe all of them come down to finding the Sixth Circuit discussion persuasive and that they're not really reanalyzing it, fair?

MR. MARX: I'm happy to jump in. Yeah, I think that's essentially right, maybe with one slight qualification because this is a very complicated issue. We're all trying to kind of read the same tea leaves here.

I think the case, the out-of-circuit case that's most commonly cited by the district courts here, after everyone's done talking about *Greber* and what *Bay State* did or didn't say about it, is *McClatchey*.

And while I completely agree that sort of the

headline of *McClatchey* is you don't have to show anything more than a purpose or one purpose, the -- kind of the thrust of the decision and the language it uses talks about a motivating factor and expressly distinguishes between having a hope or expectation of improper referrals.

And so, you know, I think it's -- it's a little hard to tell exactly where *McClatchey* lands, and I think it suggests that there needs to be something more than just some evidence that it was a part of the thinking on behalf of a defendant, even if it wasn't a motivating factor, even if it was a hope or expectation, but it wasn't, you know -- we'd use the language "primary factor."

So I think I'm, essentially, agreeing with you; but I think that, you know, when you dig into the weeds of those cases, sometimes the language, I think, kind of muddles the question, which, of course, as Your Honor has identified, are particularly important in a criminal case where mens rea is often the backstop against concerns like fair notice and vagueness and critical to understanding, you know, what someone willfully needs to know to violate a statute and be convicted of a crime.

MR. LOONEY: Just to respond, briefly, and maybe as a matter of process, it would be worth submitting briefs on this specific issue because it's only been teed up in the context of our dueling jury instructions at this moment, so

it's not fully --

THE COURT: You have some long footnotes.

MR. LOONEY: On both sides. That's true.

THE COURT: Yes.

MR. LOONEY: The one thing, you started identifying, I think, we all agree what the relevant body of cases are. I do want to -- you know, I would point first of all to the statute, and I think it says if -- it's either "the purpose" or "a purpose," intended --

THE COURT: Well, and that's --

MR. LOONEY: And that's where I started. I think most cases have interpreted that with the "one purpose," with "one purpose," not "primary purpose," because of the language of the statute itself.

THE COURT: Well, I think what the Sixth Circuit did is it looked at the statute, and it said what was the purpose of the 1977 amendment. I mean, that was the analysis; and everyone else, I think, is saying the same.

MR. LOONEY: Yeah.

THE COURT: So --

MR. LOONEY: And so what I was just going to continue to say is, building off that, I think -- I think all of the circuit courts that squarely address it come out on our side. I think that is where the lay of the cases is.

And then I would say you referred to the fact that

there are more civil cases than a criminal case interpreting. It's the same statute, same statutory language, so I don't think there needs to be that distinction made between those as far as the elements of the offense.

THE COURT: I -- I understand that it is the same statute and it can be charged either way. And in both cases, if it's a civil qui tam case, it's essentially being prosecuted by the government or in the government's name, either way. But I'm being slightly cautious given the responsibility in a criminal case.

There -- in a couple of the decisions that were cited, and I don't remember offhand which one, they used not the word "a purpose" but "a material purpose"; or I think in the jury instructions that you submitted from Judge Woodlock, he doesn't get into whether it's material or not, but he seems to avoid -- they use "a" or "one" or something that gets you very far down the road.

And I understand that in your proposed instruction, there's a de minimis, but -- and I don't know if a jury understands the word "material." But it does seem to me that if you take the line of how much of a reason, a purpose, the improper purpose needs to be, I believe at this point I'm with the government that you don't have to show that it was the sole purpose. You don't have to show that it was a primary purpose. But I'm not sure it's enough to show it's a

maybe possible, very small purpose over there.

And so "material" in some ways captures it, but maybe not to the jury's understanding. So your reaction on that from both of you?

MR. LOONEY: I think I have three reactions to it. One, I think "one purpose," like, that expresses that it was a reason for doing this, a reason for the conduct. And I think that is enough. It suggests that it must be, you know, the defendant's purpose.

You know, so it is not -- I think if, you know, it was 99 percent for another reason and 1 percent was "Maybe we'll get some referrals out of that," I don't think a reasonable person would say that's the purpose of doing something.

So I -- that is what that, you know -- I think that's captured by the language about if it's only a de minimis reason, you exclude that category, and it has to be a purpose -- I don't think you need --

THE COURT: Hard to know whether a jury reads de minimis as .01 percent or 10 percent.

MR. LOONEY: I think -- well, I don't want to get into mathematical precision on this, but I think the language "one purpose" suggests that it is a reason for someone to do -- having done something, and I think that is enough.

THE COURT: Are you comfortable with the

language -- not necessarily the whole thing, but just how the purpose is referred to in Judge Woodlock's instruction that you provided?

MR. LOONEY: I don't have his instruction in front of me, so I can't address that. That brings me to my second point, which was I think further briefing on this particular issue makes a lot of sense. It doesn't have to be -- not going to give you 20 pages, but a few pages identifying the relevant material would be helpful.

THE COURT: So -- yes?

MR. MARX: Just, if I may, and if Your Honor wants more paper, we're happy to provide it; but I think you have all the cases that we could possibly cite. A couple of things.

One is, you know, I think it's important -- comes down often to the tiniest words, but even when Mr. Looney uses the words "a purpose" or "the purpose," those are the opposite ends of the spectrum that Your Honor just defined.

"The purpose" I think would suggest the sole purpose. Not even we contend that's the law, although we'd be happy with the instruction. "A purpose" suggests it could be one of who knows how many purposes or how small a purpose. So I don't think either of those are faithful to the law.

And I think what Your Honor is wrestling with, although I hear you saying you're not inclined to give a

primary purpose instruction, is that there needs to be some adjective that helps the jury understand it needs to be important or material. Whether that's a word like "motivating," which appears in the cases, or "material," which is a more common legal phrase, I think there needs to be some qualification.

And the one additional complication I just point out is whatever decision Your Honor reaches about this will have consequences, will sort of ripple into the instruction about willfulness, right? Because, again, we don't contend, the law is clear, that Mr. Humad did not need to know that he was acting in violation of something called the anti-kickback statute or where you find that in Title 42 or the particular, you know, metes and bounds of that federal statute.

But he did need to know, he did need to act willfully, and that means with a bad purpose to violate the law to do something he understood was unlawful generally without knowing the AKS, although no one is going to dispute, he had heard about the AKS, he knew about the AKS, but as far as the willfulness instruction is concerned.

If the government is correct and it's sort of an analysis of mixed motives and any -- a purpose, even a minor purpose, is sufficient, then I think the jury would need to understand that in order to willfully violate the AKS, a person not only needs to understand it's unlawful to bribe a

doctor to pay -- to provide remuneration to induce the referral, but that acting with a mixed motive is a crime.

Because I think a reasonable person, an innocent person, could think as long as I have a valid purpose for doing it, a contract or a business reason, or something else, the fact that I may also have some other reason that the government doesn't -- maybe that's not willful. And I think the jury would need to understand that the person would need to know acting with a mixed motive could still be a violation of the law.

I don't think there's going to be any evidence in the case that Mr. Humad knew that or anyone explained that to him. So I think the government -- I think the government is wrong on the law about trying to put the bar too low; but I'm also wanting to flag that if that's where the bar ends up, I think we're going to have some pretty complicated arguments about what it means to willfully act in violation of this law if it's defined as with any mixed motive or any purpose to induce a referral, because I think that -- that puts a lot of people who may be engaging in innocent conduct potentially within the net of a much broader federal criminal statute than I think it should be read as.

MR. LOONEY: I disagree that there is this interplay between these because I think -- and the Second Circuit has said this recently and very clearly:

"Willful," within the statute, has its ordinary meaning in criminal law, with bad purpose. And that's the instruction we've asked for on that issue. And I don't think that there is this interaction of whether it's, you know, notice or something similar exists.

THE COURT: Okay. This is what would be helpful for me. I am at this point viewing a standard that might be somewhat -- articulated somewhat differently than "a" or "one" with a de minimis exception. And I'm thinking about terms such as a material or the wording in the jury instruction from Judge Woodlock.

So if you could look at those potential instructions or way to proceed and give me your response to that, I -- I do want as little paper as possible. So you can have one sentence that says, "I object to all of this, Judge," and then give me the sort of, "but if you're thinking this way, here's our response." That would be helpful.

MR. LOONEY: There was one --

THE COURT: Sure.

MR. LOONEY: -- minor point I wanted to address with something Mr. Marx said, which is he also raised the language from Judge Woodlock's instruction, *Reichel*, about made with a hope or expectation of future referrals. And I just wanted to flag it because it strikes me that this idea that there is a distinction between --

THE COURT: You argued that in your papers --

MR. LOONEY: Yes.

THE COURT: -- I think, and I agree with you on that.

MR. LOONEY: Right. Thank you.

MR. MARX: Your Honor, just one other procedural matter on this. We'll submit concise briefing on it. I don't think it's the defense's expectation -- I know it's often our experience that you might not reach a firm decision on how to instruct the jury on this issue until right -- till the charge conference.

THE COURT: Well, I can't until the charging conference, but I think it's helpful for you to know --

MR. MARX: Yes.

THE COURT: -- and for all of my evidentiary rulings as we go through what I think the rule is here.

MR. MARX: Absolutely. What I was going to say is I don't think we have any intention of trying to wade into this complicated issue in our opening argument or saying anything to the jury about how much of a purpose or mixed motives or things like that. I think we'll stick to what we see as a preview of the evidence.

And if the government is sort of content to do the same, I think we can all continue to wrestle with this and then Your Honor can reach a decision at the charge conference

with the benefit of having heard the evidence at trial.

THE COURT: I don't think I'm quite as bad as the First Circuit, but I do tend to not resolve things till I have to. So it's probably likely this won't be finally resolved until the charge conference. But I do want to -- I just think it's a better, cleaner trial if I have a sense of this and you have a sense of this. So --

MR. LOONEY: The only other question I wanted to ask --

THE COURT: Sure.

MR. LOONEY: -- is when would you like a filing, just on this?

THE COURT: Sometime next week.

MR. LOONEY: Will do. Thank you.

THE COURT: Okay. That was on the jury instructions. On the -- you've given me a motion in limine about the admissibility of emails. And I want to make sure I understand what I'm being given here and being asked to do.

Do I understand these are exemplars of emails that you want to show, or are these the emails in dispute?

MR. LOONEY: Exemplars, Your Honor.

THE COURT: Okay. There are two arguments, I think, that the government raises for why these come in, either that they are made by an agent of Mr. Humad or that they're made in furtherance of a conspiracy.

Do all of the arguments apply to all of the emails, or do some apply to some and some apply to others?

MR. LOONEY: Some to some, some to others. The -- the Venn diagram of agents and co-conspirators, there's overlap, but it's not complete overlap.

THE COURT: Would it be possible for you to give me a one-page cheat sheet that just is, "As to these exemplars, here's the speakers we think are agents, here's the speakers we think are co-conspirators"? And maybe they're both and maybe they're only one or the other, but it would help me to understand.

And maybe there's a third category, which is: Is anyone -- are you claiming that anyone is an agent of a co-conspirator?

MR. LOONEY: I don't think we're claiming that third category, but I will think better -- if that exists, we will certainly flag that.

THE COURT: Just so I understand which analysis I'm kind of trying to go through to look at these documents.

MR. LOONEY: We'll do that.

THE COURT: To the extent that these are being offered only under the co-conspirator exception and not the agent exception, I understand that the defendant wants me to figure out the whole *Petrozziello* problem in advance, but I find that very hard.

Is there any reason -- if that's the bucket we're in, the co-conspirators ones, is there any reason not to proceed unless it's obvious on its face that they're outside the charged conspiracy or something of that sort?

I'm sorry.

MR. MARX: No, Your Honor. And this may be -- I know this issue came up in the other matter that we have, the Sadeghi case, where I think there's sort of, from our perspective, larger issues about who some of these speakers were and how to tell whether they're inbounds or out of bounds as far as the conspiracy.

We don't have the same concerns here. While we preserve our objections and always typically ask for *Petrozziello* rulings as early as possible in the case, here -- and is it okay if I refer to the unindicted co-conspirators by name in court at this point?

THE COURT: Probably easier not to just because there's going to be a transcript.

MR. MARX: Okay. So I think for the -- I think the parties are on the same page that -- about the small list of unindicted co-conspirators, the vast majority of whom will be trial witnesses for the government.

And so I think this case, as far as the elements of whether you fall within the co-conspirator exception, like, question one, are you in the conspiracy, this is a case where

it's actually pretty easy to answer that question because the government has identified who it believes is on that list.

For example, the cooperating witness, J.A., J.M., and M.M., who are the doctors who consulted for SpineFrontier, there's not -- we don't contend that there's insufficient evidence under *Petrozziello* to take that de bene and to introduce their emails.

And so I think, on the co-conspirator issue, we sort of know who the universe of potential declarants are. There the question is really whether the statements the government wants to introduce -- and it's helpful to know exactly which ones for this purpose are in furtherance of the charged conspiracy, as opposed to just discussions about other matters.

THE COURT: Okay. So I think for me to give you anything helpful on this, one, I would love this little cheat sheet; and included in the cheat sheet is who you -- who are the unindicted co-conspirators, and I -- that can be filed under seal for now. That will help me go through the documents.

But in general, I think the way I would proceed under the conspiracy exception would be to allow it to be shown to the jury and then just reserving admitting it until the end -- much easier than when we're dealing with testimony because I can make that very clear distinction to the jury:

"You're being allowed to see it right now, but if it's not there at the end of the day, then you can't rely on it." But that's how I would proceed with that.

Okay. Anything else on the -- those emails? I think once I have that cheat sheet, I can perhaps give you some better guidance on what my answers are for you.

MR. LOONEY: On the cheat sheet, do you just want a reference of the attached emails to that exhibit? You don't want us to go through our entire exhibit list and do that exercise, do you?

THE COURT: No, I think the defendants would love it if you would do that, and that would probably be helpful to speed things up at trial. But for this purpose, I think you've given me some exemplars. I don't want to read 600 or however many emails you're planning to offer. I'll stick with these. And then perhaps once I help on that, there will be more clarification between you and the defense.

MR. LOONEY: We've been working productively on a number of issues, so we'll be able to work it out.

THE COURT: Okay.

MR. MARX: Yeah, and what we anticipate, because I think Your Honor's pretrial order asked the parties to submit a list of the potential trial exhibits with the parties' objections set forth, and so what we've been anticipating doing is, based on these exemplars and sort of the

back-and-forth about the general rules governing these types of documents, whether they're alleged agent statements or alleged co-conspirators statements, is just to preserve an 801 objection on that list.

I think by the time we get to trial and those are presented, we'll all know what the issue is, and Your Honor will be able to move quickly through them based on what you decide pretrial.

THE COURT: The reference to my exhibit list raises a question about my practice here and the question of whether I'm unnecessarily slowing things down at trial or not, and I would appreciate counsel's thoughts on this.

When an exhibit is listed on that trial exhibit list as "no objection," it has been my practice to still admit them in one by one. And my thinking on that is that, for the jury, if you just say, "Okay. Exhibits 1 through 10 are admitted," they don't really even know what it is, whereas if you offer it and I admit it, it's just a few minutes of a pause to focus them.

On the other hand, it does slow things down, and I don't think that's the practice in all sessions. And I would be open to your feedback on that.

MR. LOONEY: I think, from our perspective, for unobjected-to exhibits, our preference is to move them in. Sort of -- I know Judge Casper, for instance, the first thing

that happens is, "I admit so-and-so exhibits."

And that allows -- we don't have to take the time to put them in. Many documents, it is either -- you know, they are self-evident or what they are. And so, you know, if they are of an important material issue, they can be held up, and, you know, "If you want to look at this, jury, go to Exhibit 52, which has been admitted, and you can find that information right there if you have a question," that type of thing.

So that's helpful and it makes things smoother. And we don't have to use jury time. So that I think is the most efficient way to do it. Also, bulk documents where it's, you know, financial records, business records, they can be admitted, and then the evidence exists within the record for any appellate issues for anything like that. So --

MS. QUEENIN: But just to -- sorry, just to piggyback, maybe to address the Court's concern to some sort of hybrid makes sense, because I agree that it's probably really annoying for the jurors to just have all this stuff moved in and not know what it is, we don't object, obviously, to saying something, like, you know, "Exhibits 1 through 5 are bank records from Santander," and giving them a sense of what they are for the purpose of, one, educating the jury and, two, slowing it down a little bit so we're not just bulk moving in stuff.

Separately, like, I don't think we've thought through how much volumewise this is really going to impact. It may not be a huge amount. So I just don't want to leave the Court with the impression that we're going to be moving in, like, 500 exhibits at a time. That's certainly not our intention.

MR. MARX: So I think -- I think our preference falls somewhere along the lines of what Ms. Queenin was suggesting, some kind of hybrid approach. I mean, the government's current exhibit list, I think, has something in the neighborhood of 350 documents. I would say a substantial quantity of them are what we think of as documents that could come in in sort of a bulk fashion.

They're, you know, bank records or payroll records or, you know, time sheets where it's, you know -- it'll be listed as 30 or 40 exhibits, but it's, essentially, the same document month after month after month. I don't think we'd have an objection to those being moved in in a way that's efficient and saves the jury time, it doesn't bore them.

One concern we have that comes up often in cases when the government asks to just move in evidence that's been -- that there's no objection to is it creates a sort of odd situation where often the jury isn't really engaging with the evidence or thinking about it until the closing argument when it sort of falls from the sky, from their perspective.

And we don't think that's really consistent with the truth-seeking function of the trial. It also inhibits our ability to elicit sort of things about documents that we don't have objections to but we think are material to the jury's deliberation.

And so what we typically ask for and what we'd ask for here -- we're happy to work with the government to try to identify documents on their exhibit list where we have no objection to their bulk admission; but, for example, for an email or a contract or a document that may have some significance, that it be brought in through a witness so that that witness can then be cross-examined or at least we have an opportunity to point out certain things to the jury that we think are significant about that document before the closing argument when they may be overwhelmed with other issues.

THE COURT: So let's do this. When you're doing your final version of the document list, instead of saying "no objection," make it "no objection, bulk admission okay" or "no objection" and just leave it at that or some system of that sort.

And then I would suggest on the bulk admission things, if you could group it so instead of saying, you know, here are 50 documents, saying that you're moving 1 through 10, which are all time sheets from such and such to

such and such date, and just give a sentence of what it is, and then I'll allow it in and we can have that kind of a compromise.

MR. MARX: Yeah, that's no problem. And I think that makes sense. One potential category you may end up seeing on the list is there may be situations where we have an objection we feel it's important to preserve, whether it's a 401 objection or, say, a 901 objection.

And if Your Honor rules and says it comes in, where we'd say we have the objection; if it's overruled, we're -- we're content with the bulk admission of those category of records. That may be a category you see on the list.

THE COURT: Okay.

MR. FICK: And I'm sorry. I would just even add, even for bulk admission, we would still want there to be a witness sponsor with whom we could at least put something on the screen and sort of point out some things, right?

Because the problem that has actually occurred sometimes -- right? -- is a document only gets mentioned by the government in closing; and then we're like, "Oh, wait a minute. We didn't know they were going to do that." Or even worse, the Court of Appeals will say, "Oh, well, there was a document in this thing that was admitted that, like, you know, takes care of the sufficiency problem," even though nobody talked about it at the trial, right?

So that's the risk that we're trying to mitigate, even though we agree we want to make this efficient and, et cetera.

THE COURT: So let me take that apart in two pieces. The one is you said, "I want a witness who I can cross-examine," et cetera. You're always entitled to that, but I put that in a slightly different bucket. I'll put that in your, you know, object as to foundation and then wait till they make the foundation and then the thing comes in. So that's sort of one category if you're insisting that there's a witness bringing it in.

But if the problem is not that there's a witness, but just this idea that there's sort of hidden material -- and I've been in the same circumstance where the -- you know, I read what the First Circuit said about the case in front of me, and I'm like, you know, that wasn't the case that was tried here, because there are documents that the appellate lawyers, nobody here, but the appellate lawyers -- I mean, you guys may be the appellate lawyers, too -- but the people who were putting on the case aren't the ones who are making the argument. And then you get to the Court of Appeals, and they're making an argument about something that's not -- didn't happen in the courtroom.

So let's take those things apart. If there's -- if the question is, "I need someone to question about this,"

make that clear to the government. We'll have the person here. You have that right.

But if it's a question that you don't want it buried, then I think the answer is to sort of think about what the label is that it's coming in; and maybe as you're going back and forth about whether it's okay to put in as a bulk, if you ask the government why they are putting that in, that might help elucidate that there's, you know -- that there's some reason that this is coming in or not.

I would like to try to move more efficiently. I don't think my trials are the most efficient possible, but I also -- I don't -- I don't like the idea that there's an enormous -- you know, there are boxes that never get opened in the other room.

And I guess I would -- you know, I would sort of separate out, if you have a case where you have a summary chart that has been admitted and you want to put in all the documents that support the summary chart, that just seems a whole different category. Of course, they're there. The jury isn't going to open that box unless someone raises a question with the chart, but there's a way for everybody to say we really have no dispute about this chart. That's sort of what that is signaling. And, you know, you don't have to just take our word for it. It's there if you want to, but nobody is hiding the ball from you.

But so why don't you -- why don't you work on it and see if you can do something to signal it in a way so that we can make the things more efficient on that.

All right. I had a couple more things on the pending motions in limine. On the government's nullification arguments, I felt like the briefs were not speaking to each other, and I just want to make sure I understood both sides' position.

I understood the government's argument to be limitations on persons, evidence other than cross-examining the cooperators and that you weren't trying to limit the cross-examination of the cooperators. And I understood the defendant's response to be, "Well, wait a minute; we have a right to cross-examine the cooperators."

So I'm -- maybe you can explain to me, one, what the government is trying to keep out; and, two, whether the defendants have any objection to what it is that's listed in the government's motion rather than just talking about it in general.

MS. QUEENIN: Your Honor, I'm happy to address that.

So I think -- I forgot how you just phrased it, but I wouldn't say we're not trying to limit cross-examination of the cooperators. I would say the motion was primarily directed at arguments of counsel; but, of course, often that

bleeds into cross-examination questions.

THE COURT: So are you or are you not trying to limit the cross-examination?

MS. QUEENIN: I would say, for purposes of the Court assessing this motion and, I guess, proceeding in the fashion that that's probably most expeditious, let's assume we are trying to limit cross-examination to the same issues; in other words, if we are arguing, for example, that counsel cannot stand up in opening and say a man's freedom and citizenship is at stake, that would also apply to asking Witness 1, "Are you aware that, you know, my client can go to jail or whatever?"

THE COURT: No.

MS. QUEENIN: That's a terrible example.

THE COURT: But do you dispute that they can ask the witness who signed the civil settlement that they could have faced criminal sanctions?

MS. QUEENIN: No. We don't dispute that.

THE COURT: Okay. So they're not disputing that you can ask those questions.

MR. FICK: Right. And so --

THE COURT: About their own -- I mean, the questions about what Mr. Humad is facing is not an appropriate question for the co-conspirator, I mean, or the cooperator. But you can ask the cooperator whether they

would be facing civil -- criminal penalties.

MR. FICK: Right. No disagreement there. I mean, I think our concern was that the government's motion was written in a kind of way that was very sweeping by its words. The cases talk -- that they cite -- principally talk about a sort of open, you know, explicit appeals to nullification, which we are absolutely, of course, not going to do.

THE COURT: So what would be helpful for me -- I will be very frank with you: I have more paper than I can make my way through in this job, and I'm trying to read what you give me.

But it would be really, really helpful if, instead of thinking what are the far extremes of the cases that the government is citing or that the defendant is citing, if you could just look at what the government is asking me to do and what the defendant is asking me to do and is there actually any difference there? That would save me a lot of -- a lot of angst.

I think, on this one, I don't think you're in disagreement about what I'm finding or not here or allowing in or not.

MR. FICK: It's certainly my hope that that is correct. I mean, we -- we endeavor not to provoke, you know, rebuke from the bench or even objection if we can avoid it, right? And so we're not going to be asking inappropriate --

what we think are inappropriate questions.

THE COURT: But, again, just focusing on not what -- obviously, you're not doing things that are going to get me angry, and you're not doing things that are going to get me angry.

What I'm trying to figure out is: What exactly is the limit that the government is asking, and do you have a problem with that limit? Not every other limit that could be invoked.

MS. QUEENIN: Your Honor, if I may, just because -- so I file some version of this motion in every case that I try; and just to give you explicit insight into why, it is to prevent precisely the scenario that I set forth in --

THE COURT: I understand why you filed your motion. And I understood their response to essentially say, "Yeah, that's fine," except it's nine pages. And it has, "But there's this we can still do and this we can still do," but I didn't see you asking for it.

And so I couldn't tell whether I'm misreading this or whether you're filing the motion you always need to file, and you're filing the response you always need to file, without the two of you actually saying what I need to decide.

MR. FICK: So I will say there's one, I think, clear disagreement, even if it's pretty silly.

THE COURT: Okay.

MR. FICK: I mean, you know, I was trained -- in pretty much every case I've ever tried, I have made, like -- I tend to make in closing a one-sentence, anodyne statement that, like, a man's liberty is at stake or this is very important. It's not like an argument to say, "Oh, you shouldn't send him to jail. He's facing all this" -- it's a one-sentence, anodyne statement like that to focus the jury. I --

THE COURT: Well, it focuses the jury that he'll be serving time.

MS. QUEENIN: Yes. That is exactly the reason why I filed this motion, and that's why I quoted counsel in footnote 2 from another trial. And I'll tell you why.

Because in my best-case scenario in filing this, is not to have the Court, like, engage with hypothetical scenarios that, like, no one knows if they're going to happen or not. You can't do that. We wouldn't ask you to do it.

What is helpful to the government and what I think we're entitled to is Your Honor's statement that that is not permissible, because once it's said, that's it. The jury has heard it. The instruction is not particularly helpful, even if the jury is presumed to have followed it.

So that is precisely the type of thing that I think we do need to figure out in advance and it would be helpful to have the Court's view on, because in our view, that's

completely impermissible.

MR. FICK: It's always been my understanding, and I've never, until this motion, drawn rebuke or objection or anything for it, is that a sort of one-sentence, anodyne statement of that nature in a closing is not inappropriate. But if the Court says, no, we can't do that -- Mr. Marx will be closing -- we won't. You know --

MS. QUEENIN: But the reason that may not draw objection is, sitting at this table, objection during a defense closing is a pretty bold move, and it's not a move that we like to make because it looks terrible.

THE COURT: What I think is appropriate in this case where no one -- I'm not going to stop you from asking the cooperators that they were potentially facing criminal penalties that could involve incarceration. I'm not going to stop that.

But with regard to the closing, I think the fair argument here is: This is a criminal case. We all know how serious a felony criminal conviction is. You need to be -- that -- and that's just one step different from what you're saying is liberty.

MR. FICK: That's fine, Your Honor. I think we understand the Court's instruction, inclination. We'll follow it. You know, so I think we had a disagreement with the government about exactly where that line is drawn.

You've made it clear what your view is. Fine. And other than that, I think the rest of this --

THE COURT: Okay.

MR. FICK: -- I agree with Your Honor is probably theoretical.

THE COURT: Okay. So I think this one I'm just going to terminate as resolved here in this interim pretrial conference. But it's just -- I mean, it's an example -- it's 16 pages between the two of you of things for me to review. And I hear what you're saying, that that is the nub of it, but that's not what's --

MR. FICK: I mean, it's a nub that we actually disagree about. The rest, I think we're -- we understand the boundaries and what's in play, I think.

THE COURT: Okay. The -- the cross-examination of government witnesses, the case that you cited that would -- for the proposition that it would be appropriate to cross-examine about some of these -- about these lesser offenses was one where the criminal charge was pending. Am I correct -- at the time of the trial.

Am I correct that you aren't giving me any authority for the notion that -- you used the word "recent," but other than -- that you're not giving me any cases where it's simply recent rather than pending?

MR. FICK: If we're referring to, like, the OUI

conviction and those other things, I mean, I think it's -- we've continued to do some, like, looking into this, right? But as I stand here now, I think it's highly unlikely we would want to go into any of those or have a basis to do so. If that changes, we'll raise it at sidebar, is I think where we left it.

I think there's a question as regards one of them, and I'm now forgetting which -- who it is; but there's a question of whether this individual, like, lied during the traffic stop and would have admitted that during the plea colloquy. We haven't been able to yet -- if we'll ever be able to get it, to, like, see what was actually said during that plea colloquy.

The lie would make the prior conviction potentially relevant if it was confirmed in a court document; but we don't have that yet, so we're not going to go there, unless and until we do.

THE COURT: I'm assuming that at this point -- or I guess I will say this, that I am precluding the cross-examination subject to a timely renewed motion as to why I should allow it, because I don't see anything here.

The expert issue, has that been resolved? Is that -- are you going to give me something more on that?

MR. GEORGE: I think we can happily report that's been resolved or it's very -- at the precipice of being

resolved.

THE COURT: Excellent.

MR. MARX: Yes. Well, one of the many things that we've been working together on is a set of stipulations, one of which would obviate the need, I think, for the government to call either the CMS or the VA witnesses. And we're working on trying to streamline the trial by having stipulations on those topics as well as related Sunshine Act issues, none of which we would necessarily need to have a government witness to explain to the jury.

So that's -- it's moving along. We -- I think, according to the pretrial order, the stipulations may be due on Monday, but we're -- we're making good progress and optimistic where we'll end up.

THE COURT: Okay.

MR. GEORGE: Just one quick point on that -- I assume that Mr. Marx isn't going to disagree -- if we don't have the stipulations filed by Monday, I assume the Court would prefer us to continue to -- we have every indication we're going to agree, but --

Is that fair?

THE COURT: Yes.

MR. MARX: Absolutely fair. Yes. Agreed.

THE COURT: The patient harm, absence of patient harm, necessity of the services, I think the government is

correct. It's not an element of the cause of the charges here. The defendant has expressed concern that it is an over- -- not I'm not sure the right word here that you used -- but it was sort of lurking in the background.

Why wouldn't the cleanest way for me to proceed here would be in the preliminary instructions to instruct the jury that the government is not alleging that the plaintiffs suffered harm or that the surgeons performed medically unnecessary surgeries, just take the whole stench away?

MR. GEORGE: Well, Your Honor, I think the government would argue for more than that if --

THE COURT: I understand you're arguing for more than that.

MR. GEORGE: Yeah, if you're telling me that it's that or nothing, sure, we'll accept that. But I think that Your Honor has it correct; the law is clear. This is not an element of the offense. And I think what you're going to be hearing throughout the trial is that a lot of these products are very similar across many different companies.

THE COURT: Right.

MR. GEORGE: And so there probably isn't going to be evidence, very much evidence, that the products were deficient; but there also shouldn't be very much evidence that the products were fantastic.

And so whether the patients were harmed or not is

not really the issue. The issue is, as the government alleges, there was a financial motivation to engage in this conduct. And it's illegal. And the reason is that we want to prevent the possibility of patient harm.

THE COURT: So I understand you arguing for -- you're arguing for a different resolution here. I guess my question for you is, as a -- other than saying, "I want a better -- I want a version I like better," legally, do you see any problem with instructing the jury this way?

Because as I read the facts here or as I read the allegations here, not only -- that there's just not going to be evidence on either side that these products were less good than other products or that the defendants -- that the -- that people prescribe them -- well, at any rate, there's not going to be any evidence on either side that doctors were prescribing something worse than appropriate.

The debate about whether they're prescribing the best or just an equivalent product seems to me a fair debate on both sides. But the question about whether anybody was prescribing inadequate or harmful isn't on the table, is it?

MR. GEORGE: The government does not think that that should be on the table, that --

THE COURT: But so my question is: Why not a preliminary instruction that makes clear, because I think it removes their main argument for cross-examination, which is

that their client is being accused of harming patients, to remove it, which is consistent with the government doesn't have to prove this, but it's slightly stronger than the government doesn't have to prove it, which is to say the government is making no claim about that? Because I don't think you are, are you?

MR. GEORGE: We're not, Your Honor. I think my hesitation with that is: Are they going to be allowed to elicit testimony about it, notwithstanding the fact that the jury is instructed that this is not the allegation? And I think that encourages nullification.

THE COURT: If they are arguing -- if they want to elicit testimony from the doctors that the doctors were not prescribing something harmful, that seems to me unnecessary, not relevant, if I give this instruction. But if they want to elicit testimony that the doctors were giving the best in the class, sure, why can't they get that? That does go to their --

What I'm trying to do is -- every single doctor is going to get up there and testify, "Of course I wasn't harming my patient." You know that, right?

MR. GEORGE: I would expect that a doctor would not say they were intending to harm a patient, yes.

THE COURT: Okay. And it seems to me you have a right to not have that question in front of the jury somehow

undermining the cooperator's statement because that's not what's at issue. And I'm saying put it at the front end. It's not at issue. Take away the reason to ask the doctor, "You wouldn't prescribe something harmful," because that's not the issue, and I've made clear, gotten rid of the stench by instructing at the front end.

If they want to then go further and say, "Didn't you use this product because it was better than any other product?" why can't they ask that question?

MR. GEORGE: I -- I appreciate Your Honor's suggestion of the instruction, and so I'm not arguing that the instruction should not be given. I would -- we would like that instruction to be given.

I -- specifically, with respect to this motion, what we don't -- what we want them to be precluded from doing is asking or eliciting testimony about there not being patient harm as some sort of defense to providing bribes.

Now, if they ask about the status of the products, I would like the chance to think about that for a second with my colleagues, but I -- so if I could take --

THE COURT: Sure.

MR. GEORGE: We -- okay. We don't have an issue with that type of question, which I believe Your Honor is saying and we believe is separate from patient harm.

THE COURT: Yeah.

MR. FICK: I think that's -- that's a perfect resolution to this problem from our point of view. It takes patient harm off the table.

But to the extent the doctors get up and say, "Yeah, we were scoundrels. We took bribes," we can at least establish that "Well, you know, you've previously said these were great products, and you -- that's why you prescribed" -- right? So we can at least sort of -- we can ask the appropriate questions while taking the patient harm piece out of the case completely.

THE COURT: What -- right. The piece -- the part I don't want is the question, "You wouldn't be prescribing this if it was harmful for your patient?"

MR. FICK: Of course.

THE COURT: Even the question, "You wouldn't be prescribing this if it was an equivalent product," I'm not sure the relevance because it could be an equivalent product and be illegal here. So I'm not sure where that goes. But the, "You're prescribing it because you think it's a better product," it certainly seems to me fair game.

MR. FICK: Right. And it's just -- you know, a lot will depend, I think, on a question-by-question basis sort of what their testimony is, and we -- we'll, you know, address that. But I agree completely with the notion of just taking patient harm out of the case completely and, you know --

THE COURT: So patient harm is out of the case completely. Equivalent product, it seems to me, if it's -- if they're doing a -- if they're providing an equivalent product to some other product, what's the relevance of that?

MR. FICK: I mean, I don't think that's a question we would want to ask, candidly.

THE COURT: Okay.

MR. FICK: Our point is that we think the SpineFrontier products were better than other products. There were reasons for that. A lot of the doctors said that in other settings and on other occasions, and so that is sort of, I think, relevant cross as for the reasons the Court points out.

MR. MARX: Your Honor, if I may, just one practical example, which, you know, I think may come up, you know, there are a number of doctors who are involved in the consulting program who started using these products before they entered a consulting agreement with the company.

And so asking them, "And you choose to use the products because you thought they were great products and the most appropriate products for that procedure," seems like a perfectly appropriate question for understanding their thinking, whether they were improperly induced to use those products.

We don't really have any interest in saying, "Well,

how did the surgery work out? And was it good for the patient or bad for the patient? Did they get harmed or not?"

But the focus for us on cross-examination of the doctors is to get into the doctor's head and to rebut the allegation that the only reason they used these products is because of an inducement by the company or even a reason they used the products was an inducement by the company, as opposed to an independent medical judgment they made in their practice to use a particular device or a particular product in a surgery, separate and apart from the issue of whether it was good for the patient or not whether the surgery was successful.

MR. GEORGE: So I would say, unfortunately, the more that we discuss this, the more complicated it gets, because I think some of the statements from my co- -- my colleagues here are what we would term "nullification arguments."

You know, at -- asking the doctors whether -- their opinion of the products, in our mind, is different than getting up at closing argument and saying that the doctors said these were best in class, and, therefore, dot, dot, dot, you can give bribes? That's a nullification argument. It's not legal under the anti-kickback statute to give bribes for any product, the best product, the only product, the worst product. Those are arguments that cannot -- that is not a

defense to an anti-kickback statute violation.

THE COURT: So -- but if the product is an equivalent product, I'm with you. I agree with you that the testimony would not be relevant. But if the -- if the -- if the doctor says, "I'm putting this product in because it is the better product," does that take away from the argument that you're having to prove that the defendant was compensating them to get them to do it?

MR. GEORGE: Yeah, I think the -- that argument is problematic on two fronts. Number one, best in class is not a defense to the AKS. Number two, this trial is about Mr. Humad's mind, his intent, not the doctors'.

If the doctors thought that the product was best in class, there's the legal argument that I've made. There's also the fact that that doesn't say anything about Mr. Humad's mens rea. Whether the doctor thought it was best in class does not show one way or the other whether that was Mr. Humad's motive in offering bribes.

MR. FICK: A couple of things. First of all, the defense is not these were great products; therefore, it's okay to give a bribe. The point is that evidence tends to make it less likely that anyone ever intended or thought these were bribes.

THE COURT: Well, the person who has to intend is Mr. Humad.

MR. FICK: Sure. But if he's getting feedback from doctors saying these products are great and he believes the doctors understand the products are great and if the doctors -- I'm seeing the Court's skepticism. I'm not sure --

THE COURT: Well, he thinks the product is great. The doctors tell him the product is great. But he's still going to pay people to use the product. I think their point is: Why is it a defense that everybody thinks it's great?

MR. FICK: It's not -- I mean, it doesn't justify an unlawful payment, but it makes it less likely that either the doctors, who are alleged co-conspirators, or Mr. Humad believed that the payments were for the purpose of improper inducements, right?

I mean, the doctors are going to get up and say, "Yeah" -- you know, they're going to get up and say now because they're in the position they're in, "Yeah, we were scoundrels. We were bribed. We did this for the money," which is inconsistent with their prior statements, inconsistent with the reasons they participated in consulting in the first place and actually gave real feedback to make the products better, which we will be able to establish.

And so, you know, I think some discussion, at least in terms of the credibility of their testimony, has to be able to touch on what they thought of these products.

MR. GEORGE: I think, respectfully, this argument is a non sequitur. It does not follow that because the doctors thought or didn't think that the product was good that that says anything about Mr. Humad's intent in paying bribes.

MR. FICK: Well --

THE COURT: Are they -- this is only a conspiracy charge?

MR. GEORGE: No. There's three substantive AKS violation charges too, one with respect to each of the three.

MR. FICK: But evidence does not have to be directly probative of Mr. Humad's intent to be admissible, especially on cross, where we're trying to undermine the now testimony of these doctors that these were all just bribes and they were hacks, et cetera.

THE COURT: I'm going to think a little bit more about the positive side testimony. But I am going to -- I hear no objection to a preliminary instruction that there is no -- that there is no -- the indictment does not charge that there was any patient harm or -- I guess patient harm -- whatever the language was I gave you before.

I will incorporate something of that sort into a preliminary injunction -- a preliminary instruction, and I hear no objection from the parties about that.

And doing so will underscore the lack of relevance

of any questions about patient harm. Those are off the table. The questions about patient benefit, I'm going to think about a little more, and I hear the arguments here on both sides and -- just --

MR. FICK: And I think the texture of the trial evidence will be helpful to Your Honor also there. I mean, obviously, you know, we can object to each other on a question-by-question basis. And, obviously, some guidance in advance is always helpful. But I think some of this will be sort of more apparent as the Court hears the doctors.

THE COURT: Okay. I will keep thinking about that.

I think those are the only things I'm prepared to discuss at this time. There are no other ones of these motions in limine that have gone away because you are happily resolving it, are there?

MR. MARX: Not at this time, Your Honor.

MR. GEORGE: I don't think so, Your Honor.

THE COURT: Okay.

Oh. This was in the various nullification argument -- are you seeking to present as a defense that Mr. Humad was targeted because of his ethnicity?

MR. FICK: No. We might ask some witnesses about awful things they've said about Mr. Humad because of his ethnicity, which I think sort of demonstrates their animus towards Mr. Humad; but we're not going to say that the

government did anything wrong in charging Mr. Humad because of his ethnicity.

THE COURT: Any reaction to their asking questions about things people said about his ethnicity?

MS. QUEENIN: Your Honor, we're considering filing something on that. We were just discussing it before we came down. And I recognize, ideally, I would have done that before today, and I apologize that I didn't. But if we could have some time to digest that; and if we are going to file something, we'll do it next week, and we'll keep it very brief.

THE COURT: Okay.

MR. FICK: I mean, we'll answer it. I think, you know, bias of a witness is always a central issue; and if a witness has expressed bias toward Mr. Humad for a particular reason, we should be able to elicit that.

THE COURT: Okay. We'll get to that when we get to it. I don't think I'm prepared on anything else to go through. We have our final pretrial conference when?

MR. LOONEY: I believe it's next Friday. Am I wrong?

MS. QUEENIN: Two Fridays.

MR. LOONEY: Two Fridays.

MR. MARX: Don't rush us.

THE COURT: Okay. I will see you all then. If

there's something urgent before that, let me know.

MR. GEORGE: Can I bring up one other thing --

THE COURT: Sure.

MR. GEORGE: -- that occurred to me?

Obviously, Your Honor's very familiar with the involvement of counsel issue which went up to the First Circuit and came down, and that's why we're here a year later than maybe we otherwise would be.

I think, from our filing and the defendant's opposition, that we are -- we have come to the same place, both happy about --

THE COURT: Except everybody is unhappy.

MR. GEORGE: Right. Well, both happy in one half and unhappy on the other, I think is the way that Mr. Marx put it, which I think is correct.

I just raise this because I think it's important for the government that the Court know that we -- that we have, basically, this agreement that this is what the law is and that the Court be aware of the limits and the contours of this as we go through the trial. I have every reason to trust that -- what the defense says, but it's obviously an important issue. And once the cat's out of the bag, it's a really big mess.

THE COURT: Right. I mean, I think the way I understand that we are proceeding here is that the evidence

and arguments that counsel are raising wouldn't rest on communications that would have happened between counsel and their client or counsel and Mr. Humad, that you're not arguing --

For example, if you have something that you're suggesting that the attorneys are blessing what's going on, we would have no evidence as to what it was exactly they were blessing because we wouldn't be implying that they had any knowledge one way or another as to what was, in fact, going on.

So the limitation of what you can argue or evidence that you can get into, in a sense, is limited to whether that statement is being offered to establish something that couldn't be a fact without an underlying attorney-client communication.

MR. MARX: I think -- I think I may agree with that, but I guess I had sort of come at it from a slightly different direction, which is the one, I think, the First Circuit -- the direction the First Circuit took, which I think the government has -- has embraced at this point, despite its mutual unhappiness with the result, which is that the First Circuit divided this issue into, essentially, two phases or two parts.

At the front end, with regard to the creation of the consulting agreement itself and the establishment of the

program, I think the First Circuit said, without any potential risk of an implied waiver or getting into these complicated issues, the argument can be made that Mr. Humad took comfort in the fact that there was an opinion letter from a law firm about the contract itself, for example; but he could not then make an argument about any ongoing involvement of counsel in the implementation or the execution of the program, and we don't intend to make that argument.

THE COURT: I think that, as to the first, I think there's a little bit more of a nuance, and I saw this maybe as a slight difference in how you both presented it.

He knew that there was a letter saying something was okay, but you don't get to say just because it's an early document rather than a late document that this letter says that what they were actually doing was okay, right?

MR. MARX: Correct, as far as the implementation or the execution --

THE COURT: Not the --

MR. MARX: -- of the program based on that letter, right. I think --

THE COURT: Well --

MR. MARX: It --

THE COURT: If the argument you want to make to the jury is, in essence, not explicitly, but is, implicitly, they went and they told their attorneys what they were going to

do, and their attorneys said that what they were going to do is good and legal, you can't do that. And you don't get to do that merely because it happened earlier rather than later.

MR. MARX: No, no. I'm not making a temporal distinction, Your Honor. I'm making kind of a substantive distinction that the First Circuit drew between the -- you used the words establishment of the -- or setting up of the program, like the creation of that contract itself, which this outside law firm, which was retained, and the First Circuit said explicitly that Mr. Humad is allowed to ask the jury to draw a favorable mens rea inference from the retention of counsel for the assistance of creating that contract.

THE COURT: But not for saying -- they did not go so far as to say so long as -- because this contract -- because they issued this opinion letter --

MR. MARX: Yeah.

THE COURT: -- therefore, other things follow or correct or not, because the opinion letter is based -- what they didn't sanction -- it wasn't temporal. It was whether what they were offering implicitly or explicitly waived the attorney-client. And to say, "I went and talked with an attorney and the attorney issued a letter," doesn't waive the attorney-client.

To say, "This letter is the letter they issued,"

doesn't waive the attorney-client because we know that's the letter they issued. To say, "And this letter shows that such and such, and such and such would be correct," you can't do because the letter is only based on what they were told; and you don't have what they were told because that would be attorney-client communication.

MR. MARX: Right. And the letter doesn't say anything about how the program actually functioned, which I think is what the government's primary concern is, but I think --

THE COURT: What I'm not wanting is an argument being made about -- that looks at that letter and gets into the details of that letter, because they can't cross-examine about what information was being used as to the details of that letter.

MR. MARX: Well, it's a little bit of a tricky situation because there's half a dozen copies of that letter on the government's exhibit list, so --

THE COURT: I understand that.

MR. MARX: So the letter will be presented that --

THE COURT: But it's not being presented for the truth of underlying facts as to what was going on with this program.

MR. MARX: That's right. But I thought I said -- I apologize if I'm not being clear about it -- the "what's

going on with this program," whether doctors are actually consulting, how they're getting paid, whether they're getting paid based on volume or cases, which the letter says not to do, we're not going to make the argument that lawyers blessed any of that conduct. The First Circuit said we can't, and we won't.

THE COURT: Are you going to make the argument that the lawyers blessed anything?

MR. MARX: I think the First Circuit said -- and unless Your Honor directs us not to, I think the First Circuit said we're allowed to make the argument that someone in Mr. Humad's position -- it's inconsistent with the willful violation of the AKS for someone in his position to know that his company had retained this outside law firm to help create this agreement that was used with the doctors and not to go beyond that, not to go beyond that they remained involved, that they --

THE COURT: I think the problem is, to the extent that you're underscoring this agreement and this program and so forth, I think that goes a little beyond what the First Circuit said.

What the First Circuit said is he gets to rely on the facts that his -- his company went and got a lawyer and issued an opinion. Whether -- they didn't go into what those details of the opinion is and what he gets to rely -- based

on what's written in there. I think those are different things.

MR. MARX: Well, but the problem is we know what the opinion is, and the opinion is going to be in evidence. So it seems like an artificial --

THE COURT: Because --

MR. MARX: -- way to proceed to say --

THE COURT: It's exactly back where we started.

MR. MARX: Right.

THE COURT: It's going to come in evidence.

MR. MARX: Yeah.

THE COURT: But if it comes in evidence, does it get to come in for the truth of anything that's said in there? The fact that it's coming in, it is coming in as the letter that went out to people.

MR. MARX: Right.

THE COURT: It is coming in as a letter that was prepared by the company.

Let's say the letter in there says, "We have reviewed your books." Do you get to put that in and say, therefore, the books were reviewed? Answer, no. That's a truth of the matter, and you can't get to the truth of the matter without being -- an opportunity to cross-examine as to what those facts are based on.

MR. MARX: Yeah. But I don't think it's -- I guess

I don't see how it's a truth-of-the-matter question.

THE COURT: Then we don't have a problem.

MR. MARX: It's an opinion letter, and so the question is how it -- how, if at all, it reflects or bears on Mr. Humad's state of mind.

And I think what the First Circuit said is, if he knew his company had retained outside counsel to help prepare this contract and the contract says, as long as you do this, you've complied with the AKS, whether that's right or wrong, it's just an opinion that lawyers gave, that someone -- that tends to rebut the suggestion that he was willfully violating the AKS, at least with regard to the creation of that agreement.

Now, the government is going to say -- in fact, they're going to use this as a sword, right? They're going to say, "You had an agreement. It said not to do X, and then you did X, which shows that you were willfully violating the AKS. The letter is a window into your mind. You were told by lawyers what not to do, and then you did it anyway."

So this is the battlefield on which the mens rea issue will be litigated, and I think the First Circuit has said we're entitled to make the very limited argument that it's inconsistent with the willful violation of the AKS that you retained counsel to help put this agreement together. Whether he complied with it or not, the lawyers said nothing

about, and we will not suggest that the lawyers blessed in any way.

THE COURT: Okay. The "will not suggest the lawyers blessed in any way" is helpful. I don't want to -- I don't know whether I'm seeing a problem here or not. I don't know whether you're holding back on something or not.

MR. MARX: No.

THE COURT: I just don't see it as a temporal issue. I see it a communication issue.

If you are using anything for the purpose of proving a fact that can't be proven without a communication between attorneys and clients, then that fact can't -- it can only -- all it can come in is -- "I read this and I thought such and such"; "I read this and I knew it to be true because we gave him this information," you don't get to.

I mean, he can't -- he can't go further than, and you can't go further than, the face of the document without assuming anything about any implied facts in there. And I haven't gone back and re-read that letter since several years ago, so I don't know if this is a fight that is irrelevant or not.

I just got nervous reading your response where you're saying we're going to do this, but, you know, everything -- all discussion of that letter and so forth. So I don't know if there's something else there besides them

saying there's this violation.

MR. MARX: Look, I don't think so. And I, you know, appreciate Your Honor hasn't read the letter as recently or as many times, probably, as we have. But when I read the government's submission, I thought this was one of the instants where I wasn't sure we needed a motion because it felt like we were in agreement that the First Circuit has ruled. We had a lengthy hearing about this a few weeks ago. And I think we've both identified where the line is.

THE COURT: What's difficult for me is you're saying, "I don't think there's an issue," but you write ten pages, and it forces me -- I mean, it's a little bit like when I'm screening for law clerks, and you have all of these evaluations that say how fantastic -- and you have to go through and sort of compare and sort of word by word and say, oh, wait they didn't mention this about them or they did or -- it's just -- I feel it's very hard to figure out: Is there something there, or isn't there something there?

MR. MARX: Right. I completely appreciate that. And that's why my four-page response to the government's motion just sought to identify three categories that -- the two about counsel, which the government's submission identified that we agree with, and then a third, which comes from a footnote in Your Honor's opinion about this historically about pointing to the presence of other people

without regard to their profession.

And that's it, just to lay down a marker that we're all in agreement as to where the lines are drawn and all equally unhappy about how complicated this was and how we don't get to say everything we want to say, and they don't get to completely take this issue off the table altogether.

But that's it. I mean, I really -- I don't see this as an issue. The government is going to put the evidence in. The First Circuit has told us very clearly what we can't say about that evidence, and we'll -- we'll abide by that, having preserved our objection.

MS. QUEENIN: Our purpose in bringing this up today at all, Your Honor, at the conclusion of the hearing was just to highlight the -- you know, if this line is crossed, it is catastrophic for several reasons, which we don't need to detail for the Court, not the least of which is we're in possession of 800 pages of privilege logs. And that's not the pages of documents; that's the log itself.

And one idea I had, which I think I decided not to bring up, but now I am, if the Court wanted to be really careful on this and if we are concerned that -- if we are concerned that lines are getting blurred or that there is confusion or disagreement where people are talking past each other, the Court could review those limited lines of the defense's opening and closing ex parte prior to them being

delivered to avoid a mistrial.

I'm framing it. We don't need your reaction today and we defer to the Court as to whether you want to be that involved, but that was an idea that at least I had for something that could allow there to be some parameters. It wouldn't prejudice the defense in the sense that the government's not viewing it, so I just wanted to mention that.

MR. MARX: I mean, I -- I would object. I've never had a prosecutor ask my openings or closings to be previewed with the Court. It's not even how I typically give a closing argument, that I would have it scripted in that way.

But, I mean, again, it seems like a lot of time being spent on something that -- that the First Circuit has said this is how it's going to work, and Your Honor has said pretty clearly I'm going to do whatever the First Circuit says I need to do.

The opinion says, on the other hand, after explaining what it is we can't say -- and I've said on the record we won't -- it may be that Humad merely seeks to argue that he was less likely to have formed the intention to violate the AKS because he knew that SpineFrontier had engaged a law firm to set up the consulting program and remain on retainer to address problems as they arose.

That does not require the jury to draw an inference

that corporate counsel approved Humad's action in implementing the program during the years it was in operation. Full stop. That's a line that we understand and we're more than happy to abide by. We will.

THE COURT: So for your opening argument, are you going to say anything more than that sentence with regard to attorneys?

MR. FICK: Opening is meant to be much more circumspect. I might not even say that.

MR. MARX: Yeah, it's very hard to imagine; and should we feel compelled to, Your Honor, we will raise that issue in advance, but --

THE COURT: Perfect.

MR. MARX: -- it's hard to imagine that happening in opening.

THE COURT: Absent further communication from counsel, there's no mention of this in the opening.

As to how the questions proceed at trial, let's proceed this way, which is if you are asking any question that is making the government nervous, they can make an objection. I will stop you at that moment, pending an opportunity to talk about it outside of the jury. You will move on. We will not have a big debate in front of the jury at that point, and then we'll figure it out.

But I will give them -- I will not say, "Wait till

the fourth question comes."  I will allow them to stop it at the first question if they're getting concerned so that we can get -- make sure where it's going before it gets too far. But that should take care of the problem.

Okay.  Now are we done?

MR. GEORGE:  Yes, Your Honor.

MR. MARX:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you.

THE DEPUTY CLERK:  We are in recess.

(Court in recess at 12:24 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 3rd day of August, 2026.

/s/ Robert W. Paschal

______________________________

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter